# In The Matter Of:

*Bettersten R. Wade, et al. v*
*City of Jackson, Mississippi, et al.*

---

*Chief James E. Davis*
*September 9, 2020*

---



Realtime Court Reporters

601-573-0961
amanda@awreporting.net

*Min-U-Script® with Word Index*



EXHIBIT
"E"

## Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSISSIPPI
2

3   BETTERSTEN R. WADE AND
    VERNICE ROBINSON, INDIVIDUALLY AND ON
4   BEHALF OF ALL THE HEIRS AT LAW AND
    WRONGFUL DEATH BENEFICIARIES OF
5   GEORGE ROBINSON, DECEASED              PLAINTIFFS

6

7   VERSUS        CIVIL ACTION NO. 3:19-CV-897-CWR-FKB

8   CITY OF JACKSON, MISSISSIPPI;
    ANTHONY FOX (IN HIS INDIVIDUAL
9   CAPACITIES); DESMOND BARNEY (IN
    HIS INDIVIDUAL AND OFFICIAL CAPACITIES);
10  LINCOLN LAMPKIN (IN HIS INDIVIDUAL
    AND OFFICIAL CAPACITIES); AND
11  AMERICAN MEDICAL RESPONSE, INC.         DEFENDANTS
    ************************************************
12        DEPOSITION OF CHIEF JAMES E. DAVIS

13  ************************************************

14        APPEARANCES NOTED HEREIN

15

16        DATE: SEPTEMBER 9, 2020
       PLACE: OFFICES OF THE CITY ATTORNEY
17           455 E. CAPITOL STREET
             JACKSON, MISSISSIPPI
18           TIME: 10:23 A.M.

19

20

21  REPORTED BY: TODD J. DAVIS
                  CSR #1406, RPR
22

23

24

25
```

## Page 2

```
1   APPEARANCES:

2

3        DENNIS C. SWEET, III, ESQ.
         Sweet & Associates
4        158 East Pascagoula Street
         Jackson, Mississippi 39201

5

6             COUNSEL FOR PLAINTIFFS

7
         LEE O. THAMES, JR., ESQ.
8        City of Jackson
         Post Office Box 2779
9        Jackson, Mississippi 39207
         lthames@city.jackson.ms.us

10

11        COUNSEL FOR CITY OF JACKSON

12       MICHAEL V. CORY, JR., ESQ.
         Danks Miller & Cory
13       Post Office Box 1759
         Jackson, Mississippi 39215
14       mc@dmclaw.net

15

16        COUNSEL FOR ANTHONY FOX

17       FRANCIS S. SPRINGER, ESQ.
         Springer Law Office, PLLC
18       Post Office Box 1280
         Madison, Mississippi 39130
19       springerlawoffice@gmail.com

20

21        COUNSEL FOR LINCOLN LAMPLEY

22       TOM R. JULIAN, ESQ.
         Daniel Coker Horton & Bell
23       4400 Old Canton Road, Ste 400
         Jackson, Mississippi 39211
24       tjulian@danielcoker.com

25
```

## Page 3

```
1   Also Present:   Anthony Fox
                     Desmond Barney
2                    Lincoln Lampley

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
1                     INDEX
```

```
2   Style and Appearances ....................    1

3   Index ....................................    4

4   Examination by Mr. Sweet.................    5

5   Certificate of Court Reporter ...........  133

6   Certificate of Deponent..................  134

7

8   EXHIBITS:

9   Exhibit 1 Letter.........................   11

10  Exhibit 2 Report of Postmortem Examination.  38

11  Exhibit 3 E-Mail.........................   48

12  Exhibit 4 Order..........................   97
```

Page 5

1         CHIEF JAMES E. DAVIS,
2   having been first duly sworn, was examined and
3   testified under oath as follows:
4   EXAMINATION BY MR. SWEET:
5       Q.   Chief Davis, have you been deposed
6   before?
7       A.   Yes.  Once.
8       Q.   Okay.
9       A.   Yeah.
10      Q.   And I know you went over -- you had some
11  time to go over with your lawyer about the rules?
12      A.   Yes.
13      Q.   If you don't understand something, just
14  tell me you don't understand it.
15      A.   Okay.
16      Q.   If you want me to repeat something, I'll
17  go over it.
18           You have the right to read and sign
19  your deposition.
20      A.   Uh-huh (affirmative response).
21      Q.   You understand what that's about?
22      A.   Yes.
23      Q.   Do you want to read and sign, or you
24  want to waive it?
25      A.   I'll waive.

Page 6

1       Q.   Okay.  It's just that he's taking it
2   down right.
3       A.   Okay.
4       Q.   If he wasn't competent, we wouldn't hire
5   him, so...
6            All right.  Can you state your full
7   name?
8       A.   James Edward Davis.
9       Q.   How old are you, Chief Davis?
10      A.   52.
11      Q.   You married?
12      A.   Yes.
13      Q.   How long you been married?
14      A.   Oh, man, I don't know.  Eight, nine
15  years, somewhere around there.
16      Q.   Okay.  Is that your first marriage or
17  you been married before?
18      A.   Second.
19      Q.   Okay.  Where are you originally from?
20      A.   Natchez, Mississippi.
21      Q.   Really?
22      A.   Yeah.  Uh-huh (affirmative response).
23      Q.   Well, how long you been up here?
24      A.   Probably 30 -- 37 years.
25      Q.   Did you ever do any police work down in

Page 7

1   Natchez?
2       A.   No.  No.
3       Q.   Where did you go to school?
4       A.   South Natchez.
5       Q.   Okay.
6       A.   Yeah.
7       Q.   Pardon?
8       A.   South Natchez High School.
9       Q.   All right.  What about after high
10  school?
11      A.   Strayer University.
12      Q.   And what did you major in at Strayer?
13      A.   Criminal justice.
14      Q.   When was that?
15      A.   Oh, I started a couple years ago.
16  Because I'd been -- went to community college, and
17  then I started working.  Got busy tied up in work.
18  Then I went back to finish my degree.
19      Q.   Okay.  Your law enforcement -- did you
20  go to the academy?
21      A.   Yes.
22      Q.   Is that here?
23      A.   Yeah.  Here.
24      Q.   When did you go to the academy?
25      A.   January 2nd, '94.

Page 8

1       Q.   Who was your training guy -- the
2   director at that time?  Do you know?
3       A.   I think Joe Austin.
4       Q.   Could you tell me all the positions
5   you've held with the Jackson Police Department?
6       A.   Patrol officer.
7       Q.   What precincts?
8       A.   Precinct 3.
9            And firearm instructor.
10      Q.   Okay.  You said what now?  Firearm
11  instructor?
12      A.   Yeah.  Firearm instructor -- instructor.
13  Range master.  SWAT team member.  Precinct
14  sergeant.  Precinct lieutenant.  Precinct
15  commander.  District commander.  Deputy chief.
16  Assistant chief.  Now serve as chief.
17      Q.   Okay.  And how long have you been chief
18  now?
19      A.   Since September of '18, I think.
20      Q.   Okay.
21      A.   Yeah.  Couple years.
22      Q.   Okay.  Now, other than the academy
23  training, what other training have you received as
24  an officer?
25      A.   Oh, multiple -- multiple trainings.

Page 9

1   Command -- been to command college. Multiple
2   trainings throughout my career.
3       Q.   Okay. I want to ask you -- I'm going to
4   come back to this. I want to get this out of the
5   way.
6           You know, y'all did a news
7   conference about this case -- George Robinson,
8   right?
9       A.   I actually requested then DA --
10      Q.   Robert Smith?
11      A.   -- Robert Smith to go ahead and present
12  this case to grand jury and let's do a joint press
13  conference in reference to his case. After
14  multiple times asking him to do so, it was never
15  done. So that's the press conference that I
16  wanted shortly after this incident took place.
17      Q.   Okay. All right. Well, you wanted him
18  to present it to the grand jury and have a press
19  conference about what the grand jury would do?
20      A.   Yes. The --
21          MR. THAMES: Object to the form. You
22      can answer.
23      A.   Yes. Because of the community wanted to
24  know what took place, I asked that he go ahead and
25  present it to the grand jury so that I could put

Page 10

1   these gentlemen back to work. And he said he
2   wanted to speak with the family members first.
3           And I said that, after multiple
4   tries and requests through memos through the DA,
5   that interview with the media so we can address
6   the citizens never took place.
7       Q.   Okay. So had the internal affairs --
8   when you wanted to do this -- present it to the
9   grand jury and the press conference, had internal
10  affairs looked into this?
11      A.   Yes. Yeah.
12      Q.   Had internal affairs made a decision?
13      A.   No. The internal affairs presented
14  their findings, as it relates to this case, as --
15  was there any signs and the facts of police
16  brutality, and there was no findings. And I asked
17  that the -- and then the DA sent me a memo stating
18  that he wanted the FBI to do a civil rights
19  violation investigation. And per deputy chief, a
20  report got back to the DA, that he did not -- the
21  FBI did not find any civil rights violation as it
22  relates to this case.
23      Q.   What does that mean? They didn't find
24  any civil rights violation?
25      A.   Well, Mr. Smith requested them, and

Page 11

1   that's the information that we got.
2       Q.   But, no, I've heard that said, that they
3   didn't find any civil rights violation. I didn't
4   see anything in writing.
5           Is it something in writing?
6       A.   It should be from the DA's office.
7   Because the DA made that request through the --
8   per the memo.
9       Q.   No. I work with the DA's office.
10      A.   Yeah.
11      Q.   They ain't got anything.
12      A.   Well, I got a memo from the DA --
13      Q.   What DA is that?
14      A.   -- stating that he requested -- he
15  stated that, you know, I'm requesting
16  investigation assistance of the FBI as it relates
17  to --
18      Q.   Let me have -- let me have that marked.
19  If we're going to read it, I need to mark it.
20          (Exhibit No. 1 marked for
21          identification.)
22  BY MR. SWEET:
23      Q.   Yeah. Okay. Can we have this marked
24  Exhibit 1, and we'll make a copy of it?
25      A.   Yes.

Page 12

1       Q.   And what's the date of that?
2       A.   January 25th, 2019.
3       Q.   '19?
4       A.   Yes.
5       Q.   Okay. And he said he wanted the FBI --
6   my question was -- to you was, you ever seen
7   anything the FBI saying they did not find
8   anything? I want to see the memo where the FBI
9   said, We don't find any civil rights violation.
10      A.   Nor had I requested an investigation
11  from the FBI, I would have asked for that
12  information. But due to the DA asked their
13  request from the FBI to do an internal affairs
14  investigation, I would hope -- I would believe
15  that the DA will have that information. Because
16  he stated that he is requesting that information.
17      Q.   Okay.
18          MR. THAMES: And if I can help clear
19      this up a little bit -- or try to. We don't
20      have any possession of that. Obviously, the
21      district attorney's office is --
22          MR. SWEET: Well, I mean, I've talked to
23      the district attorney's office, and I've
24      gotten information and given them
25      information.

Page 13

1    MR. THAMES: Well, then you probably
2  have more than I do.
3    MR. SWEET: I've got a lot.  I haven't
4  seen anything.
5    MR. THAMES: But we don't -- we don't
6  have -- and I want -- I would like to have
7  that.
8    MR. SWEET: Let me ask him.  Let me ask
9  him.
10 BY MR. SWEET:
11   Q.  He started out saying the FBI hadn't
12 found any evidence of any civil rights violation.
13   A.  Correct.
14   Q.  Okay.  I've heard on TV from officers.
15 I've heard from other people.
16      Where is that document?  Who said
17 that from the FBI?  I want to depose them.
18   MR. THAMES: Okay.  I get it.
19 BY MR. SWEET:
20   Q.  I want to know who said that.  I talked
21 to the FBI.  The FBI came to my office.  All
22 right?  They wanted me to give them information.
23 That said nobody would talk to them.  All right.
24 I assisted them some.  All right?
25   A.  Uh-huh (affirmative response).

Page 14

1    Q.  Okay.  I don't have anything from them.
2  I don't know what they did.  They didn't have
3  anything when they came to my office.
4    A.  Uh-huh (affirmative response).
5    Q.  All right?
6    A.  Right.
7    Q.  Okay.  So they couldn't have a civil
8  rights violation.  They didn't know anything.
9      You understand?
10   MR. THAMES: I object to the form on
11   that.
12   MR. SWEET: Let me finish.
13 BY MR. SWEET:
14   Q.  You didn't have an autopsy at the time
15 you did all this, did you?
16   A.  I can't recall whether --
17   Q.  You didn't have a tox screen at the time
18 y'all did this?
19   A.  I can't recall.
20   Q.  This gentleman said that he put a drug
21 in his mouth, right?
22   A.  Okay.
23   Q.  As an officer -- as a police officer,
24 you know if you put drugs in your mouth, something
25 will be in your system if your body takes drugs,

Page 15

1  right?
2    A.  It depend on what the drug is.
3    Q.  That's right.
4    A.  Some you --
5    Q.  Well, I -- you're telling me there's a
6  drug that won't show up in your system on a blood
7  test?
8    A.  I mean, I don't know.  I'm not a medical
9  doctor.
10   MR. THAMES: I'm going to object.  He's
11   not an expert on medication or --
12   MR. SWEET: We got -- you can object to
13   the form.
14   MR. THAMES: Okay.  I --
15   MR. SWEET: All other objections are
16   reserved.  If he can answer it, he can
17   answer.  He's a police officer.  They testify
18   about taking drug screens and arresting
19   people all the time.
20   MR. THAMES: Well, you know more about
21   it than I do.
22   MR. SWEET: Okay.  Let me ask him.
23 Let's see what he knows.
24   MR. THAMES: But --
25   MR. SWEET: Let's see what he knows.  I

Page 16

1  really -- I mean, you seem like a nice guy.
2  But it just doesn't -- I really don't care
3  what you know, man.  I just need to know what
4  he knows.
5    MR. THAMES: I understand.
6    MR. SWEET: All right.
7  BY MR. SWEET:
8    Q.  You understand when you take blood they
9  can test your blood in your system?
10   A.  Yeah.
11   Q.  If you have illegal drugs in your -- you
12 can have -- if you took it --
13   A.  Yes.
14   Q.  -- it should show in your system,
15 shouldn't it?
16   A.  I assume that --
17   MR. THAMES: Object to form.
18 BY MR. SWEET:
19   Q.  Did y'all have the tox screen here to
20 see if it's any illegal drugs in --
21   A.  No.
22   Q.  -- Mr. Robinson's system?
23   A.  No.  We turned the case over to the DA's
24 office.  After we got all the -- our findings.
25   Q.  What were your findings?  I have --

---

**Page 17**

1  okay. I asked for that. I have asked for the
2  internal affairs report.
3      A.  Yeah.
4      Q.  They said it's privileged, and I signed
5  a privilege document.
6      A.  Yes. Okay.
7      Q.  So they supposed to be -- I have yet to
8  get it.
9      A.  Okay.
10     Q.  All right. So, you know, this case is
11 moving on. I need to know what's in it.
12     A.  Okay. I'll let the legal --
13         MR. THAMES: Excuse me one second.
14 BY MR. SWEET:
15     Q.  I'm going to go back to these other
16 questions.
17     A.  Uh-huh (affirmative response).
18     Q.  But at the time that you said you wanted
19 to get the men back to work --
20     A.  Yes.
21     Q.  Okay. So you knew they would be
22 cleared?
23     A.  Yes.
24     Q.  Okay. So, I mean, just to be fair,
25 whatever -- at the time that you said they were

---

**Page 18**

1  going to be cleared, there was no autopsy report,
2  right?
3      A.  I can't recall. Because we turned the
4  case over to the DA's office. And I would --
5  would hope -- and I talked to many, many, many
6  times to the DA asking to go ahead and bring this
7  case up with the facts that I received. And --
8      Q.  What facts did you receive?
9      A.  I had a lady to come to my office
10 because I was always on the TV to see something,
11 say something. I was on the streets when this
12 gentleman -- this pastor died on --
13     Q.  Right.
14     A.  -- the steps of his church --
15     Q.  Right.
16     A.  -- early Sunday morning.
17     Q.  Right.
18     A.  I was out there, along with the entire
19 community out there.
20     Q.  Right. Right.
21     A.  So -- and I walked the streets with the
22 community. So days later a young lady came to my
23 office and say, We have a video you need to see.
24     Q.  Right.
25     A.  And --

---

**Page 19**

1      Q.  Video of what?
2      A.  Video -- a Facebook video of the scene
3  where George Floyd came in contact with the
4  officers.
5      Q.  George Robinson?
6      A.  I mean George -- I'm sorry. George
7  Robinson came in contact with the officers. And
8  based on what I heard from the community -- and
9  let me paint a picture to you of that scene. That
10 scene -- the whole community was out in the
11 streets, looking for this individual, giving us
12 information, working with the police as to bring
13 this -- this individual that committed this crime
14 to justice. So the scene that I saw, it was many
15 people out in the streets.
16     Q.  Okay. You -- so the picture you saw --
17 scene was not of George Robinson being in a
18 confrontation the officers.
19         It was a scene of a lot of people
20 out there?
21     A.  No. It was a scene of the video that
22 the young lady showed me.
23     Q.  Okay. What was the video of?
24     A.  Facebook video of the scene where blue
25 lights, police, and George Robinson there on the

---

**Page 20**

1  scene. That's the video that I saw, and I never
2  seen any police brutality whatsoever.
3      Q.  Okay. I want to see this video. I
4  haven't seen this video.
5      A.  Yeah. Well, I -- I tried to -- tried to
6  get it. I saw the video. And during the time
7  that the media was talking about this video, it
8  was out. For some reason, it's not out there.
9  But --
10     Q.  Oh, you talking about the video when he
11 was at the hotel?
12     A.  No. No. We saw that -- that video. I
13 think we have that video.
14     Q.  Okay.
15     A.  But the video before, when the officers
16 came in contact with him on Jones Street.
17     Q.  Okay.
18     A.  That video where people said --
19     Q.  Who had video?
20     A.  A lady named Ms. -- I think Ms. Jones.
21 She contacted me. I --
22     Q.  Okay. The lady contacted me, too, with
23 the video, but you couldn't make anything out in
24 the video she had. You could see the blue lights.
25     A.  Yeah. That's the same video.

---

Chief James E. Davis

Page 21

1  Q.  But you could not see any persons or
2  anything that occurred?
3  A.  Yeah.  Yeah.  That's the video.
4  Q.  Okay.
5  A.  That is the video.  And this lady had
6  confidence in me that --
7  Q.  Did you interview her?
8  A.  Yeah.  We went by head of detective --
9  Q.  Do you know what she said happened?
10 A.  We had -- yeah.  We have a detective,
11 yeah.
12 Q.  Okay.  You know she said that they
13 assaulted him.  They threw him to the ground.  I
14 have a summary -- I have a taped statement from
15 her.
16 A.  What's the description of the "they"?
17 Q.  The officers.
18 A.  No.  What is the description of --
19 Q.  Oh, you talking about the one where she
20 said one of them looked like Rick Ross?
21 A.  Yes.
22 Q.  Okay.  Yeah.
23 A.  Yeah.  That's the description.  And
24 based on those facts -- and she told -- I think
25 she --

Page 22

1  Q.  Okay.  Let's go -- hold on.  I'm going
2  with you on this.
3  A.  Uh-huh (affirmative response).
4  Q.  All right.  What did she say?
5  A.  She said -- same thing what you have
6  in --
7  Q.  You say you're crediting her and her
8  video.
9  A.  Yeah.
10 Q.  What did she say she saw?
11 A.  She told me -- I had sent Detective
12 Hearn over to speak with her and Detective Gaiter.
13 Q.  Right.  Right.
14 A.  She said a large male subject, looked
15 like Rick Ross, about six --
16 Q.  Three.
17 A.  -- three.
18 Q.  Right.
19 A.  With a full beard.
20 Q.  Right.
21 A.  And he had a red stripe on his uniform.
22 And she stated that that was the individual that
23 assault Killer George.
24 Q.  She said -- she said it was a police
25 officer?

Page 23

1  A.  No.  She did not identify a JPD uniform.
2  She said that a large guy --
3  Q.  Right.
4  A.  -- looked like Rick Ross, big beard,
5  about --
6  Q.  Did you tape her saying --
7  A.  -- 600 -- yeah.  We got a written
8  statement from the commander.
9  Q.  Where is this statement?
10 A.  I don't -- I don't have the statement
11 with me.  But the same statement that she told you
12 about the six -- the six -- the guy looked like
13 Rick Ross.
14 Q.  Right.
15 A.  Her statement was the same as mine.  And
16 none of these gentlemen --
17 Q.  Fit that description?
18 A.  -- fit the description, nor did we wear
19 beards, nor did we have a red uniform on.
20        So based on those facts, that's why
21 I -- multiple times I asked the DA to go ahead and
22 present this to the grand jury so I can put these
23 officers back to work.
24 Q.  Okay.  So you wanted to go to the grand
25 jury because you felt that they would be

Page 24

1  exonerated?
2  A.  Based -- yes.  Based on the information
3  that I got --
4        MR. THAMES: I'm going to object to the
5     form.
6  A.  And based on the information that I got
7  from the community -- I was out there.  I was out
8  there.
9  BY MR. SWEET:
10 Q.  I understand you were out there.  I'm
11 just saying --
12 A.  And I listened to the community.
13 Q.  Okay.
14 A.  And we put the cry out to the community,
15 and the community helped bring this guy to
16 justice.
17 Q.  Right.
18 A.  Yeah.
19 Q.  Okay.  You know the house where
20 Mr. Robinson lived?
21 A.  No.  I don't know the house.
22 Q.  You know he lived in front of that house
23 where he was --
24 A.  No.  I never knew where he lived.
25 Q.  You didn't know he lived right there?

---

**Page 25**

1   A.  No.  I never --
2   Q.  At the rooming house?
3   A.  No.  I just knew he lived in a hotel
4  room.  And we got the video where he --
5   Q.  Okay.  You knew he lived in a hotel
6  room?
7   A.  Yeah.  After watching the video.  Once
8  we -- we had the -- we started the investigation
9  and we --
10   Q.  Let me clear that up.  Let me clear that
11  up.
12       The Motel Inn -- you-all knew he
13  lived there?
14   A.  No.  No.  We did not know until we
15  started the investigation on his whereabouts.  And
16  we tracked him down, and sure enough the video
17  showing him drive up to the hotel, the video
18  showing him getting out of his car, the video
19  showing him going in and out of the room of the
20  hotel.
21       Based on those informations that I
22  received from our investigation -- we was hands-on
23  in the investigation.  I spoke with the DA's
24  office, asking that he -- let's address the media.
25   Q.  Okay.

---

**Page 26**

1   A.  Let's address the media.  Because I
2  traveled all over the city.  The community wanted
3  to know what -- what -- what took place.  And I
4  wanted to him to speak with us.  And I asked him
5  to bring the grand jury.  He say wait until I
6  speak to the family.
7   Q.  Well, the grand jury met on this case.
8   A.  Yeah, I know.
9   Q.  The grand jury indicted them.
10   A.  Yeah.  After Robert is gone.  Robert is
11  not the DA.
12   Q.  So you thought Robert was going to clear
13  them?
14   A.  No.  No.  No.  I didn't think anybody
15  is --
16   Q.  You think the grand jury is wrong here?
17   A.  No.  No.  I don't think anything is
18  wrong.  I'm just asking --
19   Q.  Well, do you think --
20   A.  I made the request from a chief that
21  the -- because of --
22   Q.  Well, no.  You were saying here you were
23  going to clear them, and you were going to get
24  them back to work, right?
25   A.  No.  Based on the information --

---

**Page 27**

1   Q.  You just told me, Chief -- you said you
2  wanted to get them back to work.  You said it more
3  than once.
4   A.  Based -- yes.  I said it.
5   Q.  And you said you wanted to go to the
6  grand jury so you could get them back to work,
7  right?
8   A.  Based on the information --
9   Q.  Didn't you say that?
10   A.  Based on the evidence --
11   Q.  I'm not saying based on the evidence.
12  What did you just --
13   A.  They -- based on the evidence --
14       MR. THAMES: I think -- hold on.
15  Let's --
16       MR. SWEET: No.  He -- I have a right to
17  answer my question.
18       MR. THAMES: No.  I understand.  But
19  you've asked this question about six times.
20       MR. SWEET: And I'm going to get an
21  answer.
22       MR. THAMES: And he's answered it.
23       MR. SWEET: I'm not going to get no --
24  he can mumbo jumbo all he wants.  I'm going
25  to keep asking him until --

---

**Page 28**

1       MR. THAMES: That's fine.  But you can
2  mumbo jumbo, too.
3       MR. SWEET: We'll be here all day.  It's
4  a simple question.
5       MR. THAMES: That's great.  That will be
6  great.
7  BY MR. SWEET:
8   Q.  I asked him, didn't you say you were
9  going to put them back to work?
10   A.  Yes.  Based on the evidence that I saw,
11  based on the evidence that the community brought
12  forward, based on the evidence -- the statements
13  from the officers, I never seen any sign, any
14  evidence of police brutality where an individual
15  was supposed to have gotten hit in the head.  And
16  AMR checked him out.  Got a report from AMR where
17  they did all the checkpoints, saying the guy got
18  in the car and drove away.
19   Q.  Right.
20   A.  And based on that evidence, yes, I
21  wanted to put them back to work.  Yes.  I wanted
22  to put the closure to the community.  And that had
23  to go through the DA because I asked him many
24  times, Let's go ahead and bring the grand jury,
25  many, many times, and that did not happen.  I

---

Page 29

1   don't know why it didn't happen.
2   Q.  Didn't happen?
3   A.  Did not happen.
4   Q.  The grand jury --
5   A.  He did take -- Robert Shuler Smith did
6   not take this case to the grand jury.
7   Q.  I'm not worried about Robert Shuler
8   Smith.  He got -- he was not in the DA.
9   A.  Yeah.  Yeah.
10  Q.  The case went to the grand jury.
11      You understand that, right?
12  A.  I understand the case --
13  Q.  The case is pending.  They're pending
14  the criminal --
15  A.  During the multiple times I asked Robert
16  Shuler Smith to --
17  Q.  What does that mean?  So what?
18  A.  Let's address the community.
19  Q.  So what?
20  A.  Because it's important to be transparent
21  with the community.
22  Q.  Okay.  Transparent -- they indicted
23  them.
24  A.  It is important to be transparent to the
25  community during that time -- during that unrest

Page 30

1   time.
2   Q.  Okay.  But they're indicted.
3   A.  I had to address the community where I
4   had to --
5       MR. THAMES: There's not a question to
6   answer, Chief.
7       MR. SWEET: He said he want to be
8   transparent.  He want to go to the grand
9   jury.
10  BY MR. SWEET:
11  Q.  They've been.  You understand they've
12  been?  Do you -- okay.  Let me break it down, the
13  question.
14      You understand that they have been
15  to the grand jury?  Yes or no?
16  A.  Please I understand that I asked --
17  Q.  Do you understand that they have been to
18  the grand jury?  Yes or no?
19  A.  Yes.  Yes.
20  Q.  You understand the grand jury has
21  indicted them?
22  A.  Yes.  Please understand that I asked
23  then Robert Shuler Smith multiple times, per
24  e-mail, per memo, per personal conversations,
25  let's address the answer -- let's address this

Page 31

1   issue.  Let's bring it before the grand jury so
2   that we can put closure to the community because
3   all across this city I'm getting asked questions.
4       We gave this case over to the grand
5   jury -- over to the DA, Robert Shuler Smith, and
6   we was out of the case.  So --
7   Q.  Okay.
8   A.  -- since I'm still getting questions,
9   I'm going to Hinds County DA, asking that he bring
10  this case.  And I told him, So we can bring this
11  case, based on the facts and circumstances, so I
12  can put these gentlemen back to work.
13  Q.  Okay.  You understand that it went to
14  the grand jury now?
15  A.  Yes.
16  Q.  And you understand that they've been
17  indicted?
18  A.  Okay.
19  Q.  Okay.  Now --
20  A.  But that --
21  Q.  But when you wanted to go to the grand
22  jury, did you have an autopsy report?
23  A.  No.  That --
24  Q.  Did you have an autopsy report?
25  A.  No.  That case was given to the -- to

Page 32

1   the DA.  So at that time, when I had -- based on
2   the facts that I had in front of me and all the
3   investigations, from witnesses, from people there
4   on scene, from me walking the streets, talking to
5   these people, they did not see --
6   Q.  What people are you talking to?  I want
7   to --
8   A.  Many people.  I don't know.
9   Q.  I'm so tired about hearing about the
10  community, the streets.  Give me a name.  Because
11  I went out there, and I talked to individuals; and
12  I tape-recorded them.
13  A.  Good.
14  Q.  And they haven't told me nothing like
15  what you saying.
16  A.  Well, good.  Well, one thing --
17  Q.  And I sent the tape-recording to the DA,
18  and they called them; and they indicted them.
19  A.  Okay.  Well --
20  Q.  I want to know who you talked to that --
21  A.  One thing about it, the person that --
22  that told you they saw you Rick Ross looking
23  individual --
24  Q.  Now, let --
25  A.  -- that is the person with the video.

Chief James E. Davis

Page 33

1 That is the video was driving questions to the
2 police department.
3 Q. Okay.
4 A. That is the video that Robert Shuler
5 Smith -- that is the video that Robert Shuler
6 Smith supposed to have saw. That is the video
7 that Robert Shuler Smith said -- he said he going
8 to talk to the family before we take this case to
9 the grand jury.
10 Q. Why are we talking about Robert Shuler
11 Smith? He's not the DA.
12 A. I'm talking about what took place then.
13 Q. But we're talking about now.
14 A. Had it to --
15 Q. You --
16 MR. THAMES: Okay. Hold on. Hold on.
17 Let's -- I'm --
18 THE WITNESS: Hey, man, don't lecture me
19 no more.
20 MR. SWEET: Talk to your witness.
21 Answer my questions.
22 I don't need you to lecture me. I've
23 been doing this for 40 years, and I've been
24 very successful. So don't tell me about
25 answering questions -- asking questions.

Page 34

1 Now, you can tell him to answer them, and we
2 can get this over with.
3 MR. THAMES: I'm trying to -- I'm
4 trying --
5 MR. SWEET: He wants to give me a
6 scenario -- this nonsensical scenario about
7 Robert Shuler Smith. I don't care about
8 Robert Shuler Smith.
9 MR. THAMES: I'm trying to clarify the
10 timeline.
11 MR. SWEET: Well, clarify it for him. I
12 know the timeline. I've been working this
13 case. I know this case. You don't need to
14 help me. I don't need your help.
15 MR. THAMES: Well, I think everybody --
16 MR. SWEET: Tell your witness to answer.
17 MR. THAMES: -- needs to be on the same
18 page if we're going to try to get to the
19 bottom of it.
20 MR. SWEET: I ain't trying to get to the
21 bottom of it. I'm going to win this case,
22 and I need him to answer my questions.
23 MR. THAMES: Hey, come on, man. Don't
24 be this way.
25 MR. SWEET: You don't -- well, then be

Page 35

1 quiet. Let me do my job.
2 MR. THAMES: No. I'm not going to be
3 quiet. I'm not going to let you harass my --
4 MR. SWEET: Harass him?
5 BY MR. SWEET:
6 Q. Okay. Let me see. Let me ask you a
7 question.
8 MR. THAMES: I just wanted to -- you're
9 talking about, look, the district attorney at
10 the time of the incident --
11 MR. SWEET: Let me tell you something --
12 MR. THAMES: -- was Robert Shuler Smith.
13 MR. SWEET: Okay. It doesn't matter.
14 MR. THAMES: I understand that. But he
15 keeps talking about that because that's who
16 he reported it to.
17 MR. SWEET: So what?
18 MR. THAMES: Now you're talking about
19 what happened last week.
20 MR. SWEET: Yes.
21 MR. THAMES: We don't have anything to
22 do with that.
23 MR. SWEET: He's the chief now. He was
24 the chief then. He's the chief now.
25 MR. THAMES: Yes.

Page 36

1 MR. SWEET: Okay. Did he not be the
2 chief at some point? Hey, man, I'm just
3 going to ask the guy the questions. It's a
4 yes or no.
5 MR. THAMES: Look --
6 MR. SWEET: I don't want to hear about
7 Robert Shuler Smith. I could care less about
8 Robert Shuler Smith.
9 MR. THAMES: Okay. Well, just get a
10 timeline right.
11 MR. SWEET: What's been the timeline?
12 What have I been asking?
13 BY MR. SWEET:
14 Q. Okay. You understand, in 2020, the case
15 went to the grand jury?
16 A. Yes.
17 Q. You understand, in 2020, these
18 persons -- people were indicted?
19 A. Yes.
20 Q. In 2019, you asked for it to go to the
21 grand jury?
22 A. Many, many times.
23 Q. Many times?
24 A. Many times.
25 Q. Okay. And Robert Shuler Smith did not

Page 37

1  take it to the grand jury?
2     A.  Correct.
3     Q.  Okay.  Now, you understand, in 2019
4  there was no autopsy results?
5     A.  I don't know.  I don't know.
6     Q.  Okay.  Well, you understand -- you're a
7  police officer, right?
8     A.  Yes.  But I turned the case over to the
9  DA's office.
10        MR. THAMES: Chief, just answer his
11     questions and --
12  BY MR. SWEET:
13     Q.  You're a police officer, right?
14     A.  Yes.
15     Q.  Okay.  You understand what an autopsy
16  is?
17     A.  Yes.
18     Q.  Okay.  It tells you how a person dies?
19     A.  Yes.
20     Q.  You understand that, right?
21     A.  Yes.
22     Q.  And you understand most murder
23  investigations or most charges of homicide you're
24  going to have an autopsy report?
25     A.  Yes.

Page 38

1     Q.  Okay.  So really and truthfully, it
2  would be an incomplete case without an autopsy
3  report?
4        MR. THAMES: Object to the form.
5  BY MR. SWEET:
6     Q.  Do you know how he died?  Do you know
7  what the -- have you read the autopsy report?
8     A.  No.  I have never seen the autopsy
9  report.
10     Q.  Okay.  Read the last paragraph.  The
11  summary at the bottom.
12        MR. THAMES: Let's put a reference to
13     what we're looking at here.
14        MR. SWEET: Yeah.  We can mark it.  This
15     is -- mark it as Exhibit 2.
16        (Exhibit No. 2 marked for
17        identification.)
18        MR. THAMES: And I need to look at it,
19     too.
20        MR. SWEET: Okay.  You haven't seen it?
21        MR. THAMES: I don't know.  I don't
22     know.
23        MR. SWEET: Get it marked as Exhibit 2
24     and let your lawyer look at it, please.
25        MR. THAMES: I mean, I'm not trying to

Page 39

1  be harsh here.  I just --
2        MR. SWEET: You can be harsh or anything
3     you want, but I'm going to ask my questions.
4     We can be here all day.
5        MR. THAMES: Of course.  But I'd like to
6     see the document.
7        MR. SWEET: All right.
8  BY MR. SWEET:
9     Q.  You read it?  Hold on.  Let me look at
10  it.
11        You said the evidence -- this is
12  the evidence about facial abrasions, scalp
13  contusions, brain contusions, subdural hematoma,
14  and brain swelling.  These injuries resulted in
15  his death.
16     A.  Okay.
17     Q.  You understand?  So he was beaten about
18  the head, and it resulted in his death.
19     A.  Okay.
20        MR. THAMES: Object to the form.
21  BY MR. SWEET:
22     Q.  You understand he had cracked ribs?
23     A.  No.  I never seen the report.
24     Q.  Okay.  I got his medical -- no one told
25  you he had cracked ribs?

Page 40

1     A.  No.  No.  We turned this case over to
2  the DA's office.  And as far as that, I -- first
3  time I've ever seen that.
4     Q.  Okay.  So this -- it was ruled a
5  homicide because he was beaten about the head.
6        MR. THAMES: Object to the form.
7     A.  Okay.
8  BY MR. SWEET:
9     Q.  You see the autopsy report.  It said
10  because of -- the beating about the head are what
11  resulted in his death.  Ain't no doubt about why
12  he died.  Because he was beaten about the dead.  A
13  subdural hematoma.
14        You understand that?
15        MR. THAMES: Object to the form.
16        MR. CORY: Object to the form.
17  BY MR. SWEET:
18     Q.  You understand that?
19     A.  Yeah.
20     Q.  So that means somebody killed him.
21        MR. THAMES: Object to the form.
22        MR. CORY: Object to the form.
23  BY MR. SWEET:
24     Q.  It says homicide on here.  You see in
25  the autopsy report --

Page 41

1    MR. THAMES: If you don't know, you
2  don't know.
3  A.  Yeah.
4    MR. SWEET: You want to answer for him?
5    MR. THAMES: Yeah. I'll answer for him.
6    MR. SWEET: Okay.
7    MR. THAMES: How about that?
8    MR. SWEET: Oh, I don't want you to, but
9  you can.  I mean, we can stay here until we
10  get you answers.  You answer a while.  He
11  answers a while.
12    MR. THAMES: That's great.  That's
13  great.
14    MR. SWEET: Okay.
15  BY MR. SWEET:
16  Q.  So you understand he was committed as a
17  homicide?
18  A.  Yes.
19  Q.  All right.  Homicide means somebody else
20  killed him?
21  A.  Yes.
22  Q.  Okay.  So you say your officers didn't
23  do it because you were going to put them back to
24  work?
25  A.  Yes.  I said that.

Page 42

1  Q.  Who did it?
2  A.  I don't know.
3  Q.  What investigation have y'all done to
4  determine who did it?
5  A.  We've got an investigation starting from
6  the people in the community, the facts and
7  circumstances.  And we've got a report from AMR
8  stating that, when they returned to the -- when
9  they reported to the scene, this individual
10  checked out at a 15, the highest score, and
11  indicating that there were no abnotalities
12  [sic] --
13  Q.  Abnormalities.
14  A.  -- abnormalities noted in his mental
15  state.
16  Q.  Hey, man -- okay.
17  A.  And so this is from the ambulance that
18  checked --
19  Q.  I'm not worried about that.  I'm
20  saying -- okay.  We have a fact -- I understand.
21  I have an ambulance report.
22  A.  Okay.
23  Q.  Okay.  I've seen the ambulance.  I'm
24  going to depose them.
25  A.  All right.

Page 43

1  Q.  All right?  I'm talking about this
2  report says that somebody beat him to death.
3  A.  Well --
4  Q.  Okay.  What investigation have you done
5  to find out who that is?
6  A.  We have done a thorough investigation
7  from the facts and the circumstances that we got
8  from the community, from the video, statements
9  from the officers, statements from people that was
10  there on scene.  I actually got on TV and
11  mentioned it, if you see something, say something.
12  Q.  I'm talking about who is your suspect,
13  man?
14  A.  When I say --
15  Q.  Who is your suspect?
16  A.  We don't know the suspect.
17  Q.  I mean, it's a murder in Jackson.
18  A.  Yes.
19  Q.  Are y'all not in the business of solving
20  murders?
21  A.  Yes.
22  Q.  You're saying -- you're saying you
23  cleared your police officers?  They didn't do it?
24  A.  In most -- in --
25  Q.  I understand this whole thing is --

Page 44

1  A.  Our internal affairs investigation did
2  not lead us to believe that there was no police
3  brutality --
4  Q.  Okay.  We got it.
5  A.  -- whatsoever.
6  Q.  I'm going with that.  I'm going with
7  that.  No police brutality.
8  A.  Uh-huh (affirmative response).
9  Q.  Okay.  I'm going with you on this.
10  A.  Okay.
11  Q.  Your investigation to clear these
12  officers -- you cleared them.
13  A.  Okay.
14  Q.  Who did it?
15  A.  That's what we're trying to find out.
16  Q.  Okay.  What have you done?
17  A.  Got on the news.  And I said, If you see
18  something, say something.  And this when this
19  video showed up Mr. Robinson drive up to this
20  hotel.  And based on what you just told me -- or
21  just showed me -- this is the first time I saw
22  that -- I'm asking myself, how in the world can an
23  individual get in a vehicle and drive away from
24  what you just showed me.
25  Q.  I have an expert.

Chief James E. Davis

**Page 45**

1  A.  Yeah.  Well --

2  Q.  I mean, I'm not --

3  A.  I can't --

4      MR. THAMES: Wait.  Let him answer this

5  question.

6      MR. SWEET: No.  I didn't ask him a

7  question.  He's going on and --

8      MR. THAMES: Okay.  Well, then let's

9  just stop.  Stop.

10     MR. SWEET: Okay.  Well, tell me -- you

11  don't him to answer the question?

12     MR. THAMES: No.  You said there wasn't

13  a question -- there wasn't a question in

14  place.

15     MR. SWEET: That's fine.  Put on the

16  record that he told him not to answer any

17  further questions.

18     MR. THAMES: No.  I did not say that.

19     MR. SWEET: Well, then what do you want

20  him to answer about?

21     MR. THAMES: I did not.  You said that

22  there was not a question in place.  So I

23  said, if there's not a question in place,

24  there's no reason for him to answer something

25  if there's not a question in place.  That's

**Page 46**

1  what I said.

2      THE WITNESS: Can I get a copy of that

3  report there?

4      MR. SWEET: Yeah.

5      THE WITNESS: Yeah.  I --

6      MR. SWEET: We've marked it as an

7  exhibit.  It's going to be a part of your

8  deposition.

9      THE WITNESS: Okay.  Yeah.  I'd love to

10  make a copy of --

11     MR. THAMES: It's already been marked as

12  Exhibit 2.

13     THE WITNESS: Okay.

14     MR. SWEET: I just told him that.  You

15  going to repeat everything I say?

16     MR. THAMES: Yeah.

17     MR. SWEET: Okay.  Well, repeat it.

18  BY MR. SWEET:

19  Q.  All right.  Now, what I'm asking you is,

20  how in the world -- you say you want to know how

21  in the world he drove a car away?

22  A.  No.  I -- just hearing -- or reading

23  that and I'm thinking --

24  Q.  You said you wanted to --

25  A.  I'm thinking -- I'm thinking if a person

**Page 47**

1  being beaten to that point and a brain injury --

2  and I've seen multiple injuries where somebody

3  been beat in the head, shot in the head, and I

4  never seen them get up or drive away, less -- or

5  walk away, less alone drive away.  And this --

6  Q.  Okay.  So you're giving an opinion now?

7  Your opinion is --

8  A.  No.  It's not an opinion.  It's just,

9  from this report here and from this individual

10  getting in his car, leaving this scene, driving to

11  a location with these injuries.

12  Q.  And what are you basing that on?

13  A.  Basing on what -- this report.  And this

14  is the first time I've seen this report.  So --

15  Q.  Okay.

16  A.  -- I'll --

17  Q.  Did you -- you said -- now, I know you

18  went to Strayer College.

19      Did you go into medical training?

20  A.  No.  No.  I never received any --

21  Q.  No medical training?

22  A.  But I've got a medical report from AMR

23  stating that they checked this individual out.

24  Q.  Did you talk to --

25  A.  And he checked the highest number --

**Page 48**

1  yes.  Yes.  They -- the memo went out to them.

2  They checked this individual out.  And the highest

3  score that they can give was a 15, and this

4  individual was checked out with a 15.

5  Q.  Okay.  What day was this incident?

6  A.  January.  Part of January.

7  Q.  Okay.  Is this a medical document?

8  A.  That's from the ambulance service that

9  service the citizens of Jackson.

10     MR. SWEET: Okay.  Let me have that

11  marked as an exhibit.

12     (Exhibit No. 3 marked for

13     identification.)

14  BY MR. SWEET:

15  Q.  It didn't have -- this isn't a medical

16  record generated in connection -- in the regular

17  course of your business?

18  A.  No.  That's the --

19     MR. THAMES: Object to the form.

20  A.  No.  This -- this is some information

21  after we're doing our complete --

22  BY MR. SWEET:

23  Q.  Hold on a second.  Tell me how this

24  e-mail came to be about.  Tell me about that.

25  A.  I asked -- I asked that we go out and

| Page 49 |
|---|

1  contact the ambulance service that reported to the
2  scene of this incident.
3      Q.  Right.
4      A.  And they sent this e-mail out.  And,
5  actually, I asked them to go down to their
6  headquarters to speak with someone in charge and
7  give us the facts.  And this is the information --
8  Mr. Ryan Wilson -- this is the information that
9  was given to me.
10     Q.  Who is Ryan Wilson?
11     A.  He is an employee with the ambulance
12 service.
13     Q.  Was he out at --
14     A.  He's a -- he's a clerical management.
15     Q.  Was he out there on the scene that
16 night?
17     A.  I don't know if he was on the scene, but
18 this the information from their records.
19     Q.  Did you interview him?
20     A.  No.  We had the detectives to interview
21 him.
22     Q.  Did you go -- get any medical personnel
23 to look at any of this?
24     A.  Did I get any medical personnel?
25     Q.  Uh-huh (affirmative response).

| Page 50 |
|---|

1      A.  Yeah.  These are the -- these are the
2  ones charged with serving ambulance service to the
3  city of Jackson.
4      Q.  So this guy saw George Robinson?
5      A.  You got to ask him that.
6      Q.  Okay.  That's an exhibit there.  I made
7  it an exhibit.
8      A.  Okay.  Yeah.  Yeah.
9      Q.  Okay.  No.  I'm asking you.  I mean,
10 this guy -- this won't be admissible in trial.
11 This is -- you understand this is rank hearsay?
12         MR. CORY: Object to the form.
13         MR. THAMES: Object to the form.
14     A.  Well, they going to have to answer to
15 that.
16 BY MR. SWEET:
17     Q.  Right.
18     A.  And my job was just to find the facts so
19 I can address the community.
20     Q.  Okay.  Well, I'm showing you the facts.
21 Here's a fact that I'm showing you.  A man was
22 beat to death about the dead.
23     A.  Okay.
24         MR. THAMES: Object to the form.
25

| Page 51 |
|---|

1  BY MR. SWEET:
2      Q.  Right?  I mean, I'm showing you the
3  autopsy, right?
4      A.  Yeah.
5      Q.  That's a fact that you didn't know until
6  today?
7          MR. THAMES: Object to the form.
8      A.  I did not know that -- yeah.
9  BY MR. SWEET:
10     Q.  Okay.  So, I mean, you're going to go to
11 the grand jury, and it's an important fact to how
12 the man died.
13     A.  Well, if that's the case, I asked this
14 case to go to the grand jury.  I asked for all
15 this information here you're asking for -- we
16 asked the DA for this information.  And -- and we
17 constantly asked and asked --
18     Q.  So in a regular homicide investigation,
19 you ask the DA for the autopsy?
20     A.  Yeah.  We asked -- no.  We asked the
21 DA -- the case is given to the DA.  So the autopsy
22 and all that was generated through the DA's --
23     Q.  When you say the case was given them,
24 what was given to them?
25     A.  All our findings as it relates to --

| Page 52 |
|---|

1      Q.  Tell me your findings.
2      A.  Our findings that -- the facts.
3      Q.  Tell me the findings you gave to them.
4      A.  Officers -- the -- from the
5  investigation report.
6      Q.  Right.
7      A.  Officer's report, all their encounters
8  took place to -- in reference to the officer's
9  encounter with Mr. Robinson.
10     Q.  Officer's report?  Okay.
11     A.  All those facts and the facts from --
12 interviews from people --
13     Q.  Who?
14     A.  The lady that was sitting on her front
15 porch and --
16     Q.  Okay.  That's the only person I can find
17 that y'all interviewed -- these detectives
18 interviewed.  They interviewed one lady sitting on
19 her porch, and y'all say y'all don't believe her.
20     A.  She's the one --
21         MR. THAMES: Object to the form.
22 BY MR. SWEET:
23     Q.  You know we deposed the officer who
24 interviewed her.
25     A.  Okay.  That's fine.  That's fine.

Page 53

1    Q.  He said he didn't believe her.
2    A.  Well, that's fine.  I -- she -- the lady
3    came to my office and showed me a video.  And --
4    Q.  Okay.  But -- I understand she showed
5    you a video.  You didn't see George Robinson being
6    assaulted.  And she said she -- somebody assaulted
7    him.  But she said it was more than one person.
8    A.  She told me a guy six-three --
9        MR. THAMES:  I'm going to object -- I'm
10   going to object to the form.
11   BY MR. SWEET:
12   Q.  Did you find out --
13   A.  -- that looked like Rick Ross and --
14       MR. THAMES:  He hasn't asked you a
15   question.
16   BY MR. SWEET:
17   Q.  Let me ask you this question.  We see
18   that he was assaulted at some point that day.
19       MR. CORY:  Object to the form.
20   BY MR. SWEET:
21   Q.  And he was beat about the head, right?
22       MR. SWEET:  Object to the form.
23   BY MR. SWEET:
24   Q.  Right?  Am I right?  This autopsy says
25   he was beat about the head.

Page 54

1    A.  Right.
2    Q.  He was killed by somebody, right?
3    A.  Okay.
4    Q.  Your suspect is a Rick Ross looking guy.
5    A.  Yes.
6    Q.  Right?  That's who you think did it?
7    A.  Yes.
8    Q.  Okay.  What efforts have you gone to
9    find this Rick Ross looking guy?
10   A.  By all the other evidence.  We're
11   canvassing the streets, listening to witnesses, to
12   try to --
13   Q.  Who have you talked to?
14   A.  -- the facts and the circumstances.
15   Q.  I want to see the reports.
16   A.  Well, we'll find -- I don't have --
17   Q.  I've asked for them in this discovery.
18   A.  Okay.
19   Q.  Give me all the reports of anybody
20   interviewed, any statements, all of that.
21   A.  Well, we --
22   Q.  So I'm hearing you saying you talked to
23   all of these people.  I don't have any evidence of
24   that.
25   A.  That's the evidence that I got it, that

Page 55

1    I saw, was the evidence that was floating around.
2    You got the video.  You had the video.
3    Q.  I seen the video.  Not from y'all.  I
4    got it from the lady.
5    A.  So what did the video showing --
6        MR. THAMES:  Just let him ask you a
7    question, and you can answer the question.
8    Okay?
9        THE WITNESS:  Okay.
10   BY MR. SWEET:
11   Q.  I just want to know what evidence I
12   don't have that you have.
13       MR. THAMES:  You don't -- object to the
14   form.  He doesn't know that.
15   A.  Okay.  Okay.
16   BY MR. SWEET:
17   Q.  I don't have any -- I've gotten
18   statements from individuals in the community.
19   A.  Okay.
20   Q.  I've recorded --
21   A.  Okay.
22   Q.  -- four or five people out there.  Okay?
23   A.  Okay.  Uh-huh (affirmative response).
24   Q.  And I've talked to that lady, also,
25   right?

Page 56

1    A.  Uh-huh (affirmative response).
2    Q.  Okay.  And they all say he was assaulted
3    out there on the street.
4    A.  Right.
5    Q.  Okay.
6    A.  Uh-huh (affirmative response).
7    Q.  Your evidence says he was assaulted out
8    there on the street, right?
9    A.  Right.
10   Q.  But you're saying you just -- it just
11   wasn't your police officers, right?
12   A.  No.  It was not our -- I do not believe
13   that.
14   Q.  Okay.  And you have an open homicide
15   investigation on this thing?
16   A.  Yes.
17   Q.  Okay.  When you have an open -- who is
18   the detective investigating this right now?
19   A.  I don't know the detective assigned to
20   it right now.
21   Q.  Okay.  What has he done?
22   A.  Well, Deputy Chief Hearn is assigned.
23   Q.  What has he done?  Do I need to talk to
24   Deputy Chief Hearn?
25   A.  Yeah.  Yeah.  Talk to Deputy Chief

Page 57

1  Hearn.
2    Q.  Does he usually do the homicide
3  investigations?
4    A.  I had him and Commander Gaiter to go out
5  there on the scene themselves once the lady came
6  to my office.  And I asked him to go out and speak
7  with her.
8    Q.  Okay.  We --
9    A.  And many -- and mind you, many citizens
10  that we spoke to on Jones Street that night -- it
11  was many -- the whole community was out on Jones
12  Street.  So it's very hard for me to believe that
13  a police officer will commit -- and especially
14  when we're so in tune with community policing here
15  in Jackson and knowing the characters of these
16  officers and the work that they do, in broad
17  daylight, of -- do the damage to this individual
18  for what this autopsy showed.  So...
19    Q.  Where was it done?
20    A.  That's a question that --
21    Q.  We know it wasn't done at the hotel,
22  right?
23    A.  Right.
24    Q.  We've got a video of the hotel.
25      MR. CORY: Object to the form.

Page 58

1      MR. THAMES: Object to the form.
2    A.  No.  No.  I can't tell you it wasn't
3  done at the hotel.  I saw a video where he drives
4  up to the hotel.
5  BY MR. SWEET:
6    Q.  He drives up to the hotel.
7    A.  Gets out of his car.
8    Q.  Right.
9    A.  Walks into the --
10    Q.  Nobody assaulted him?
11    A.  Walked back into this room.  We saw
12  multiple -- multiple people going --
13    Q.  In and out?
14    A.  -- in and out the hotel room.
15    Q.  Have you interviewed those people?
16    A.  No.  I --
17    Q.  Do you know who they are?
18    A.  I don't have the whole report.  I --
19    Q.  Do you know who they are?
20    A.  I don't have the whole report, so I
21  can't tell you that those --
22    Q.  You have an open homicide?
23    A.  Yes.
24    Q.  And you don't think you want to
25  interview the people at the hotel?

Page 59

1    A.  I don't -- I don't have that --
2      MR. THAMES: Object to the form.
3    A.  -- that case in front of me.
4  BY MR. SWEET:
5    Q.  Did he go anywhere else besides straight
6  to the hotel?
7    A.  I have -- I can't answer that.
8    Q.  You can't?
9    A.  I cannot answer what --
10    Q.  I can.  I can.
11    A.  Okay.
12    Q.  Through investigation.
13    A.  Okay.
14    Q.  You know he had a ankle bracelet on?
15    A.  Yes.
16    Q.  Okay.  So you can go get a movement
17  monitor of where he went.
18    A.  Yes.  Yes.  Yes.
19    Q.  You know I've looked at that.
20    A.  Yes.  Yes.  He moved --
21    Q.  He went straight from the hotel and up
22  to the hospital.
23    A.  Okay.
24    Q.  Didn't go nowhere else.
25    A.  Okay.

Page 60

1    Q.  You understand that?
2    A.  I don't -- I don't have the facts in
3  front me, but when I get the facts --
4    Q.  I mean, you wanted to go to the grand
5  jury, and you didn't have that fact?
6    A.  Yeah.  I was -- I believed in the -- and
7  had the confidence in the DA to take his word on
8  it.
9    Q.  Take word on what?
10    A.  And he said, Chief, let me look over
11  this case.  Let me speak with the family members.
12    Q.  Okay.  You know we have -- DA is a
13  political office, right?
14    A.  He's the DA.
15    Q.  It's a political office.
16      You understand?
17    A.  Okay.  But --
18    Q.  There's a new DA.
19    A.  Yeah.  Yeah.  Yeah.  Exactly.
20    Q.  So the new DA said, Let me look over it.
21    A.  You asked me did I do my investigation.
22  I'm telling you the walks of my investigation,
23  what I took from --
24    Q.  Okay.  When you did the investigation,
25  you didn't have the autopsy report?

Page 61

1    A.  No.  We gave it to the DA.
2    Q.  You didn't have the tox screen.
3        You didn't have the autopsy report
4   to give him.
5    A.  No.  I -- no.
6    Q.  You gave the case.
7    A.  He did not give me this information that
8   he gave you.
9    Q.  When you did your internal -- when you
10   did your internal affairs report and ready to go
11   to the grand jury to clear these guys, you did not
12   have an autopsy report, did you?
13    A.  I did not need an autopsy --
14    Q.  You did not have a toxicology report.
15    A.  I did not need that.
16    Q.  You did not have the movement report
17   from the -- from the ankle bracelet, did you?
18    A.  No.  I did not need that.
19    Q.  You did not talk to any other witnesses
20   on the scene other than this woman?
21    A.  Yes.  We talked to the -- our
22   investigators basically --
23    Q.  Who?  Who?
24    A.  -- from the packet that they -- the
25   evidence that they prevented -- presented to me.

Page 62

1   They did not find --
2    Q.  Who did they talk to?
3    A.  -- any wrongdoing.
4        Community -- people in the
5   community.
6    Q.  I understand.  Who?
7    A.  People in the community.
8    Q.  I mean, you talk about this one woman.
9    A.  I don't have the facts exactly who they
10   talked to in the community, but they talked to
11   people in the community.  A community member
12   called me.
13    Q.  I don't want -- can you tell me a name?
14    A.  Came to my office, showed a video -- I
15   don't have her name right now.  But I have the
16   name --
17    Q.  I don't want -- you're wasting time with
18   me.
19    A.  Okay.
20    Q.  I want to know who it is.
21    A.  You'll have it.
22    Q.  You're going to give me the name?
23    A.  Yes.  I'll give you the name of the
24   woman we spoke to.
25    Q.  Okay.  Is this the one with the video or

Page 63

1   a different one?
2    A.  The one with the video.
3    Q.  Oh, I know who that is.
4    A.  Yeah.  Yeah.
5    Q.  I want to -- you keep talking about her.
6   I know who she is.
7    A.  Right.
8    Q.  Anybody else you talked to, other than
9   this woman with the video?
10    A.  That's the only one with the video.
11   That's the only one -- based on what I needed to
12   make a decision to --
13        MR. THAMES: Just answer the question,
14   Chief.
15    A.  Okay.
16   BY MR. SWEET:
17    Q.  No.  Make a decision to do what?
18    A.  Go ahead.  Go ahead.  Go ahead.
19    Q.  I wanted to know -- I just wanted to
20   know -- you keep saying the community.  I just
21   want to know who else you talked to.  I know this
22   woman.
23    A.  I don't -- I don't have the whole case
24   in front of me right now.
25    Q.  You need to be re-deposed then?

Page 64

1    A.  Yes.  We did --
2    Q.  Okay.  What do you need to go get so you
3   can answer my question?
4    A.  Well, I don't have that to go get.  I
5   have to have --
6    Q.  I'm going to ask for you to go get the
7   whole case --
8    A.  Okay.  Well, if --
9    Q.  -- so you can answer my questions.
10    A.  -- that's an internal affairs case,
11   that's internal.
12    Q.  No.  They've agreed to give me the
13   internal affairs documents.  They just haven't
14   produced them yet.
15    A.  Okay.  Well --
16    Q.  Can we go on break and go get the
17   internal affairs case?
18    A.  No.  I -- you said they.  Who is they?
19        MR. THAMES: Just -- just answer his --
20   BY MR. SWEET:
21    Q.  The lawyers.
22    A.  Okay.  Well --
23    Q.  The court has agreed to -- we had a
24   hearing, and they agreed to produce it to me.
25    A.  Well, I haven't --

Page 65

1   Q.  They told the judge they would produce
2   it.
3       MR. THAMES: And I --
4   A.  That's the first time I heard of that.
5       MR. THAMES: And I just -- hold on,
6   Chief.  If I was told to produce it and it
7   hasn't been produced, I apologize.  I did
8   not --
9       MR. SWEET: Haven't produced them.  I
10  got -- I have my expert deadline come up.  I
11  needed the police chief.  I need the expert
12  deadline.  My guy has to give a preliminary
13  report.  We move to strike him.  I need -- I
14  need the information.
15      MR. THAMES: Okay.
16      MR. SWEET: I don't want to go back to
17  federal court.  I -- y'all -- they said work
18  it out.  I'm trying.  You just haven't
19  produced stuff.
20      MR. THAMES: Okay.
21      MR. SWEET: I wanted stuff when I
22  deposed him, to ask him -- he's going on
23  about the file.  Okay.  I don't have it.
24  I've asked for it.  We've had a hearing about
25  it.  Y'all agreed to produce it.  I'm

Page 66

1   deposing him.  This guy is going off on
2   something about some report.  I'd like to see
3   it.  He doesn't have whole file.  Okay.  Why
4   not?  I'm doing everything I can do to get it
5   to him.
6   BY MR. SWEET:
7   Q.  All right.  We've said that -- okay.
8       You all -- how did you get that
9   video at the hotel?
10  A.  Detectives went out and spoke with the
11  management at the hotel, and they produced it.
12  Q.  Okay.  We started this by saying you did
13  a press conference.
14      Why did you hold a press conference
15  showing him going in the hotel?
16  A.  I did not hold a press conference.
17  Q.  You were at the press conference.
18  A.  Showing him going in the hotel?
19  Q.  Yeah.  Showing the video.
20  A.  Well, I --
21  Q.  You said, We're not going to answer any
22  questions.  I think the mayor and you were there.
23  A.  Well, I can't -- I can't recall.  I
24  can't recall right now.  There have been many,
25  many press conferences, so I can't recall that

Page 67

1   particular one.
2   Q.  Okay.  Well, why would you-all do that?
3   A.  I would have to -- being transparent
4   with the --
5   Q.  How is that being transparent?
6   A.  Because the --
7   Q.  You keep using the "transparent."
8       How is that being transparent?
9   A.  Because the community wanted to know
10  what took place.  And we was doing all we can to
11  show the facts that we had --
12  Q.  What facts is that?
13  A.  -- at the time.
14  Q.  Tell me what that facts showed.
15  A.  The video.
16  Q.  What does it show?
17  A.  The video.
18      I can't recall.  I haven't seen the
19  video since --
20  Q.  The guy walking in and out of the hotel?
21  A.  Yeah.  Yeah.  I haven't seen that video
22  since back then.
23  Q.  Y'all said it was the Mustang Motel, and
24  it wasn't, right?
25  A.  I don't know.

Page 68

1   Q.  The Mustang Motel was over on 49.
2   A.  I don't know what --
3   Q.  This is the Mustang Inn.
4   A.  I don't exactly know what -- if it's
5   Mustang -- the facts is in there.  Because we
6   presented the facts, so...
7   Q.  Okay.  So you said your investigation
8   was closed, right?
9   A.  Yeah.
10  Q.  You wanted it to go to the grand jury?
11  A.  The internal affairs investigation was
12  closed.  We presented all the facts that we had
13  and gave it to the DA's office.
14  Q.  Is the investigation still ongoing?
15  A.  No.
16  Q.  When was it over?
17  A.  We gave it to the DA's office.
18  Q.  So you're not still investigating?
19  A.  No.
20  Q.  You're sure?
21  A.  Positive.
22  Q.  When did that happen?  In '19?
23  A.  Yeah.
24  Q.  Huh?  '19?
25  A.  Year of '19, yes.

Page 69

1    Q.  Okay.
2    A.  This case.
3    Q.  I'm going to show you something.  I can
4  show you this over and over.  I've done got this
5  response from the City I don't know how many times
6  in discovery.
7    A.  Okay.
8    Q.  I'll just give you one.  Look at
9  response 16.
10    MR. THAMES: Yeah.  We don't have that.
11  BY MR. SWEET:
12    Q.  Read that response right down there.
13  16.
14    MR. THAMES: Hold on.
15    MR. SWEET: That's your response.
16    MR. THAMES: Okay.  Well, I'd like to
17  look at first.
18    MR. SWEET: Okay.
19  BY MR. SWEET:
20    Q.  I can show you that response over and
21  over and over I got.
22        Read 16 aloud for me.  Turn it over
23  because I had it on the next page.
24    MR. THAMES: Well, let's do the --
25    MR. SWEET: I don't want to do that.

Page 70

1      This is my question.  You can come back on
2  the redirect and ask what --
3    MR. THAMES: I want the full record,
4  though.
5    MR. SWEET: You know what, it is the
6  full record.  It's in your -- you filed it.
7  That's your response.  I have a point I want
8  to go.
9  BY MR. SWEET:
10    Q.  Just turn to the next page.
11    MR. THAMES: All right.  So this is
12  request No. 16.
13    MR. SWEET: I'm not -- I'm not trying to
14  read the whole question.  Y'all say that over
15  and over.  I'm making one point.  It's my
16  deposition.
17    MR. THAMES: He didn't answer --
18  BY MR. SWEET:
19    Q.  Just read that.
20    MR. THAMES: He didn't answer these.
21    MR. SWEET: Well, I -- okay.
22  BY MR. SWEET:
23    Q.  Read the next -- read the question
24  there.
25    MR. SWEET: I asked to depose the mayor.

Page 71

1    Y'all said no.  I would get to depose the
2  chief.  Now you're saying he didn't answer
3  them.  Make your mind up.  Okay.  I mean,
4  come on.
5  BY MR. SWEET:
6    Q.  Read the next -- read the answer.
7    MR. THAMES: All right.  Hold on.  Let's
8  see.
9        All right.  So he's asking you about
10  this request No. 16.
11    MR. SWEET: I'm not asking about that
12  request.  I'm asking about the answer.  I
13  don't care about the request.  I can go to
14  several requests.  I'm going to this answer.
15  BY MR. SWEET:
16    Q.  What does it say?
17    MR. THAMES: I understand.  But he needs
18  to have the --
19    MR. SWEET: Go to the next page.  He
20  doesn't need to have it to get my answer.
21    MR. THAMES: Yeah, he does.
22    MR. SWEET: Look, you get to -- you can
23  come back and ask him anything you want.
24        You done a deposition before?
25    MR. THAMES: No.  Never done one before.

Page 72

1    MR. SWEET: Okay.  You act like you
2  haven't.  Move to the next page, man.  Move
3  to the next page.
4    MR. THAMES: My witness is entitled to
5  read what he's being asked about.  And then
6  he's our response.
7  BY MR. SWEET:
8    Q.  What does the City say to that response?
9  Would you mind reading the response?
10    MR. SPRINGER: It's about time for a
11  break.  We've been going almost an hour.
12  BY MR. SWEET:
13    Q.  Read that for me, please.
14    MR. THAMES: This right here.  It speaks
15  for itself, but you --
16    MR. SWEET: Well, man, I'm not asking
17  you.  You say it speaks for yourself.  I want
18  him to read.  Let him speak for it.  He can
19  read that.  I can ask him to read something
20  in a deposition.  I'm asking him to read.
21    MR. THAMES: Okay.
22  BY MR. SWEET:
23    Q.  Please read it.
24    A.  City defers plaintiffs in the
25  disclosure -- the City is still investigation --

**Page 73**

1   Q.   What now?
2   A.   -- contained -- the City is still
3   investigating.
4   Q.   Okay.
5   A.   City complained -- contained the
6   complaint as community response to --
7   Q.   This says y'all are still investigating
8   as of -- what's the date on this?  Pass me that.
9       I mean, I can go through them.  I
10  highlighted the number of them.  I was going to go
11  to court and move to compel -- here you go.
12  That's the 2nd day of April, 2020.
13  A.   Uh-huh (affirmative response).
14  Q.   I got something after that they say
15  y'all still investigating.
16      You're telling me that's wrong.
17  A.   Uh-huh (affirmative response).
18      MR. THAMES: Object to the form.
19  BY MR. SWEET:
20  Q.   You're saying you ready to go to the
21  grand jury in 2019.
22  A.   Yeah.  Yeah.
23      MR. THAMES: Yeah.  You didn't --
24      THE WITNESS: Yeah.
25      MR. THAMES: You didn't sign that.

**Page 74**

1       MR. SWEET: I know he didn't sign it.
2   Is that -- that's the response of the City,
3   isn't it?  Let me see that.
4       MR. THAMES: That's correct.
5       MR. SWEET: Let me see.  Is Charlotte
6   Jackson -- is she a lawyer for the City?
7       MR. THAMES: That's correct.
8       MR. SWEET: Isn't he the chief for the
9   City?
10      MR. THAMES: That's correct.
11      MR. SWEET: Oh, okay.  They the same
12  organization?  Here's Deputy Chief Joe Wade.
13  Isn't he with the City?
14  BY MR. SWEET:
15  Q.   You know Joe Wade?
16  A.   Uh-huh (affirmative response).
17  Q.   He deputy chief?
18  A.   He assistant chief.
19  Q.   Okay.  Assistant chief.
20      Yeah.  He said y'all still
21  investigating.
22  A.   Okay.  I didn't see that in there where
23  he said it, but if he said it, yeah.
24  Q.   What I'm saying -- you saying -- we went
25  through this whole thing about Robert Smith and

**Page 75**

1   going to the grand jury.  I filed this case.
2   A.   When you --
3   Q.   And he said -- it's saying y'all still
4   investigating, right?
5   A.   Okay.
6   Q.   Did it say that?
7   A.   Well, anytime we have an unsolved
8   homicide --
9   Q.   Okay.
10  A.   -- the investigation never really stop.
11  Because information can come up at any time.
12  Q.   Okay.  What's come up?
13  A.   To be honest -- anytime -- it can come
14  up anytime.
15  Q.   Okay.
16  A.   So, of course, it will be still under
17  investigation until we find the individual or --
18  that is responsible for that.  So of course it
19  would be still under investigation.  Let's
20  don't --
21  Q.   Let's make no doubt about it.  The
22  information you got is he was assaulted out there
23  on the street by a Rick Ross looking guy?
24  A.   Yes.
25  Q.   That's where you are now?

**Page 76**

1   A.   Yeah.  That's the information we --
2   Q.   And you're looking for the Rick Ross
3   looking guy that assaulted him on the street?
4   A.   We're looking for information as it come
5   in, and we will gather that information --
6   Q.   Looking for the Rick Ross looking guy?
7   A.   Yeah.
8       MR. THAMES: Object to the form.
9   A.   We will gather that information, and we
10  will forward that information over to the DA's
11  office.
12  BY MR. SWEET:
13  Q.   Okay.  So let me just go through the
14  investigation we doing as we sit here.
15  A.   Okay.
16  Q.   What I've established.  Okay?
17  A.   Okay.
18  Q.   He was -- died from multiple contusions
19  and blows to the head, right?  He left the scene
20  and went to the Mustang Inn.
21  A.   Broke ribs and all that stuff.
22  Q.   Yeah.  Left the scene and went to the
23  Mustang Inn, right?  The evidence is going to show
24  you he went straight there.  He didn't go anywhere
25  else, right?

Chief James E. Davis

Page 77

1   A.  I can't --
2        MR. THAMES: Object to the form.
3   A.  I can't -- I can't --
4   BY MR. SWEET:
5   Q.  Well, would you assume that I -- his
6   ankle bracelet -- we have the monitoring
7   information on it?
8        MR. THAMES: If you don't know --
9   A.  I don't know.  A lot of this information
10  has went over to the DA's office.  And, of course,
11  like the autopsy report, I didn't have that.  I
12  don't know that.  So I can't --
13  BY MR. SWEET:
14  Q.  So when you say you turned it over to
15  them, what you basically saying, We're not going
16  to do nothing.  Y'all just go and do what you
17  going to do on it.
18        MR. THAMES: Object to the form.
19  BY MR. SWEET:
20  Q.  Take it to the grand jury?
21  A.  No.  I didn't say that.
22  Q.  The only thing you gave them to take to
23  the grand jury is some woman --
24  A.  Yes.
25  Q.  -- with a videotape and the police

Page 78

1   statements, what they said they did.  That's all
2   you had?
3   A.  Yeah.  And from the community -- the
4   people in the community.  And I don't have that
5   right in front --
6   Q.  I want to know who these people are.
7   A.  Okay.  I will -- I will have to find
8   that information out.
9   Q.  When?  I've asked for it.  I've asked
10  for who was witnesses, who y'all know.  See, this
11  is -- I asked for discovery.  I asked for all this
12  information.
13  A.  Well --
14  Q.  So I -- we won't come to depositions and
15  say, I got people, I know people.  I asked the
16  City to name them for me.
17  A.  Well --
18  Q.  I asked them for their reports.
19  A.  Okay.  Well --
20        MR. THAMES: He's answered -- it's asked
21     and answered.
22  BY MR. SWEET:
23  Q.  I want to know who -- what report --
24  where are you going to find this information out?
25  What documents are you going to look at to find

Page 79

1   this information out?
2   A.  I have to go back over all the
3   documents.  And then --
4   Q.  What documents?
5   A.  I'll present what you're asking to our
6   legal team, and they'll --
7   Q.  I got a whole bunch of -- I got all the
8   police reports.
9   A.  Okay.  Well --
10  Q.  I got all the summaries.  I got the
11  tapes when y'all had a meeting with you and the
12  mayor and all them.
13  A.  Okay.
14  Q.  I got all that stuff.
15  A.  Right.
16  Q.  Okay.  What other documents are there?
17  A.  I don't know.  I don't know.  But I
18  will --
19  Q.  None exist.  I got it.
20  A.  Well, I didn't --
21  Q.  There are no other witnesses.
22  A.  I didn't get that request from you,
23  so...
24  Q.  Okay.
25        MR. THAMES: He didn't produce them.  We

Page 80

1     did.
2   A.  Okay.
3   BY MR. SWEET:
4   Q.  Okay.  So you don't know anything about
5   this -- about this press conference where y'all
6   went in and said, I'm not going to answer any
7   questions and just showed the --
8   A.  No.  I can't --
9        MR. THAMES: Object to the form.
10  A.  -- I can't recall -- I can't recall that
11  because I've been to many press conferences.  So
12  if you show me the press conference, it will bring
13  it back to my memory if I was there.
14  BY MR. SWEET:
15  Q.  Okay.  Now, you did you-all -- y'all had
16  a police -- a procedure in place, right, where you
17  go out to -- you send a bunch of officers out to
18  an area?
19  A.  We --
20        MR. THAMES: Object to the form.  Is
21     there a question here?
22        MR. SWEET: Yes.
23        MR. THAMES: What's the question?
24     Because I don't --
25

---

Page 81

BY MR. SWEET:
1
2    Q.   Y'all had a procedure where y'all send a
3    bunch of officers out to an area, don't you?
4    A.   No.  No.  We don't have a procedure
5    where we send a bunch of officers out in the area.
6    Q.   On this date, you sent SWAT to
7    Washington Addition and Jones Street area, right?
8    A.   Yes.
9    Q.   You sent homicide to Washington and
10   Jones Street area, right?
11   A.   Yes.
12   Q.   Right?
13   A.   Yes.
14   Q.   You sent narcotics in Washington
15   Addition -- that area, right?
16   A.   Yes.
17   Q.   And you sent patrolmen to that area,
18   right?
19   A.   Yes.
20   Q.   Okay.  And when you were in that area,
21   they were out there to conduct field interviews,
22   right?
23   A.   No.  No.  They was out there to
24   apprehend the suspect -- I think Marquez Hamilton.
25   Q.   He wasn't there?

---

Page 82

1    A.   Responsible -- he lived in the
2    community.  And he was apprehended in the
3    community.
4    Q.   Well, he actually came to the community
5    when they called him.
6    A.   Well, I don't -- I didn't know who they
7    called.  But we was there to --
8    Q.   He wasn't there.
9    A.   -- apprehend a homicide -- an individual
10   that just had killed a --
11        MR. THAMES: Just answer his question.
12   BY MR. SWEET:
13   Q.   You understand he was not there?
14   A.   No.  I don't understand that.
15        MR. THAMES: Object to the form.
16   BY MR. SWEET:
17   Q.   Somebody said, Well, his momma is here,
18   and the momma called him, and he came over there.
19   A.   Well, I don't --
20   Q.   I mean, that was a great police tactic.
21   You called -- you asked his momma to call him, and
22   he come?
23   A.   Well, I don't know if that's just
24   relationship to --
25   Q.   You didn't need all these people in --

---

Page 83

1    what do you mean relationship?
2    A.   If the relationship -- you said police
3    called --
4    Q.   So you had a good relationship with
5    people in the community?
6    A.   Yeah.
7    Q.   They trust the police in the community?
8    A.   Yes.
9    Q.   They're forthright and honest to the
10   police in the community?
11   A.   Yes.
12   Q.   And they don't lie about stuff to the
13   police in the community?  They didn't lie here,
14   did they?
15   A.   Well, I don't know.
16        MR. THAMES: Object to the form.
17   A.   What I said -- from the evidence that I
18   said, the lady was truthful to who she saw, that
19   witnessed Rick Ross individual that assault --
20   that -- Mr. Robinson.
21   BY MR. SWEET:
22   Q.   Do you know who was person who
23   identified the mother and helped get the guy over
24   there, what his name was?
25   A.   No.  I don't have all --

---

Page 84

1    Q.   You know, his name was Mr. Arnold?
2    A.   No.  I can't recall that.
3    Q.   Okay.  Mr. Arnold was right there at
4    that house on Jones Street?
5    A.   Okay.
6        MR. THAMES: He's already said he
7     doesn't know.
8    BY MR. SWEET:
9    Q.   Did you know Mr. Arnold was right there
10   at the house at --
11   A.   No, sir.  I didn't know.
12   Q.   All right.  And you understand
13   Mr. Arnold was the one who gave the officer the
14   name of the mother?
15   A.   No.  I don't -- I'm not -- I don't know
16   Mr. Arnold.
17   Q.   Okay.  You know Mr. Arnold -- you
18   understand he gave a statement?
19   A.   No, I did not.  I don't understand that.
20   I didn't --
21   Q.   You understand that he said that it was
22   your officers who, right there in front of him --
23   in front of that residence where Mr. Robinson
24   lived -- beat Mr. Robinson.
25   A.   I don't --

---

Page 85

1    MR. THAMES: I'm going to object to the
2  form.
3    A.  First I've heard of that.
4    MR. THAMES: And the witness has already
5  said that he doesn't know about Mr. Arnold.
6  So...
7    A.  That's the first I've heard of that.
8  BY MR. SWEET:
9    Q.  Really?
10   A.  That's the first I've heard of that.
11   Q.  Okay.  Well, you know your officers
12 interviewed Mr. Arnold out there that day?
13   A.  I don't -- I don't recall.  I don't
14 recall.
15   Q.  Do you know a Ray Rowland?
16   A.  No, sir.  I can't off --
17   A.  He was out there that --
18   A.  Right off the top of my head --
19   Q.  Carly Balton?
20   A.  I don't --
21   Q.  Samuel Rawls?
22   A.  I don't know.
23   Q.  Constance Johnson?
24   A.  All I know is I did a press conference
25 asking the community --

Page 86

1    MR. THAMES: Just answer the questions.
2    A.  No.  I don't -- I don't know any of
3  those -- those individuals.
4  BY MR. SWEET:
5    Q.  Okay.  Where does your investigation
6  lead you to determine that Mr. Robinson was
7  assaulted?  Where did this assault occur?
8    MR. THAMES: I'm going to object to the
9  form of the question.
10   A.  We don't know where, sir, because he was
11 inside of a hotel room.  And for what -- the
12 evidence that I've seen, I did not see him
13 assaulted from the lady on Jones Street.  Nor did
14 I see him assaulted walking into his hotel room.
15 I did not see him, from the video evidence that I
16 have, what took place inside of the hotel.  I know
17 many people went inside -- in and out of the hotel
18 room.
19 BY MR. SWEET:
20   Q.  When you say "many" --
21   A.  I don't --
22   Q.  What do you mean many?
23   A.  Many.  More than two.
24   Q.  More than two is many?
25   A.  Yeah.  More than two people went in --

Page 87

1    Q.  Have you talked to them?
2    A.  No.  I went -- I just saw video.
3    Q.  Well, you know, in a police
4  investigation, you can look at a video.  You can
5  go up here and find out who the person is and say,
6  okay, that's this person.  Interview this person.
7  That's this person.  Interview that person.
8    A.  Yeah.
9    Q.  You know you can do that?
10   A.  Yes.  If you can see those individuals
11 clear.  If those individuals want to talk.
12   MR. THAMES: Just answer the question.
13   THE WITNESS: Okay.
14 BY MR. SWEET:
15   Q.  They talked.  We went over there and
16 talked to him.
17   A.  Okay.
18   Q.  They said he wasn't assaulted.
19       You got anything to contradict
20 that?
21   A.  No.  I --
22   MR. THAMES: Object to the form.
23   A.  -- don't have nothing.  Nothing.  I just
24 basically got the facts that we got and the
25 evidence that I had.  That's all I had to work

Page 88

1  with.  And...
2  BY MR. SWEET:
3    Q.  Well, you didn't even know he had the
4  bruises on the head until I showed you this.
5    MR. THAMES: Object to the form.
6    A.  Okay.
7  BY MR. SWEET:
8    Q.  Right?
9    A.  Okay.
10   Q.  I want to talk about this procedure.
11 Called a jump out squad or whatever?  You heard
12 about that?
13   A.  Never heard of jump out squad.
14   Q.  Never heard of jump out boys, jump out
15 squad?
16   A.  No.  I never heard of jump out squad.
17 We don't practice that in the Jackson Police
18 Department.
19   Q.  You don't?
20   A.  No, we don't.
21   Q.  Do you have a procedure where y'all send
22 officers to what y'all identify an area as trouble
23 or hotspot, where you have some unique -- you're
24 looking for a suspect?
25   A.  No.  No.  We --

Page 89

1    Q.  You don't have any procedure where you
2  do that?
3    A.  No.  No.  We have -- what we have, since
4  I've been in place, we have Operation Safe Streets
5  where we go out and set up administrative
6  checkpoints in areas.  And that is initiative to
7  engage the citizens to let them know that they're
8  safe in Jackson.  It's more humanizing policing.
9  It's not enforcing.  It's basically educating the
10  community on why we're there.
11    Q.  Didn't you call the mayor and say, Look,
12  we're going to send all these officers over to
13  Jones Street because of that murder that happened?
14    A.  No.  No.  I don't recall --
15        MR. THAMES: Object to the form.
16    A.  -- telling the mayor.
17  BY MR. SWEET:
18    Q.  How do you go about employing [sic]
19  SWAT?
20    A.  I have the autonomy to deploy SWAT
21  because we got a -- information that a Hamilton --
22  Marquez Hamilton that lived in that area --
23    Q.  Right.
24    A.  -- that had -- is -- was responsible for
25  the death of Anthony Longino.

Page 90

1    Q.  Where did you get that information from?
2    A.  Community.  People in the community.
3    Q.  Who in the community?
4    A.  I --
5    Q.  The streets?
6    A.  Yeah.  The streets.
7    Q.  Street community?
8    A.  Yeah.  The street -- the people in the
9  community.  And, sure enough, we did apprehend
10  Mr. Hamilton in the community.  The street --
11  information we got from the street was the facts.
12    Q.  What was the facts?  He was in the
13  community?
14    A.  That he committed that murder --
15    Q.  Okay.
16    A.  -- early Sunday morning.
17    Q.  Okay.
18    A.  And the information that we got from the
19  streets --
20    Q.  Yes.
21    A.  -- in the community on Jones Street.
22    Q.  Yeah.
23    A.  We apprehended that murder suspect.
24    Q.  On Jones Street?
25    A.  On Jones Street.

Page 91

1    Q.  You know his mother called him and asked
2  him and he came -- he said, Yeah, hold on.  I'll
3  come over there?
4    A.  Okay.  I don't --
5        MR. THAMES: Object to the form.
6    A.  I don't know.
7  BY MR. SWEET:
8    Q.  You know he wasn't over there?
9    A.  Okay.  I don't know.  I don't know.
10  But I know --
11    Q.  Well, you're telling me what you know.
12  You're telling all this about you apprehending the
13  suspect in the area.  You did this, and you did
14  that.  That sounds great.
15        Do you know the -- you don't
16  actually know the facts then?
17    A.  Yes.  I know the facts.
18        MR. THAMES: Object to the form.
19  BY MR. SWEET:
20    Q.  You understand wasn't there when they
21  were over?
22    A.  The facts --
23    Q.  You understand his mother called him and
24  he --
25    A.  The murder suspect was arrested on Jones

Page 92

1  Street.  That is the fact.
2    Q.  Okay.  Due to all these officers being
3  there, they found him?  What happened?  They found
4  him over there, or did they -- they found him
5  barricaded and had a shootout with him?  I mean,
6  what happened?
7        MR. THAMES: Object to the form.
8    A.  We --
9  BY MR. SWEET:
10    Q.  How was he apprehended?
11    A.  I deployed -- I deployed SWAT --
12    Q.  Okay.
13    A.  -- team due to we had a murder suspect
14  in the community that had just murdered a preacher
15  on the steps of his front door.  We deployed a
16  SWAT team there to bring this individual to
17  justice.
18    Q.  We've had 80 something homicides in
19  Jackson this year.  You employed SWAT on all of
20  them?  80 some odd --
21    A.  Because -- because of a --
22        MR. THAMES: Object to the form.
23  BY MR. SWEET:
24    Q.  How many homicides have you deployed
25  SWAT to this year?

Page 93

1   A. Okay. Anytime that we've got a murder
2   suspect that -- in the community and we know that
3   he's in the community from the intel --
4   A. He wasn't in the community.
5   A. From the intel that we got from the
6   community --
7   Q. What intel? From who?
8   A. It was facts that he was in the
9   community on Jones Street.
10  Q. The street community committee is not
11  a -- is not a reliable source of information.
12  A. Well, sir, you're telling me --
13      MR. THAMES: Object to the form.
14  A. You're telling me the information that
15  you got -- you got from the streets.
16  BY MR. SWEET:
17  A. I ain't telling you nothing I got from
18  the streets.
19  A. The names that you just read out are the
20  people that you say --
21  Q. I didn't get them from the streets. I
22  got them from the --
23  A. From Jones Street.
24  Q. I got them from those persons --
25  A. So you're discrediting --

Page 94

1       MR. THAMES: Okay. Stop. Stop. Chief.
2   Chief. Chief. Chief. Chief. Chief.
3   BY MR. SWEET:
4   Q. I individually talked to those
5   eyewitnesses.
6   A. Right.
7   Q. Okay. I keep -- and I named you names.
8   You keep telling me the community, the streets.
9       Name me someone.
10  A. Well, the --
11  Q. Other than the one woman -- we talked
12  about the one woman with the video. Who else did
13  you talk to?
14      MR. THAMES: Asked and answered. I
15      mean, we've gone through this ten times now.
16      MR. SWEET: Well, he keeps saying the
17      community. I want to know who. Every time
18      he tells me the community said, I'm going to
19      ask him who.
20  A. Well, the facts is the community. The
21  individual that committed the crime was on Jones
22  Street. We arrested the individual that --
23  BY MR. SWEET:
24  Q. When was the --
25  A. -- committed the crime on Jones Street

Page 95

1   the day of the -- of the murder.
2   Q. How did he get over there?
3   A. I have no idea --
4   Q. Okay.
5   A. -- how he got on Jones Street.
6   Q. So y'all didn't call him -- have his
7   momma call him, and he came over to --
8   A. Well, you told me he lived on Jones
9   Street.
10  Q. I didn't tell you nothing.
11  A. Yeah. You did mention that he lived on
12  Jones Street.
13  Q. No. You said he had --
14      MR. THAMES: All right. Let's take a
15      break. Let's take a break.
16      MR. SWEET: Okay.
17      (A short recess was taken.)
18  BY MR. SWEET:
19  Q. Have you heard about this case, Brian
20  Burns versus City of Jackson?
21  A. I can't recall.
22  Q. Were you with -- when Lee Vance was the
23  police chief, were you working with the City?
24  A. Yes.
25  Q. What was your position under Lee Vance?

Page 96

1   A. Deputy chief.
2   Q. Deputy chief?
3   A. In, I think, '17.
4   Q. Okay. At that time that you assistance
5   chief, you-all had a procedure in the city where
6   the Jackson Police Department had squads of
7   officers to go to hot spot areas of the city, jump
8   out of their cars, and detain ordinary citizens
9   for field interviews; isn't that right?
10      MR. THAMES: Object to the form.
11  A. No.
12  BY MR. SWEET:
13  Q. That's not right?
14  A. No.
15  Q. All right. You ever heard of Judge
16  Carlton Reeves?
17  A. I think so.
18  Q. Federal judge?
19  A. Yes.
20  Q. Okay. In the federal court here?
21  A. Okay.
22  Q. You heard of a case, Brian Burns, JD, a
23  lawyer, versus City of Jackson?
24  A. I can't recall.
25  Q. Okay.

Page 97

1    A.  No.
2        MR. SWEET: Let ms have this marked.
3        (Exhibit No. 4 marked for
4        identification.)
5    BY MR. SWEET:
6    Q.  Okay.  I want you look at Exhibit 4.
7    Look at the second paragraph.
8        You can look all through it if you
9    want.
10   A.  That's the...
11       MR. THAMES: Let me see, Chief.
12       MR. SWEET: That's a second copy for
13   you.
14       MR. THAMES: Oh, thank you.
15       MR. SWEET: Second paragraph.
16       THE WITNESS: Yes, sir.
17       MR. THAMES: All right.  I just got
18   through.  All right.  Just before we go any
19   further -- and I kind of know where you're
20   going, so let me just go ahead and make my
21   objection for the record.
22       This is a -- this is an order by Judge
23   Reeves, but it is addressing a motion for
24   summary judgment.  We know the legal
25   precedent.  We try to give the nonmoving

Page 98

1    party the benefit of the doubt, and all we're
2    looking at is disputes of genuine fact.  And
3    that's -- this is not necessarily a finding
4    by Judge Reeves as to the facts that are
5    stated in this paragraph.
6    BY MR. SWEET:
7    Q.  Judge Reeves is the judge we've got in
8    this case.
9        Did you know that?
10   A.  Sir?
11   Q.  Judge Reeves is the judge we have in
12   this case.
13   A.  Okay.
14   Q.  Did you know that?
15   A.  No, I did not.
16   Q.  Okay. Let's read it.  It says,
17   According -- this is what Judge Reeves wrote.
18       You see his name at the end?
19   A.  Yeah.
20   Q.  He makes findings --
21   A.  Okay.
22   Q.  -- after evidence.
23       You see where it says Carlton W.
24   Reeves, United States District Judge?
25   A.  Yes.

Page 99

1    Q.  Okay.  Let's go to the second paragraph.
2    "According to police officer testimony in this
3    case, the Jackson Police Department has squads of
4    officers go to hot spot areas of the city, jump
5    out of their cars, and detain ordinary citizens
6    for field interviews.  Patrolman do it in marked
7    vehicles, while narcotics officers, who are
8    apparently more aggressive, do it in unmarked
9    vehicles."
10       You see that?
11   A.  Yes.
12   Q.  You see it?
13   A.  Yes.
14   Q.  You disagree that that's right?
15   A.  Yes.  I disagree.
16   Q.  Okay.  "The officers do not necessarily
17   suspect that the person has committed a crime.
18   All that matters to them is that the person
19   happens to be present in a targeted neighborhood.
20   Jackson's various police chiefs have known about
21   the practice.  It has been going on for years."
22       You disagree with that?
23   A.  Totally disagree.
24   Q.  All right.  You're saying you don't have
25   any type of policy or procedure like that?

Page 100

1    A.  No, sir.
2    Q.  Okay.  On this day, you had a number of
3    people in that area, right?
4    A.  Uh-huh (affirmative response).
5    Q.  We've gone through.  You had SWAT,
6    patrolmen, narcotics, homicide, right?
7    A.  Yes, sir.
8    Q.  And you had targeted this area, right,
9    because of the shooting of the minister, right?
10       MR. THAMES: Object to the form.
11   A.  Yes.
12   BY MR. SWEET:
13   Q.  You had targeted this area because of
14   the minister, right?
15       MR. THAMES: Object to form.
16   A.  Okay.
17   BY MR. SWEET:
18   Q.  Right?
19   A.  Yes.
20   Q.  Okay.  And you went up to people, and
21   these officers questioned people or field
22   interviewed these people, right?
23   A.  No, we did not.
24   Q.  Okay.  What -- why were all these
25   officers -- what were they going to do in that

Chief James E. Davis

Page 101

1   area?
2       A.  Because the community -- just
3   conversating with the community.  If the community
4   had something, we talked to the community.
5       Q.  Okay.  So what I'm saying to you is, in
6   order to do that, they had to go interview people.
7   That's the community, right?
8       A.  No.  No.  Those individuals out there
9   was getting information that came to them.  They
10  did not do any field interview.  They did not
11  interrogate anybody.  The police --
12      Q.  What were they supposed to do, like --
13      A.  In the community, they were gathering
14  information --
15      Q.  I understand about the community.  I
16  understand.
17              What were they supposed to do out
18  there?  Just stand around out there?
19      A.  Apprehend -- apprehend the individual.
20      Q.  How?
21      A.  However we come in contact with him, we
22  was going to apprehend him.
23      Q.  He wasn't there.
24              MR. THAMES: Object to the form.
25      A.  Okay.

Page 102

1   BY MR. SWEET:
2       Q.  So what were they supposed to do?  They
3   go over to the community.  He's not in the
4   community.
5               What they were -- they're getting
6   out of their cars.  They're around.  What were
7   they supposed to do?
8       A.  No.  No.  They were not --
9               MR. THAMES: You're putting facts in
10      that you don't know whether he knows or not.
11      So he can't answer that question.
12              MR. SWEET: We deposed the officers.  We
13      know the guy wasn't there.  We know the guy's
14      mother called him.
15              You been sitting in these depositions?
16              MR. THAMES: Yeah.  I sure have,
17      unfortunately.
18              MR. SWEET: Yeah.  You understand that
19      that's what the officers testified to?
20              MR. THAMES: I'm not here to be deposed.
21              MR. SWEET: Okay.  Well, I'm not asking
22      you -- well, you said before you were going
23      to answer my questions.
24              You change your mind?
25              MR. THAMES: Well, yeah, I kind of go

Page 103

1   back and forth.
2               MR. SWEET: Okay.  Let me know now.
3               MR. THAMES: I will.  I will.
4               MR. SWEET: Okay.
5   BY MR. SWEET:
6       Q.  So you understand that -- what were they
7   to do?  The guy is not there.
8       A.  They was over there to apprehend --
9       Q.  How?
10      A.  -- Marquez Hamilton.
11      Q.  How?  If he wasn't there, how were they
12  going to -- what were they supposed to do?
13              MR. THAMES: Object to the form.
14      A.  Well, they did.
15  BY MR. SWEET:
16      Q.  I understand.  They got his momma to
17  call him.  I mean, you sent SWAT, the patrolmen,
18  narcotics, and homicide over there to get the
19  boy's momma to call him?
20              MR. THAMES: There's no question.
21  BY MR. SWEET:
22      Q.  How were you supposed to do it?  How
23  were they going to do it and he wasn't there?
24              MR. THAMES: Object to the form.
25

Page 104

1   BY MR. SWEET:
2       Q.  Were they to interview people?
3       A.  No.
4       Q.  Just walk the streets?
5       A.  No.
6       Q.  What were they to do?  What were they
7   supposed to do?
8       A.  Well --
9               MR. THAMES: Object to the form.
10      A.  Okay.
11              MR. SWEET: You can object all to the
12      form of the --
13              MR. THAMES: I'm going to.
14      A.  They were there to make the arrest, and
15  that's what they did.
16  BY MR. SWEET:
17      Q.  How?
18      A.  It's -- it could be many reasons how.
19  That's a broad -- broad question.
20      Q.  No.  I just want to know -- okay.  You
21  said y'all go over to Washington Addition area.  I
22  got a memo where you made the decision, and you
23  called and told SWAT to deploy.
24      A.  Yes.  Yes, I did.
25      Q.  Okay.  What was they to do when they got

Page 105

1  there?
2      A.  Apprehend Marquez Hamilton.
3      Q.  How?  What tactics were they to use?
4      A.  Well, we talked -- we was on the street.
5  We was talking to the community.
6      Q.  So you were interviewing --
7      A.  I was out there.
8      Q.  Okay.
9      A.  I was out there.
10     Q.  Good.
11     A.  I was out there, and I was talking to
12  the community.  And I --
13     Q.  Good.
14     A.  We was -- we did not use any tactics of
15  field interviewing because that wasn't what we
16  there for.
17     Q.  Why were they approaching George
18  Robinson?
19     A.  Because --
20         MR. THAMES: Object to the form.
21     A.  -- of the trained narcotics officers saw
22  the hand-to-hand transaction took place.  And
23  that's --
24  BY MR. SWEET:
25     Q.  What do you mean hand-to-hand

Page 106

1  transaction?  What did he see?
2      A.  Well, you have to talk to the officer.
3  I don't have all the details.  But he's a trained
4  narcotics investigator.  So what he saw, that is
5  the reason that he encountered George Robinson.
6      Q.  You know, George -- there was a barbecue
7  in the front yard.
8      A.  Lot of barbecues out there.
9      Q.  Right.  Well, I'm talking about Jones
10  Street, the one that he was in front of when they
11  assaulted him.
12     A.  Okay.  Well, I didn't see --
13     Q.  You didn't see -- hear about that?
14     A.  -- no evidence showing that they
15  assaulted him?
16     Q.  You know he went to the store for some
17  people?
18     A.  I didn't know any of that.
19     Q.  He picked up stuff and came back and
20  gave to people.
21         That's a hand-to-hand transaction?
22     A.  Well, I don't know.  I don't know if you
23  talked to him, but I didn't.
24     Q.  Talk to who?
25     A.  George.  I didn't know he went to the

Page 107

1  store.
2      Q.  He did.
3      A.  Well, I don't know he went to the store.
4  I don't know how you -- you got that, but I didn't
5  know he went to the store.
6      Q.  Talked to some other people that he went
7  to the store for.
8      A.  Yeah.  And I -- we was out there.  They
9  offered us some food.
10     Q.  Okay.
11     A.  Yeah.
12     Q.  Who offered it to you?
13     A.  The people in the yard.
14     Q.  Who?
15     A.  Many people.
16     Q.  I thought you didn't know they had a
17  barbecue.
18     A.  Yeah.  No.  I never said I didn't know
19  the -- I was out there on the streets.
20     Q.  You didn't know they had a barbecue in
21  the Washington -- at the house?
22     A.  Yeah.  They was out there in the yard.
23  Many people was out there.
24     Q.  Okay.  They were -- okay.  His car was
25  parked right there where they was barbecuing.

Page 108

1      A.  Okay.
2      Q.  It was numerous people out there in
3  front of the -- did you interview any of these
4  people?
5      A.  I talked to many people.
6      Q.  Did you interview any of those?
7      A.  It was so -- no.  Detectives do all the
8  interviewing.  I was out there talking to
9  individuals.
10     Q.  Did the detectives interview any of
11  those people?
12     A.  Yeah.  I would have -- I don't know that
13  information that -- who -- they didn't take --
14  they interviewed some people.  I don't know who
15  they interviewed.
16     Q.  I don't have any information who they
17  interviewed.  I been asking for who they
18  interviewed, any tapes or whatever.
19     A.  Okay.
20     Q.  I haven't been given anybody they
21  interviewed.
22     A.  Okay.  Well, I never got that request.
23     Q.  Okay.  So you do have interviews, but
24  you just don't have -- you didn't get the request
25  to produce them to me?

Page 109

1    A.  Yeah.  I don't know --
2        MR. THAMES: Object to the form.
3    A.  -- what -- what interviews that are was
4  taken, who they interviewed.  I can't answer who
5  they interviewed.
6  BY MR. SWEET:
7    Q.  Okay.  So this procedure here, you
8  don't -- you do -- you did target the area because
9  of the murder, right?
10   A.  Yeah.  We patrolled the --
11       MR. THAMES: Object to the form.
12  BY MR. SWEET:
13   Q.  You did assign the patrolmen, SWAT,
14  narcotics, and the other people to that area,
15  right?
16   A.  To apprehend a murder suspect.
17   Q.  And to go over there and walk the
18  streets and talk to people?
19   A.  Talk to people, yeah.
20   Q.  Okay.  Not do field interviews?  Just
21  talk to them?
22   A.  Just talk to them.
23   Q.  Okay.  Well, you agree with this, that's
24  what y'all do?
25       MR. THAMES: Object to the form.

Page 110

1    A.  No.  We -- that's saying jumping out and
2  just aggressing innocent people and taking field
3  interviews.  We wasn't -- we didn't do any of
4  that.
5  BY MR. SWEET:
6    Q.  Okay.  What is a field interview?
7    A.  Field interview is, if a crime committed
8  in the area --
9    Q.  Crime committed in the area?
10   A.  Yeah.  And an officer believed that that
11  individual is the suspect, then they would do a
12  field interview.
13   Q.  Okay.  So you only interview the people
14  who you believe the suspect?
15   A.  If we doing a field interview, we will
16  interview people that we would -- that we believe
17  that is a possible suspect in an area where a
18  crime was committed.
19   Q.  So when you have a hand-to-hand
20  transaction, you have two people, right?
21       MR. THAMES: Object to the form.
22   A.  Yes.
23  BY MR. SWEET:
24   Q.  And so one person would be the purchaser
25  of drugs.  The other one would be the seller.

Page 111

1    A.  I would assume.
2    Q.  What is Mr. Robinson supposed to be?
3  The seller of drugs?
4    A.  I have no idea what Mr. Robinson's role
5  was.
6    Q.  Do you even know if he had a role in the
7  drug transaction?
8        MR. THAMES: Object to the form.
9    A.  Yeah.  He did the transaction.  He was
10  the one identified as making the --
11  BY MR. SWEET:
12   Q.  Who identified --
13   A.  -- hand to hand.
14   Q.  Who identified --
15   A.  The -- the detective.
16   Q.  Who identified the --
17   A.  Narcotics detective.
18   Q.  Which one?  Fox?
19   A.  I don't -- I don't have the facts -- I
20  don't have the report in front of me.
21       MR. THAMES: Yeah.  Chief, don't guess.
22     You either know or you don't.
23   A.  Yeah.  I don't know which one actually
24  did --
25

Page 112

1  BY MR. SWEET:
2    Q.  Were there any narcotics recovered?
3    A.  I don't know.
4    Q.  Any money recovered?
5    A.  No.  No.  No.
6    Q.  The other person arrested?
7    A.  What do you mean other person?
8    Q.  Well, you said it was hand-to-hand.
9  That's two people.
10   A.  Right.
11   Q.  What happened to the other person?
12   A.  I don't have --
13   Q.  We know one of them is dead.
14       What happened to the other one?
15   A.  I don't have the report in front of me.
16   Q.  Okay.  You would expect, if it's
17  hand-to-hand, to have two people arrested, right?
18   A.  Correct.  No.  No.  No.  Not two people
19  to -- arrested.
20   Q.  Really?
21   A.  Yeah.  You can't -- you can't expect to
22  have -- you -- I don't know how the other
23  person -- whether or not investigated or, for
24  whatever reason -- but they made a decision to
25  engage Mr. Robinson.  So -- and that's who they

Page 113

1  engaged.
2      Q.  The person who's buying drugs -- that's
3  a crime, right?
4      A.  I didn't say they --
5      Q.  You said it was two people.
6      A.  They said it was a hand-to-hand
7  transaction, and I don't have that detective
8  report.
9      Q.  You said it was a trained narcotics
10  agent and a hand-to-hand.
11          You saying it wouldn't be drugs?
12  What would it be?
13      A.  Yeah.  Well, I don't -- I can't -- I
14  can't respond to that because I wasn't -- I wasn't
15  there.
16      Q.  Okay.  Well, you said you wanted it to
17  go to the grand jury, and you cleared them.  And
18  there's no civil rights violation.
19          If there was no hand-to-hand
20  transaction, he had no business approaching
21  Mr. Robinson, right?
22          MR. THAMES: Object to the form.
23      A.  Yeah.  I would have to -- I have to look
24  over his report and refresh my memory.
25

Page 114

1  BY MR. SWEET:
2      Q.  You didn't look over it before coming
3  here today?
4      A.  No, sir, I did not.
5      Q.  Tell me what you reviewed before coming
6  here today.
7      A.  I reviewed the -- I looked over the --
8  answer to whatever questions you -- right now
9  that --
10      Q.  What documents did you review for
11  your --
12      A.  I reviewed the DEA report and other
13  stuff that I --
14      Q.  The DEA report?
15      A.  I mean the DA.
16      Q.  What report?
17      A.  Field report, making that --
18      Q.  You got to get that -- you got to put
19  that back.  You can't take that with you.
20      A.  Okay.
21      Q.  He can make you a copy of it.
22      A.  He's got to make a copy of it.
23      Q.  Yeah.  You got to put that back.
24      A.  Yeah.  And the ambulance and basically
25  all the facts that surrounding this -- this case.

Page 115

1  And as it relates to police officers -- Jackson
2  Police officers assaulting Mr. Robinson.  Those --
3  those -- those are the things that I viewed prior
4  to coming here.
5      Q.  Well, how did the whole issue that he
6  was assaulted come up?
7      A.  Facebook.  A video.
8      Q.  I'm sorry.  What?
9      A.  A video.
10      Q.  What video?
11      A.  A Facebook video stating that Killer
12  George was assaulted.  And that information got
13  back to me.
14      Q.  Why do you keep referring to him as
15  Killer George?
16      A.  That's what she told me.  She said
17  Killer George.
18      Q.  All right.
19      A.  Yeah.  Yeah.
20      Q.  Who?
21      A.  I didn't know.  The lady that took the
22  video.
23      Q.  Okay. He's dead.  He was murdered.  Can
24  we have enough respect for him to just call him
25  George Robinson today?

Page 116

1      A.  Well --
2          MR. THAMES: Object to the form.
3      A.  -- you asked me how did I know, and I'm
4  just kind of --
5  BY MR. SWEET:
6      Q.  I asked you how you knew that he was
7  supposed to be assaulted by a police officer?
8      A.  I'm just basically trying to bring you
9  the facts of how it was brought to me.
10      Q.  How was it brought to you?
11      A.  That Killer George was assaulted.  And
12  that's how -- I didn't know his name.  I didn't
13  know anything about him.  The lady said --
14      Q.  Okay.  Who said -- was this lady?
15      A.  The lady that took the video.  The same
16  video you got.
17      Q.  She said he was assaulted by the police?
18      A.  You -- the video -- you said she said
19  that she had a video, that Killer George was
20  assaulted.  And she showed me the video and showed
21  me and said that she had evidence.  And I asked
22  her to come to my office.
23      Q.  I asked you how did the police come up
24  to be assaulted?
25      A.  Because of, I assume, the blue lights in

| Page 117 |
| --- |

1    the background, and the police right there was
2    with him. And just like you mentioned that you
3    didn't see anything --
4            MR. THAMES: Don't guess anything you
5        don't know.
6            THE WITNESS: Okay.
7    BY MR. SWEET:
8        Q. He was --
9            MR. THAMES: Just say what you know.
10   BY MR. SWEET:
11       Q. You had this whole big meeting -- and I
12   can go over here and play it. And the mayor was
13   going off about y'all didn't bring this to my
14   attention.
15       A. Okay.
16       Q. And if you're late -- and y'all going to
17   lie to me -- and if you ever don't bring something
18   to my attention again -- it's a whole, long tape.
19       A. Okay.
20       Q. All right. So what I'm saying is, how
21   did it come that he was assaulted? Y'all said
22   there was no evidence he was assaulted. Who told
23   you the police assaulted him? Why did you do an
24   investigation on the police?
25       A. Anytime that you have accusations that

| Page 118 |
| --- |

1    law enforcement --
2        Q. Who made the accusations?
3        A. The lady from the video. The lady
4    that --
5        Q. You said she said it was -- earlier you
6    said she said it was a big guy, Rick Ross. She
7    was saying it was police officer?
8        A. Yeah.
9        Q. Rick Ross was a police officer?
10       A. She said the big guy was six-three.
11       Q. I understand about six-three and looked
12   like Rick Ross, had some red stripe.
13       A. Yeah. She said that -- that was the
14   individuals that --
15       Q. She said it was a police officer?
16       A. Yeah. She said it was a police officer.
17       Q. Okay.
18       A. Rick Ross. And she described the police
19   officer as six-three, big guy --
20       Q. I understand all that.
21       A. -- with a big beard.
22       Q. I understand that.
23           But your first contact with this
24   lady, said the police assaulted him?
25       A. Yes. I asked her to come to my office

| Page 119 |
| --- |

1    and bring me what she have. And then she said,
2    Okay. Chief, you need to see this. And -- and
3    she described the big guy with the beard and with
4    a red stripe.
5        Q. Was he by himself?
6        A. No. She said many people was out there.
7    But she --
8        Q. Was there any other officers with this
9    guy?
10       A. No. The video that I saw -- I saw
11   officers out there with them. She didn't break it
12   down to who else --
13       Q. She said she saw him being assaulted?
14       A. Yes. By this guy.
15       Q. She -- and she said it was a police
16   officer?
17       A. Yeah.
18       Q. And was it more than one assaulting him?
19       A. No. She just said that one.
20       Q. It was just one?
21       A. Yeah. She told me that is the one that
22   she saw.
23       Q. Who -- when you said that, you're
24   talking about the Rick Ross guy?
25       A. The six -- about six-three, big guy, big

| Page 120 |
| --- |

1    beard.
2        Q. I understand. The Rick Ross looking
3    guy?
4        A. Yes.
5        Q. Okay. Was there other people who saw
6    the incident that it would be important to go talk
7    to?
8        A. Yes.
9        Q. Why wouldn't JPD go talk to those
10   people?
11       A. I don't have the whole file in front of
12   me. And...
13           MR. THAMES: Object to the form.
14   BY MR. SWEET:
15       Q. Pardon?
16       A. I don't have the file in front of me.
17   So...
18       Q. Who have you discussed this matter with,
19   other than your lawyer?
20       A. No one.
21       Q. Have you ever had any charges of
22   excessive force against you?
23       A. Never.
24       Q. Okay. Why -- these officers were never
25   terminated?

Chief James E. Davis

Page 121

1  A.  No.
2  Q.  Never disciplined?
3  A.  No.
4  Q.  Why weren't they put back on the street?
5  A.  Why wasn't they?
6  Q.  Yeah.
7  A.  Because we agreed -- the DA then -- that
8  he wanted to review the case.  He wanted to talk
9  to the family.  Then we do a press conference with
10  the findings.  So the reason they was not put back
11  on the streets is because we wanted them to go to
12  the DA, to hear from the DA, to -- after the case
13  go to the grand jury.
14  Q.  So you felt it was going to the grand
15  jury to absolve them?
16  A.  Yeah.  I --
17      MR. THAMES: Object to the form.
18  A.  No.  No.  I believed that it should go
19  to the grand jury.  When you look at the facts and
20  the circumstances -- the DA would determine
21  whether it go to the grand jury or no bill or
22  however.  So -- and he had the facts.  And we
23  had --
24  BY MR. SWEET:
25  Q.  So what do you think happened here?

Page 122

1  Because they've been indicted.
2  A.  I don't know.
3      MR. THAMES: Object to the form.
4  A.  I can't answer that.
5  BY MR. SWEET:
6  Q.  Do you think it was unfair to indict
7  them?
8      MR. THAMES: Object to the form.
9  A.  I can't answer that.  That's not my
10  opinion to whether -- but I --
11  BY MR. SWEET:
12  Q.  You wanted to put them back on the
13  street to work?
14  A.  Yes, I did.
15  Q.  You want them on the street to work now?
16  A.  Yeah.  Based on the evidence that I got,
17  I did not see any police brutality from the
18  evidence.
19  Q.  Well, you understand you don't have --
20  you didn't have most of the evidence?
21  A.  Correct.  Correct.
22      MR. THAMES: Object to the form.
23  BY MR. SWEET:
24  Q.  I mean, so you going to put police
25  officers on the street, and you don't have the

Page 123

1  evidence whether they assaulted somebody or killed
2  them or not?
3  A.  Based on the --
4      MR. THAMES: Object to the form.
5  A.  -- facts of all the evidence we have as
6  of today, yes, I was going to put them back on the
7  street.
8  BY MR. SWEET:
9  Q.  Okay.  I mean, you didn't have the
10  autopsy, sir?
11  A.  No, sir.
12  Q.  You didn't know he was beat about the
13  head, do you?
14      MR. THAMES: Object to the form.
15  A.  No, sir.
16  BY MR. SWEET:
17  Q.  You want to see his medical records?
18  You know he had broken ribs where he was kicked in
19  the side?
20  A.  Yeah.
21  Q.  Okay.  So if a people -- if people
22  witnessed somebody and they had said, Hey, man,
23  this officer hit him about the head, threw him on
24  the ground, and kicked in the side, you would
25  expect that he was going to have injuries to the

Page 124

1  head and injuries to his side, right?
2      MR. THAMES: Object to the form.  You
3  can -- if you can answer that.
4  A.  Say it once again.
5  BY MR. SWEET:
6  Q.  I'll withdraw it.
7      You know that gentleman had had a
8  stroke?
9  A.  No, I did not.
10  Q.  Are you familiar with people who've had
11  a stroke?
12  A.  Yes.  I'm familiar with people who have
13  had a stroke.
14  Q.  They're usually weak?
15  A.  Yeah.  One side of their body impaired
16  or...
17  Q.  Talking about one side of the body?  Are
18  you -- I can show you -- I can show them the
19  medical records.
20      You know he got out the hospital on
21  the 26th after he suffered a stroke?
22  A.  Okay.
23      MR. THAMES: Object to the form.
24  BY MR. SWEET:
25  Q.  So you expect that -- it wouldn't

Page 125

1  surprise you if one side of his body was weak?
2      A.  No.  It wouldn't surprise me.
3      Q.  Okay.  This is, I think, 17 days.  This
4  happened on the 13th.  He was out of the hospital
5  on the 26th, so 17 days after he had a stroke.
6          MR. THAMES: Chief, only answer if you
7      know.
8      A.  No.
9  BY MR. SWEET:
10     Q.  After he was released from the hospital.
11     A.  No.  I did not know any of that.
12     Q.  Well, I'm telling you the facts.
13     A.  Okay.
14     Q.  If you want to know the facts, he was
15 released from the hospital on December 26th, and
16 this incident happened on January 13th.
17     A.  Uh-huh (affirmative response).
18     Q.  And I believe that's 17, 18 days,
19 something like that.
20     A.  Uh-huh (affirmative response).
21     Q.  So you wouldn't expect someone to have
22 fully recovered from a stroke in 17 days?
23         MR. CORY: Object to the form.
24         MR. THAMES: Object to the form.
25

Page 126

1  BY MR. SWEET:
2      Q.  Right?
3      A.  Well, I can't -- I can't answer that.
4      Q.  Okay.  So you got -- and your officers
5  out there are pretty young guys, right?
6      A.  Yes.
7      Q.  So you've got three guys on a
8  62-year-old guy who was out at the hospital for a
9  little over two weeks to arrest him?
10     A.  How old was he?  He's --
11         MR. THAMES: Object to the form.
12 BY MR. SWEET:
13     Q.  He's 62.
14     A.  62?
15         MR. THAMES: So what's -- make sure you
16     understand the question.
17 BY MR. SWEET:
18     Q.  And this is -- you know the kind of
19 shape he was in.  He was just released from the
20 hospital, having been admitted for a stroke.
21         MR. CORY: Object to the form.
22         MR. THAMES: Object to the form.  He's
23     already testified he didn't know that he was
24     in the hospital.
25

Page 127

1  BY MR. SWEET:
2      Q.  Did you know that?
3      A.  No, sir.  I didn't know that.
4      Q.  Okay.  You wouldn't expect he's going to
5  be able to fight off three young, strapping
6  officers, would you?
7          MR. CORY: Object to the form.
8          MR. THAMES: Object to the form.
9      A.  Man, I can't -- I can't answer that
10 question.
11 BY MR. SWEET:
12     Q.  Killer George, 62, having a stroke, he's
13 kind of -- would be a feeble person, wouldn't he?
14         MR. THAMES: Object to the form.
15         MR. CORY: Object to the form.
16     A.  I can't -- I can't --
17 BY MR. SWEET:
18     Q.  Let's assume he's a big, strapping guy.
19     A.  Well, I just --
20     Q.  He fought off a stroke like there's
21 nothing to it.
22     A.  Yeah.
23     Q.  I mean, I don't even know why they
24 admitted him.
25     A.  I can't...

Page 128

1          MR. THAMES: Don't -- there's no
2      question.
3          THE WITNESS: Yeah.
4  BY MR. SWEET:
5      Q.  Well, my point is, you would -- you got
6  three officers in your facts who have taken out
7  and -- pulled a guy out of a car and put him on
8  the ground.  He's 62 years old and just suffered a
9  stroke.
10         You wouldn't expect that he's going
11 to be putting up much resistance, would you?
12         MR. CORY: Object to the form.
13         MR. THAMES: Object to the form.
14     A.  I can't -- I can't...
15 BY MR. SWEET:
16     Q.  They're saying that he swallowed some
17 tab -- swallowed some tab like it's illegal drugs.
18 Okay?
19     A.  Okay.
20     Q.  So you have the toxicology report.
21         You'd expect to find some illegal
22 drug in his system, wouldn't you?
23     A.  Well, I don't know.  Because I don't
24 know how long a drug stay in the system.  So I'm
25 not a medical doctor.  I can't answer that

**Page 129**

1  question.
2     Q.  Okay.  They said he put it on there that
3  day, and he was within the hospital about three,
4  four hours after this incident happened.
5          You expect, if he just swallowed
6  it, it would be in his system four or five hours
7  after --
8     A.  Well, I can't --
9         MR. THAMES: Object to the form.  Asked
10   and answered.
11     A.  I can't answer that.
12  BY MR. SWEET:
13     Q.  You know what drug they found in his
14  system?
15     A.  No.
16     Q.  An antiseizure medication.
17         Did you know that?
18     A.  No.  I --
19         MR. CORY: Object to the form.
20  BY MR. SWEET:
21     Q.  And some marijuana.
22         MR. CORY: Misstates the -- misstates
23   the facts.
24         MR. SWEET: Oh, I am?
25         MR. CORY: That's not accurate.

**Page 130**

1         MR. SWEET: Okay.  You got an expert?
2         MR. CORY: Look at the records.
3         MR. SWEET: Okay.  Well, they can tell
4   you what's in his system.
5  BY MR. SWEET:
6     Q.  You ever discharge your duty weapon?
7     A.  Have I ever discharged my duty weapon?
8     Q.  Uh-huh (affirmative response).
9     A.  In the line of duty?
10     Q.  Uh-huh (affirmative response).
11     A.  I can't recall.
12     Q.  Did you know George Robinson before
13  this?
14     A.  No, sir.
15     Q.  How well did you know the officers
16  involved in this?
17     A.  Very well.
18     Q.  Okay.  Tell me your relationship with
19  Mr. Fox.
20     A.  He's an outstanding officer.  Like I
21  know all of them.  All of them been doing
22  outstanding work.
23     Q.  I mean, did you ever -- were you ever
24  his supervisor or under his command?
25     A.  No.  I can't recall being his direct

**Page 131**

1  supervisor.
2     Q.  What about Barney?
3     A.  Never been a direct supervisor.
4     Q.  What about Lampley?
5     A.  Never been a direct supervisor.
6     Q.  Any of these -- any of these persons
7  ever had any complaints of excessive force in the
8  past?
9     A.  I can't recall.
10     Q.  Okay.
11     A.  I don't have their file.  I can't
12  recall.
13     Q.  Okay.  You said that he had lived in a
14  hotel.
15         How did you come to find that out?
16  Is that from the hotel people?
17     A.  Yes.
18     Q.  Did he live there with someone?
19     A.  I don't know.
20     Q.  Did he have a girlfriend who lived there
21  with him?
22     A.  I don't know all those details.
23     Q.  Did you, yourself, go to the hotel?
24     A.  No, sir.
25     Q.  Okay.  So what you got is you've got --

**Page 132**

1  who did you talk to, to tell you about the hotel
2  and the incident?
3     A.  I think Deputy Chief Derek Hearn, deputy
4  chief over the investigation.
5     Q.  Okay.  So you contacted AMR to get that
6  e-mail?
7     A.  No.  Commander Donna Gaiter is the
8  commander over the investigation.
9     Q.  Did y'all actually interview the person
10  who actually went on the scene with AMR?
11     A.  I don't have that information right in
12  front of me.  But I'm...
13         MR. SWEET: Let me see that exhibit
14   again.
15         MR. THAMES: What exhibit is that?
16         MR. SWEET: 3.
17         MR. THAMES: 3?  Okay.
18         MR. SWEET: I have nothing further.
19         MR. CORY: No questions.
20         MR. JULIAN: No questions.
21         MR. SPRINGER: No questions.
22         MR. THAMES: No questions.
23         (Ended at 12:12 p.m.)
24
25

Page 133

```
1              CERTIFICATE OF COURT REPORTER
2            I, Todd J. Davis, Court Reporter and
3   Notary Public in and for the County of Madison,
4   State of Mississippi, hereby certify that the
5   foregoing pages contain a true and correct
6   transcript of the testimony of JAMES E. DAVIS, as
7   taken by me in the aforementioned matter at the
8   time and place heretofore stated, as taken by
9   stenotype and later reduced to typewritten form
10  under my supervision to the best of my skill and
11  ability by means of computer-aided transcription.
12           I further certify that under the
13  authority vested in me by the State of Mississippi
14  that the witness was placed under oath by me to
15  truthfully answer all questions in this matter.
16           I further certify that I am not in the
17  employ of or related to any counsel or party in
18  this matter and have no interest, monetary or
19  otherwise, in the final outcome of this matter.
20           Witness my signature and seal this the
21  19TH day of SEPTEMBER, 2020.
22
23                      TODD J. DAVIS, CSR #1406
24  My Commission Expires:
25  March 27, 2021
```

```
1         IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSISSIPPI
2   BETTERSTEN R. WADE AND
    VERNICE ROBINSON, INDIVIDUALLY AND ON
3   BEHALF OF ALL THE HEIRS AT LAW AND
    WRONGFUL DEATH BENEFICIARIES OF
4   GEORGE ROBINSON, DECEASED         PLAINTIFFS
    VERSUS         CIVIL ACTION NO. 3:19-CV-897-CWR-FKB
5   CITY OF JACKSON, MISSISSIPPI;
    ET AL.                            DEFENDANTS
6            CERTIFICATE OF DEPONENT
7            I, JAMES E. DAVIS, certify that I have
8   examined the foregoing pages as to the correctness
9   thereof, and that after reading said pages, I find
10  them to contain a full and true transcript of the
11  testimony as given by me on SEPTEMBER 9, 2020,
12  except for the list of corrections, if any,
13  attached on a separate sheet with the page number,
14  line number and the desired correction/change.
15  Witness my hand, this the _____day
16  of_____, 2020.
17                    _____
18              JAMES E. DAVIS
19              CERTIFICATE
20           Subscribed and sworn to before me, this
21  the ____ day of _____, 2020.
22
23
24  My Commission Expires:    _____
25  _____    Notary Public
```

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 36 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

**[**

**[sic] (2)**
42:12;89:18

**A**

**able (1)**
127:5
**Abnormalities (2)**
42:13,14
**abnotalities (1)**
42:11
**abrasions (1)**
39:12
**absolve (1)**
121:15
**academy (3)**
7:20,24;8:22
**According (2)**
98:17;99:2
**accurate (1)**
129:25
**accusations (2)**
117:25;118:2
**across (1)**
31:3
**act (1)**
72:1
**actually (8)**
9:9;43:10;49:5;82:4;
91:16;111:23;132:9,10
**Addition (3)**
81:7,15;104:21
**address (8)**
10:5;25:24;26:1;
29:18;30:3,25,25;
50:19
**addressing (1)**
97:23
**administrative (1)**
89:5
**admissible (1)**
50:10
**admitted (2)**
126:20;127:24
**affairs (12)**
10:7,10,12,13;12:13;
17:2;44:1;61:10;64:10,
13,17;68:11
**affirmative (19)**
5:20;6:22;13:25;
14:4;17:17;22:3;44:8;
49:25;55:23;56:1,6;
73:13,17;74:16;100:4;
125:17,20;130:8,10
**again (3)**
117:18;124:4;132:14
**against (1)**
120:22
**agent (1)**
113:10

**aggressing (1)**
110:2
**aggressive (1)**
99:8
**ago (1)**
7:15
**agree (1)**
109:23
**agreed (5)**
64:12,23,24;65:25;
121:7
**ahead (9)**
9:11,24;18:6;23:21;
28:24;63:18,18,18;
97:20
**ain't (4)**
11:11;34:20;40:11;
93:17
**almost (1)**
72:11
**alone (1)**
47:5
**along (1)**
18:18
**aloud (1)**
69:22
**always (1)**
18:10
**ambulance (8)**
42:17,21,23;48:8;
49:1,11;50:2;114:24
**AMR (6)**
28:16,16;42:7;47:22;
132:5,10
**ankle (3)**
59:14;61:17;77:6
**answered (5)**
27:22;78:20,21;
94:14;129:10
**Anthony (1)**
89:25
**antiseizure (1)**
129:16
**apologize (1)**
65:7
**apparently (1)**
99:8
**apprehend (9)**
81:24;82:9;90:9;
101:19,19,22;103:8;
105:2;109:16
**apprehended (3)**
82:2;90:23;92:10
**apprehending (1)**
91:12
**approaching (2)**
105:17;113:20
**April (1)**
73:12
**area (21)**
80:18;81:3,5,7,10,15,
17,20;88:22;89:22;
91:13;100:3,8,13;

**101:1;104:21;109:8,**
14;110:8,9,17
**areas (3)**
89:6;96:7;99:4
**Arnold (8)**
84:1,3,9,13,16,17;
85:5,12
**around (4)**
6:15;55:1;101:18;
102:6
**arrest (2)**
104:14;126:9
**arrested (5)**
91:25;94:22;112:6,
17,19
**arresting (1)**
15:18
**assault (3)**
22:23;83:19;86:7
**assaulted (28)**
21:13;53:6,6,18;
56:2,7;58:10;75:22;
76:3;86:7,13,14;87:18;
106:11,15;115:6,12;
116:7,11,17,20,24;
117:21,22,23;118:24;
119:13;123:1
**assaulting (2)**
115:2;119:18
**assign (1)**
109:13
**assigned (2)**
56:19,22
**assistance (2)**
11:16;96:4
**Assistant (3)**
8:16;74:18,19
**assisted (1)**
13:24
**assume (5)**
16:16;77:5;111:1;
116:25;127:18
**attention (2)**
117:14,18
**attorney (1)**
35:9
**attorney's (2)**
12:21,23
**Austin (1)**
8:3
**autonomy (1)**
89:20
**autopsy (23)**
14:14;18:1;31:22,24;
37:4,15,24;38:2,7,8;
40:9,25;51:3,19,21;
53:24;57:18;60:25;
61:3,12,13;77:11;
123:10
**away (6)**
28:18;44:23;46:21;
47:4,5,5

**B**

**back (30)**
7:18;9:4;10:1,20;
17:15,19;23:23;26:24;
27:2,6;28:9,21;31:12;
41:23;58:11;65:16;
67:22;70:1;71:23;79:2;
80:13;103:1;106:19;
114:19,23;115:13;
121:4,10;122:12;123:6
**background (1)**
117:1
**Balton (1)**
85:19
**barbecue (3)**
106:6;107:17,20
**barbecues (1)**
106:8
**barbecuing (1)**
107:25
**Barney (1)**
131:2
**barricaded (1)**
92:5
**based (23)**
19:8;21:24;23:20;
24:2,2,6;25:21;26:25;
27:4,8,10,11,13;28:10,
11,12,20;31:11;32:1;
44:20;63:11;122:16;
123:3
**basically (6)**
61:22;77:15;87:24;
89:9;114:24;116:8
**basing (2)**
47:12,13
**beard (5)**
22:19;23:4;118:21;
119:3;120:1
**beards (1)**
23:19
**beat (7)**
43:2;47:3;50:22;
53:21,25;84:24;123:12
**beaten (4)**
39:17;40:5,12;47:1
**beating (1)**
40:10
**benefit (1)**
98:1
**besides (1)**
59:5
**big (10)**
23:4;117:11;118:6,
10,19,21;119:3,25,25;
127:18
**bill (1)**
121:21
**bit (1)**
12:19
**blood (3)**

15:6;16:8,9
**blows (1)**
76:19
**blue (3)**
19:24;20:24;116:25
**body (4)**
14:25;124:15,17;
125:1
**bottom (3)**
34:19,21;38:11
**boys (1)**
88:14
**boy's (1)**
103:19
**bracelet (3)**
59:14;61:17;77:6
**brain (3)**
39:13,14;47:1
**break (6)**
30:12;64:16;72:11;
95:15,15;119:11
**Brian (2)**
95:19;96:22
**bring (14)**
18:6;19:12;24:15;
26:5;28:24;31:1,9,10;
80:12;92:16;116:8;
117:13,17;119:1
**broad (3)**
57:16;104:19,19
**Broke (1)**
76:21
**broken (1)**
123:18
**brought (3)**
28:11;116:9,10
**bruises (1)**
88:4
**brutality (5)**
10:16;20:2;28:14;
44:3,7;122:17
**bunch (4)**
79:7;80:17;81:3,5
**Burns (2)**
95:20;96:22
**business (3)**
43:19;48:17;113:20
**busy (1)**
7:17
**buying (1)**
113:2

**C**

**call (7)**
82:21;89:11;95:6,7;
103:17,19;115:24
**called (12)**
32:18;62:12;82:5,7,
18,21;83:3;88:11;91:1,
23;102:14;104:23
**came (16)**
13:21;14:3;18:22;

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 37 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

19:3,7;20:16;48:24;
53:3;57:5;62:14;82:4,
18;91:2;95:7;101:9;
106:19
**Can (62)**
6:6;9:22;10:5;11:23;
12:18;15:12,16,16;
16:9,12;23:22;27:24;
28:1;31:2,10,12;34:1,
2;38:14;39:2,4;41:9,9;
44:22;46:2;48:3;50:19;
52:16;55:7;59:10,10,
16;62:13;64:3,9,16;
66:4;67:10;69:3,20;
70:1;71:13,22;72:18,
19;73:9;75:11,13;87:4,
4,9,10;97:8;104:11;
114:21;115:23;117:12;
124:3,3,18,18;130:3
**canvassing (1)**
54:11
**car (7)**
25:18;28:18;46:21;
47:10;58:7;107:24;
128:7
**care (4)**
16:2;34:7;36:7;
71:13
**career (1)**
9:2
**Carlton (2)**
96:16;98:23
**Carly (1)**
85:19
**cars (3)**
96:8;99:5;102:6
**case (48)**
9:7,12,13;10:14,22;
16:23;17:10;18:4,7;
26:7;29:6,10,12,13;
31:4,6,10,11,25;33:8;
34:13,13,21;36:14;
37:8;38:2;40:1;51:13,
14,21,23;59:3;60:11;
61:6;63:23;64:7,10,17;
69:2;75:1;95:19;96:22;
98:8,12;99:3;114:25;
121:8,12
**change (1)**
102:24
**characters (1)**
57:15
**charge (1)**
49:6
**charged (1)**
50:2
**charges (2)**
37:23;120:21
**Charlotte (1)**
74:5
**checked (7)**
28:16;42:10,18;
47:23,25;48:2,4

**checkpoints (2)**
28:17;89:6
**CHIEF (45)**
5:1,5;6:9;8:15,16,16,
17;10:19;26:20;27:1;
30:6;35:23,24,24;36:2;
37:10;56:22,24,25;
60:10;63:14;65:6,11;
71:2;74:8,12,17,18,19;
94:1,2,2,2,2,2;95:23;
96:1,2,5;97:11;111:21;
119:2;125:6;132:3,4
**chiefs (1)**
99:20
**church (1)**
18:14
**circumstances (5)**
31:11;42:7;43:7;
54:14;121:20
**citizens (6)**
10:6;48:9;57:9;89:7;
96:8;99:5
**city (20)**
26:2;31:3;50:3;69:5;
72:8,24,25;73:2,5;74:2,
6,9,13;78:16;95:20,23;
96:5,7,23;99:4
**civil (8)**
10:18,21,24;11:3;
12:9;13:12;14:7;
113:18
**clarify (2)**
34:9,11
**clear (8)**
12:18;25:10,10;
26:12,23;44:11;61:11;
87:11
**cleared (5)**
17:22;18:1;43:23;
44:12;113:17
**clerical (1)**
49:14
**closed (2)**
68:8,12
**closure (2)**
28:22;31:2
**college (3)**
7:16;9:1;47:18
**coming (3)**
114:2,5;115:4
**command (3)**
9:1,1;130:24
**commander (6)**
8:15,15;23:8;57:4;
132:7,8
**commit (1)**
57:13
**committed (9)**
19:13;41:16;90:14;
94:21,25;99:17;110:7,
9,18
**committee (1)**
93:10

**community (75)**
7:16;9:23;18:19,22;
19:8,10;24:7,12,14,15;
26:2;28:11,22;29:18,
21,25;30:3;31:2;32:10;
42:6;43:8;50:19;55:18;
57:11,14;62:4,5,7,10,
11,11;63:20;67:9;73:6;
78:3,4;82:2,3,4;83:5,7,
10,13;85:25;89:10;
90:2,2,3,7,9,10,13,21;
92:14;93:2,3,4,6,9,10;
94:8,17,18,20;101:2,3,
3,4,7,13,15;102:3,4;
105:5,12
**compel (1)**
73:11
**competent (1)**
6:4
**complained (1)**
73:5
**complaint (1)**
73:6
**complaints (1)**
131:7
**complete (1)**
48:21
**conduct (1)**
81:21
**conference (13)**
9:7,13,15,19;10:9;
66:13,14,16,17;80:5,
12;85:24;121:9
**conferences (2)**
66:25;80:11
**confidence (2)**
21:6;60:7
**confrontation (1)**
19:18
**connection (1)**
48:16
**Constance (1)**
85:23
**constantly (1)**
51:17
**contact (6)**
19:3,7;20:16;49:1;
101:21;118:23
**contacted (3)**
20:21,22;132:5
**contained (2)**
73:2,5
**contradict (1)**
87:19
**contusions (3)**
39:13,13;76:18
**conversating (1)**
101:3
**conversations (1)**
30:24
**copy (6)**
11:24;46:2,10;97:12;
114:21,22

**CORY (15)**
40:16,22;50:12;
53:19;57:25;125:23;
126:21;127:7,15;
128:12;129:19,22,25;
130:2;132:19
**County (1)**
31:9
**couple (2)**
7:15;8:21
**course (5)**
39:5;48:17;75:16,18;
77:10
**court (4)**
64:23;65:17;73:11;
96:20
**cracked (2)**
39:22,25
**crediting (1)**
22:7
**crime (8)**
19:13;94:21,25;
99:17;110:7,9,18;
113:3
**Criminal (2)**
7:13;29:14
**cry (1)**
24:14

**D**

**DA (34)**
9:9;10:4,17,20;11:7,
12,13;12:12,15;18:6;
23:21;26:11;28:23;
29:8;31:5,9;32:1,17;
33:11;51:16,19,21,21;
60:7,12,14,18,20;61:1;
114:15;121:7,12,12,20
**damage (1)**
57:17
**DA's (12)**
11:6,9;16:23;18:4;
25:23;37:9;40:2;51:22;
68:13,17;76:10;77:10
**date (3)**
12:1;73:8;81:6
**DAVIS (4)**
5:1,5;6:8,9
**day (9)**
28:3;39:4;48:5;
53:18;73:12;85:12;
95:1;100:2;129:3
**daylight (1)**
57:17
**days (5)**
18:22;125:3,5,18,22
**DEA (2)**
114:12,14
**dead (5)**
40:12;50:22;112:13;
115:23
**deadline (2)**

**65:10,12
death (6)**
39:15,18;40:11;43:2;
50:22;89:25
**December (1)**
125:15
**decision (5)**
10:12;63:12,17;
104:22;112:24
**defers (1)**
72:24
**degree (1)**
7:18
**Department (5)**
8:5;33:2;88:18;96:6;
99:3
**depend (1)**
15:2
**deploy (2)**
89:20;104:23
**deployed (4)**
92:11,11,15,24
**depose (2)**
13:17;42:24;70:25;
71:1
**deposed (5)**
5:5;52:23;65:22;
102:12,20
**deposing (1)**
66:1
**deposition (5)**
5:19;46:8;70:16;
71:24;72:20
**depositions (2)**
78:14;102:15
**Deputy (11)**
8:15;10:19;56:22,24,
25;74:12,17;96:1,2;
132:3,3
**Derek (1)**
132:3
**described (4)**
118:18;119:3
**description (5)**
21:16,18,23;23:17,
18
**details (1)**
106:3;131:22
**detain (2)**
96:8;99:5
**detective (9)**
21:8,10;22:11,12;
56:18,19;111:15,17;
113:7
**detectives (5)**
49:20;52:17;66:10;
108:7,10
**determine (3)**
42:4;86:6;121:20
**died (5)**
18:12;38:6;40:12;
51:12;76:18
**dies (1)**

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 38 of 45
Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.
Chief James E. Davis

37:18
**different (1)**
63:1
**direct (3)**
130:25;131:3,5
**director (1)**
8:2
**disagree (4)**
99:14,15,22,23
**discharge (1)**
130:6
**discharged (1)**
130:7
**disciplined (1)**
121:2
**disclosure (1)**
72:25
**discovery (3)**
54:17;69:6;78:11
**discrediting (1)**
93:25
**discussed (1)**
120:18
**disputes (1)**
98:2
**District (5)**
8:15;12:21,23;35:9;
98:24
**doctor (2)**
15:9;128:25
**document (4)**
13:16;17:5;39:6;
48:7
**documents (6)**
64:13;78:25;79:3,4,
16;114:10
**done (13)**
9:15;42:3;43:4,6;
44:16;56:21,23;57:19,
21;58:3;69:4;71:24,25
**Donna (1)**
132:7
**door (1)**
92:15
**doubt (3)**
40:11;75:21;98:1
**down (7)**
6:2,25;25:16;30:12;
49:5;69:12;119:12
**drive (5)**
25:17;44:19,23;47:4,
5
**drives (2)**
58:3,6
**driving (2)**
33:1;47:10
**drove (2)**
28:18;46:21
**drug (8)**
14:20;15:2,6,18;
111:7;128:22,24;
129:13
**drugs (9)**

14:24,25;16:11,20;
110:25;111:3;113:2,
11;128:17
**due (3)**
12:12;92:2,13
**duly (1)**
5:2
**during (4)**
20:6;29:15,25,25
**duty (3)**
130:6,7,9

**E**

**earlier (1)**
118:5
**early (2)**
18:16;90:16
**educating (1)**
89:9
**Edward (1)**
6:8
**efforts (1)**
54:8
**Eight (1)**
6:14
**either (1)**
111:22
**else (8)**
41:19;59:5,24;63:8,
21;76:25;94:12;119:12
**e-mail (4)**
30:24;48:24;49:4;
132:6
**employed (1)**
92:19
**employee (1)**
49:11
**employing (1)**
89:18
**encounter (1)**
52:9
**encountered (1)**
106:5
**encounters (1)**
52:7
**end (1)**
98:18
**Ended (1)**
132:23
**enforcement (2)**
7:19;118:1
**enforcing (1)**
89:9
**engage (2)**
89:7;112:25
**engaged (1)**
113:1
**enough (3)**
25:16;90:9;115:24
**entire (1)**
18:18
**entitled (1)**

72:4
**especially (1)**
57:13
**established (1)**
76:16
**even (3)**
88:3;111:6;127:23
**everybody (1)**
34:15
**evidence (32)**
13:12;27:10,11,13;
28:10,11,12,14,20;
39:11,12;54:10,23,25;
55:1,11;56:7;61:25;
76:23;83:17;86:12,15;
87:25;98:22;106:14;
116:21;117:22;122:16,
18,20;123:1,5
**Exactly (3)**
60:19;62:9;68:4
**EXAMINATION (1)**
5:4
**examined (1)**
5:2
**excessive (2)**
120:22;131:7
**Excuse (1)**
17:13
**Exhibit (15)**
11:20,24;38:15,16,
23;46:7,12;48:11,12;
50:6,7;97:3,6;132:13,
15
**exist (1)**
79:19
**exonerated (1)**
24:1
**expect (9)**
112:16,21;123:25;
124:25;125:21;127:4;
128:10,21;129:5
**expert (5)**
15:11;44:25;65:10,
11;130:1
**eyewitnesses (1)**
94:5

**F**

**Facebook (4)**
19:2,24;115:7,11
**facial (1)**
39:12
**fact (7)**
42:20;50:21;51:5,11;
60:5;92:1;98:2
**facts (45)**
10:15;18:7,8;21:24;
23:20;31:11;32:2;42:6;
43:7;49:7;50:18,20;
52:2,11,11;54:14;60:2,
3;62:9;67:11,12,14;
68:5,6,12;87:24;90:11,

12;91:16,17,22;93:8;
94:20;98:4;102:9;
111:19;114:25;116:9;
121:19,22;123:5;
125:12,14;128:6;
129:23
**fair (1)**
17:24
**familiar (2)**
124:10,12
**family (5)**
10:2;26:6;33:8;
60:11;121:9
**far (1)**
40:2
**FBI (12)**
10:18,21;11:16;12:5,
7,8,11,13;13:11,17,21,
21
**federal (3)**
65:17;96:18,20
**feeble (1)**
127:13
**felt (2)**
23:25;121:14
**field (13)**
81:21;96:9;99:6;
100:21;101:10;105:15;
109:20;110:2,6,7,12,
15;114:17
**fight (1)**
127:5
**file (5)**
65:23;66:3;120:11,
16;131:11
**filed (2)**
70:6;75:1
**find (20)**
10:21,23;11:3;12:7,
9;43:5;44:15;50:18;
52:16;53:12;54:9,16;
62:1;75:17;78:7,24,25;
87:5;128:21;131:15
**finding (1)**
98:3
**findings (10)**
10:14,16;16:24,25;
51:25;52:1,2,3;98:20;
121:10
**fine (5)**
28:1;45:15;52:25,25;
53:2
**finish (2)**
7:18;14:12
**firearm (3)**
8:9,10,12
**first (12)**
5:2;6:16;10:2;40:2;
44:21;47:14;65:4;
69:17;85:3,7,10;
118:23
**Fit (2)**
23:17,18

**five (2)**
55:22;129:6
**floating (1)**
55:1
**Floyd (1)**
19:3
**follows (1)**
5:3
**food (1)**
107:9
**force (2)**
120:22;131:7
**form (81)**
9:21;14:10;15:13;
16:17;24:5;38:4;39:20;
40:6,15,16,21,22;
48:19;50:12,13,24;
51:7;52:21;53:10,19,
22;55:14;57:25;58:1;
59:2;73:18;76:8;77:2,
18;80:9,20;82:15;
83:16;85:2;86:9;87:22;
88:5;89:15;91:5,18;
92:7,22;93:13;96:10;
100:10,15;101:24;
103:13,24;104:9,12;
105:20;109:2,11,25;
110:21;111:8;113:22;
116:2;120:13;121:17;
122:3,8,22;123:4,14;
124:2,23;125:23,24;
126:11,21,22;127:7,8,
14,15;128:12,13;129:9,
19
**forth (1)**
103:1
**forthright (1)**
83:9
**forward (2)**
28:12;76:10
**fought (1)**
127:20
**found (5)**
13:12;92:3,3,4;
129:13
**four (3)**
55:22;129:4,6
**Fox (2)**
111:18;130:19
**front (18)**
24:22;32:2;52:14;
59:3;60:3;63:24;78:5;
84:22,23;92:15;106:7,
10;108:3;111:20;
112:15;120:11,16;
132:12
**full (4)**
6:6;22:19;70:3,6
**fully (1)**
125:22
**further (3)**
45:17;97:19;132:18

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

## G

**Gaiter (3)**
22:12;57:4;132:7
**gather (2)**
76:5,9
**gathering (1)**
101:13
**gave (11)**
31:4;52:3;61:1,6,8;
68:13,17;77:22;84:13,
18;106:20
**generated (2)**
48:16;51:22
**gentleman (3)**
14:20;18:12;124:7
**gentlemen (3)**
10:1;23:16;31:12
**genuine (1)**
98:2
**George (22)**
9:7;19:3,5,6,6,17,25;
22:23;50:4;53:5;
105:17;106:5,6,25;
115:12,15,17,25;
116:11,19;127:12;
130:12
**Gets (1)**
58:7
**girlfriend (1)**
131:20
**given (7)**
12:24;31:25;49:9;
51:21,23,24;108:20
**giving (2)**
19:11;47:6
**Good (5)**
32:13,16;83:4;
105:10,13
**grand (42)**
9:12,18,19,25;10:9;
23:22,24;26:5,7,9,16;
27:6;28:24;29:4,6,10;
30:8,15,18,20;31:1,4,
14,21;33:9;36:15,21;
37:1;51:11,14;60:4;
61:11;68:10;73:21;
75:1;77:20,23;113:17;
121:13,14,19,21
**great (6)**
28:5,6;41:12,13;
82:20;91:14
**ground (3)**
21:13;123:24;128:8
**guess (2)**
111:21;117:4
**guy (33)**
8:1;16:1;23:2,12;
24:15;28:17;36:3;50:4,
10;53:8;54:4,9;65:12;
66:1;67:20;75:23;76:3,
6;83:23;102:13;103:7;

118:6,10,19;119:3,9,
14,24,25;120:3;126:8;
127:18;128:7
**guys (3)**
61:11;126:5,7
**guy's (1)**
102:13

## H

**Hamilton (6)**
81:24;89:21,22;
90:10;103:10;105:2
**hand (2)**
111:13,13
**hands-on (1)**
25:22
**hand-to-hand (9)**
105:22,25;106:21;
110:19;112:8,17;
113:6,10,19
**happen (5)**
28:25;29:1,2,3;68:22
**happened (11)**
21:9;35:19;89:13;
92:3,6;112:11,14;
121:25;125:4,16;129:4
**happens (1)**
99:19
**harass (2)**
35:3,4
**hard (1)**
57:12
**harsh (2)**
39:1,2
**head (15)**
21:8;28:15;39:18;
40:5,10;47:3,3;53:21,
25;76:19;85:18;88:4;
123:13,23;124:1
**headquarters (1)**
49:6
**hear (3)**
36:6;106:13;121:12
**heard (15)**
11:2;13:14,15;19:8;
65:4;85:3,7,10;88:11,
13,14,16;95:19;96:15,
22
**hearing (5)**
32:9;46:22;54:22;
64:24;65:24
**Hearn (5)**
22:12;56:22,24;57:1;
132:3
**hearsay (1)**
50:11
**held (1)**
8:5
**help (3)**
12:18;34:14,14
**helped (2)**
24:15;83:23

**hematoma (2)**
39:13;40:13
**Here's (2)**
50:21;74:12
**Hey (5)**
33:18;34:23;36:2;
42:16;123:22
**High (2)**
7:8,9
**highest (3)**
42:10;47:25;48:2
**highlighted (1)**
73:10
**himself (1)**
119:5
**Hinds (1)**
31:9
**hire (1)**
6:4
**hit (2)**
28:15;123:23
**hold (12)**
22:1;27:14;33:16,16;
39:9;48:23;65:5;66:14,
16;69:14;71:7;91:2
**homicide (14)**
37:23;40:5,24;41:17,
19;51:18;56:14;57:2;
58:22;75:8;81:9;82:9;
100:6;103:18
**homicides (2)**
92:18,24
**honest (2)**
75:13;83:9
**hope (2)**
12:14;18:5
**hospital (9)**
59:22;124:20;125:4,
10,15;126:8,20,24;
129:3
**hot (2)**
96:7;99:4
**hotel (28)**
20:11;25:3,5,17,20;
44:20;57:21,24;58:3,4,
6,14,25;59:6,21;66:9,
11,15,18;67:20;86:11,
14,16,17;131:14,16,23;
132:1
**hotspot (1)**
88:23
**hour (1)**
72:11
**hours (2)**
129:4,6
**house (7)**
24:19,21,22;25:2;
84:4,10;107:21
**Huh (1)**
68:24
**humanizing (1)**
89:8

## I

**idea (2)**
95:3;111:4
**identification (4)**
11:21;38:17;48:13;
97:4
**identified (5)**
83:23;111:10,12,14,
16
**identify (2)**
23:1;88:22
**illegal (4)**
16:11,20;128:17,21
**impaired (1)**
124:15
**important (4)**
29:20,24;51:11;
120:6
**incident (8)**
9:16;35:10;48:5;
49:2;120:6;125:16;
129:4;132:2
**incomplete (1)**
38:2
**indicating (1)**
42:11
**indict (1)**
122:6
**indicted (8)**
26:9;29:22;30:2,21;
31:17;32:18;36:18;
122:1
**individual (20)**
19:11,13;22:22;
28:14;32:23;42:9;
44:23;47:9,23;48:2,4;
57:17;75:17;82:9;
83:19;92:16;94:21,22;
101:19;110:11
**individually (1)**
94:4
**individuals (8)**
32:11;55:18;86:3;
87:10,11;101:8;108:9;
118:14
**information (45)**
11:1;12:12,15,16,24,
25;13:22;19:12;24:2,6;
26:25;27:8;48:20;49:7,
8,18;51:15,16;61:7;
65:14;75:11,22;76:1,4,
5,9,10;77:7,9;78:8,12,
24;79:1;89:21;90:1,11,
18;93:11,14;101:9,14;
108:13,16;115:12;
132:11
**informations (1)**
25:21
**initiative (1)**
89:6
**injuries (5)**

39:14;47:2,11;
123:25;124:1
**injury (1)**
47:1
**Inn (4)**
25:12;68:3;76:20,23
**innocent (1)**
110:2
**inside (3)**
86:11,16,17
**instructor (4)**
8:9,11,12,12
**intel (3)**
93:3,5,7
**internal (14)**
10:7,9,12,13;12:13;
17:2;44:1;61:9,10;
64:10,11,13,17;68:11
**interrogate (1)**
101:11
**interview (20)**
10:5;21:7;49:19,20;
58:25;87:6,7;101:6,10;
104:2;108:3,6,10;
110:6,7,12,13,15,16;
132:9
**interviewed (15)**
52:17,18,18,24;
54:20;58:15;85:12;
100:22;108:14,15,17,
18,21;109:4,5
**interviewing (3)**
105:6,15;108:8
**interviews (8)**
52:12;81:21;96:9;
99:6;108:23;109:3,20;
110:3
**into (5)**
10:10;47:19;58:9,11;
86:14
**investigated (1)**
112:23
**investigating (7)**
56:18;68:18;73:3,7,
15;74:21;75:4
**investigation (34)**
10:19;11:16;12:10,
14;25:8,15,22,23;42:3,
5;43:4,6;44:1,11;
51:18;52:5;56:15;
59:12;60:21,22,24;
68:7,11,14;72:25;
75:10,17,19;76:14;
86:5;87:4;117:24;
132:4,8
**investigations (3)**
32:3;37:23;57:3
**investigator (1)**
106:4
**investigators (1)**
61:22
**involved (1)**
130:16

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 40 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

**issue (2)**
31:1;115:5

**J**

**Jackson (14)**
8:5;43:17;48:9;50:3;
57:15;74:6;88:17;89:8;
92:19;95:20;96:6,23;
99:3;115:1
**Jackson's (1)**
99:20
**JAMES (2)**
5:1;6:8
**January (5)**
7:25;12:2;48:6,6;
125:16
**JD (1)**
96:22
**job (2)**
35:1;50:18
**Joe (3)**
8:3;74:12,15
**Johnson (1)**
85:23
**joint (1)**
9:12
**Jones (21)**
20:16,20;57:10,11;
81:7,10;84:4;86:13;
89:13;90:21,24,25;
91:25;93:9,23;94:21,
25;95:5,8,12;106:9
**JPD (2)**
23:1;120:9
**judge (11)**
65:1;96:15,18;97:22;
98:4,7,7,11,11,17,24
**judgment (1)**
97:24
**JULIAN (1)**
132:20
**jumbo (2)**
27:24;28:2
**jump (7)**
88:11,13,14,14,16;
96:7;99:4
**jumping (1)**
110:1
**jury (42)**
9:12,18,19,25;10:9;
23:22,25;26:5,7,9,16;
27:6;28:24;29:4,6,10;
30:9,15,18,20;31:1,5,
14,22;33:9;36:15,21;
37:1;51:11,14;60:5;
61:11;68:10;73:21;
75:1;77:20,23;113:17;
121:13,15,19,21
**justice (4)**
7:13;19:14;24:16;
92:17

**K**

**keep (7)**
27:25;63:5,20;67:7;
94:7,8;115:14
**keeps (2)**
35:15;94:16
**kicked (2)**
123:18,24
**killed (5)**
40:20;41:20;54:2;
82:10;123:1
**Killer (7)**
22:23;115:11,15,17;
116:11,19;127:12
**kind (5)**
97:19;102:25;116:4;
126:18;127:13
**knew (6)**
17:21;24:24;25:3,5,
12;116:6
**knowing (1)**
57:15
**known (1)**
99:20
**knows (4)**
15:23,25;16:4;
102:10

**L**

**lady (21)**
18:9,22;19:22;20:20,
22;21:5;52:14,18;53:2;
55:4,24;57:5;83:18;
86:13;115:21;116:13,
14,15;118:3,3,24
**Lampley (1)**
131:4
**large (2)**
22:14;23:2
**last (2)**
35:19;38:10
**late (1)**
117:16
**later (1)**
18:22
**law (2)**
7:19;118:1
**lawyer (5)**
5:11;38:24;74:6;
96:23;120:19
**lawyers (1)**
64:21
**lead (2)**
44:2;86:6
**leaving (1)**
47:10
**lecture (2)**
33:18,22
**Lee (2)**
95:22,25

**left (2)**
76:19,22
**legal (3)**
17:12;79:6;97:24
**less (3)**
36:7;47:4,5
**lie (3)**
83:12,13;117:17
**lieutenant (1)**
8:14
**lights (3)**
19:25;20:24;116:25
**line (1)**
130:9
**listened (1)**
24:12
**listening (1)**
54:11
**little (2)**
12:19;126:9
**live (1)**
131:18
**lived (14)**
24:20,22,24,25;25:3,
5,13;82:1;84:24;89:22;
95:8,11;131:13,20
**location (1)**
47:11
**long (5)**
6:13,23;8:17;117:18;
128:24
**Longino (1)**
89:25
**look (21)**
35:9;36:5;38:18,24;
39:9;49:23;60:10,20;
69:8,17;71:22;78:25;
87:4;89:11;97:6,7,8;
113:23;114:2;121:19;
130:2
**looked (9)**
10:10;21:20;22:14;
23:4,12;53:13;59:19;
114:7;118:11
**looking (14)**
19:11;32:22;38:13;
54:4,9;75:23;76:2,3,4,
6,6;88:24;98:2;120:2
**lot (4)**
13:3;19:19;77:9;
106:8
**love (1)**
46:9

**M**

**major (1)**
7:12
**makes (1)**
98:20
**making (3)**
70:15;111:10;114:17
**male (1)**

**man (13)**
6:14;16:3;33:18;
34:23;36:2;42:16;
43:13;50:21;51:12;
72:2,16;123:22;127:9
**management (2)**
49:14;66:11
**many (30)**
18:5,5,5;19:14;
28:23,25,25;32:8;
36:22,22,23,24;57:9,9,
11;66:24,25;69:5;
80:11;86:17,20,22,23,
24;92:24;104:18;
107:15,23;108:5;119:6
**marijuana (1)**
129:21
**mark (3)**
11:19;38:14,15
**marked (12)**
11:18,20,23;38:16,
23;46:6,11;48:11,12;
97:2,3;99:6
**Marquez (4)**
81:24;89:22;103:10;
105:2
**marriage (1)**
6:16
**married (3)**
6:11,13,17
**master (1)**
8:13
**matter (2)**
35:13;120:18
**matters (1)**
99:18
**mayor (6)**
66:22;70:25;79:12;
89:11,16;117:12
**mean (31)**
10:23;12:22;15:8;
16:1;17:24;19:6;29:17;
38:25;41:9;43:17;45:2;
50:9;51:2,10;60:4;
62:8;71:3;73:9;82:20;
83:1;86:22;92:5;94:15;
103:17;105:25;112:7;
114:15;122:24;123:9;
127:23;130:23
**means (2)**
40:20;41:19
**media (4)**
10:5;20:7;25:24;
26:1
**medical (12)**
15:8;39:24;47:19,21,
22;48:7,15;49:22,24;
123:17;124:19;128:25
**medication (2)**
15:11;129:16
**meeting (2)**
79:11;117:11

**member (2)**
8:13;62:11
**members (2)**
10:2;60:11
**memo (7)**
10:17;11:8,12;12:8;
30:24;48:1;104:22
**memory (2)**
80:13;113:24
**memos (1)**
10:4
**men (1)**
17:19
**mental (1)**
42:14
**mention (1)**
95:11
**mentioned (2)**
43:11;117:2
**met (1)**
26:7
**mind (4)**
57:9;71:3;72:9;
102:24
**mine (1)**
23:15
**minister (2)**
100:9,14
**Mississippi (1)**
6:20
**misstates (2)**
129:22,22
**momma (6)**
82:17,18,21;95:7;
103:16,19
**money (1)**
112:4
**monitor (1)**
59:17
**monitoring (1)**
77:6
**more (11)**
13:2;15:20;27:2;
33:19;53:7;86:23,24,
25;89:8;99:8;119:18
**morning (2)**
18:16;90:16
**most (4)**
37:22,23;43:24;
122:20
**Motel (3)**
25:12;67:23;68:1
**mother (5)**
83:23;84:14;91:1,23;
102:14
**motion (1)**
97:23
**mouth (2)**
14:21,24
**move (4)**
65:13;72:2,2;73:11
**moved (1)**
59:20

Case 3:19-cv-00897-CWR-FKB  Document 141-5  Filed 10/13/20  Page 41 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

movement (2)
59:16;61:16
moving (1)
17:11
much (1)
128:11
multiple (12)
8:25,25;9:1,14;10:3;
23:21;29:15;30:23;
47:2;58:12,12;76:18
mumbo (2)
27:24;28:2
murder (11)
37:22;43:17;89:13;
90:14,23;91:25;92:13;
93:1;95:1;109:9,16
murdered (2)
92:14;115:23
murders (1)
43:20
Mustang (6)
67:23;68:1,3,5;
76:20,23
myself (1)
44:22

## N

name (14)
6:7;32:10;62:13,15,
16,22,23;78:16;83:24;
84:1,14;94:9;98:18;
116:12
named (2)
20:20;94:7
names (2)
93:19;94:7
narcotics (10)
81:14;99:7;100:6;
103:18;105:21;106:4;
109:14;111:17;112:2;
113:9
Natchez (4)
6:20;7:1,4,8
necessarily (2)
98:3;99:16
need (21)
11:19;16:3;17:11;
18:23;33:22;34:13,14,
22;38:18;56:23;61:13,
15,18;63:25;64:2;
65:11,13,14;71:20;
82:25;119:2
needed (2)
63:11;65:11
needs (2)
34:17;71:17
neighborhood (1)
99:19
new (2)
60:18,20
news (2)
9:6;44:17

next (7)
69:23;70:10,23;71:6,
19;72:2,3
nice (1)
16:1
night (2)
49:16;57:10
nine (1)
6:14
nobody (2)
13:23;58:10
none (2)
23:16;79:19
nonmoving (1)
97:25
nonsensical (1)
34:6
Nor (4)
12:10;23:18,19;
86:13
noted (1)
42:14
nowhere (1)
59:24
number (3)
47:25;73:10;100:2
numerous (1)
108:2

## O

oath (1)
5:3
Object (83)
9:21;14:10;15:10,12;
16:17;24:4;38:4;39:20;
40:6,15,16,21,22;
48:19;50:12,13,24;
51:7;52:21;53:9,10,19,
22;55:13;57:25;58:1;
59:2;73:18;76:8;77:2,
18;80:9,20;82:5;
83:16;85:1;86:8;87:22;
88:5;89:15;91:5,18;
92:7,22;93:13;96:10;
100:10,15;101:24;
103:13,24;104:9,11;
105:20;109:2,11,25;
110:21;111:8;112:22;
116:2;120:13;121:17;
122:3,8,22;123:4,14;
124:2,23;125:23,24;
126:11,21,22;127:7,8,
14,15;128:12,13;129:9,
19
objection (1)
97:21
objections (1)
15:15
Obviously (1)
12:20
occur (1)
86:7

occurred (1)
21:2
odd (1)
92:20
off (6)
66:1;85:16,18;
117:13;127:5,20
offered (2)
107:9,12
office (24)
11:6,9;12:21,23;
13:21;14:3;16:24;18:4,
9,23;25:24;37:9;40:2;
53:3;57:6;60:13,15;
62:14;68:13,17;76:11;
77:10;116:22;118:25
officer (23)
8:6,24;14:23,23;
15:17;22:25;37:7,13;
52:23;57:13;84:13;
99:2;106:2;110:10;
116:7;118:7,9,15,16,
19;119:16;123:23;
130:20
officers (42)
13:14;19:4,7,18;
20:15;21:17;23:23;
28:13;41:22;43:9,23;
44:12;52:4;56:11;
57:16;80:17;81:3,5;
84:22;85:11;88:22;
89:12;92:2;96:7;99:4,
7,16;100:21,25;102:12,
19;105:21;115:1,2;
119:8,11;120:24;
122:25;126:4;127:6;
128:6;130:15
Officer's (3)
52:7,8,10
old (3)
6:9;126:10;128:8
Once (5)
5:7;25:7;27:3;57:5;
124:4
one (38)
17:13;21:19,20;
32:16,21;39:24;52:18,
20;53:7;62:8,25;63:1,
2,10,11;67:1;69:8;
70:15;71:25;84:13;
94:11,12;106:10;
110:24,25;111:10,18,
23;112:13,14;119:18,
19,20,21;120:20;
124:15,17;125:1
ones (1)
50:2
ongoing (1)
68:14
only (6)
52:16;63:10,11;
77:22;110:13;125:6
open (3)

56:14,17;58:22
Operation (1)
89:4
opinion (4)
47:6,7,8;122:10
order (2)
97:22;101:6
ordinary (2)
96:8;99:5
organization (1)
74:12
originally (1)
6:19
out (90)
9:4;13:11;18:18,19;
19:10,15,20;20:8,8,23;
24:7,7,10,14;25:18,19;
28:16;31:6;32:11;
42:10;43:5;44:15;
47:23;48:1,2,4,25;49:4,
13,15;53:12;55:22;
56:3,7;57:4,6,11;58:7,
13,14;65:18;66:10;
67:20;75:22;78:8,24;
79:1;80:17,17;81:3,5,
21,23;85:12,17;86:17;
87:5;88:11,13,14,14,
16;89:5;93:19;96:8;
99:5;101:8,17,18;
102:6;105:7,9,11;
106:8;107:8,19,22,23;
108:2,8;110:1;119:6,
11;124:20;125:4;
126:5,8;128:6,7;
131:15
outstanding (2)
130:20,22
over (50)
5:10,11,17;16:23;
18:4;22:12;26:2;31:4,
5;34:2;37:8;40:1;
60:10,20;61:6;69:4,
4,20,21,21,22;70:14,
15;76:10;77:10,14;
79:2;82:18;83:23;
87:15;89:12;91:3,8,21;
92:4;95:2,7;102:3;
103:8,18;104:21;
109:17;113:24;114:2,
7;117:12;126:9;132:4,
8

## P

packet (1)
61:24
page (6)
34:18;69:23;70:10;
71:19;72:2,3
paint (1)
19:9
paragraph (5)
38:10;97:7,15;98:5;

99:1
Pardon (2)
7:7;120:15
parked (1)
107:25
part (2)
46:7;48:6
particular (1)
67:1
party (1)
98:1
Pass (1)
73:8
past (1)
131:8
pastor (1)
18:12
Patrol (1)
8:6
patrolled (1)
109:10
Patrolman (1)
99:6
patrolmen (4)
81:17;100:6;103:17;
109:13
pending (2)
29:13,13
people (68)
13:15;15:19;19:15,
19;20:18;32:3,5,6,8;
36:18;42:6;43:9;52:12;
54:23;55:22;58:12,15,
25;62:4,7,11;78:4,6,15,
15;82:25;83:5;86:17,
25;90:2,8;93:20;100:3,
20,21,22;101:6;104:2;
106:17,20;107:6,13,15,
23;108:2,4,5,11,14;
109:14,18,19;110:2,13,
16,20;112:9,17,18;
113:5;119:6;120:5,10;
123:21,21;124:10,12;
131:16
per (5)
10:19;11:8;30:23,24,
24
person (22)
32:21,25;37:18;
46:25;52:16;53:7;
83:22;87:5,6,6,7,7;
99:17,18;110:24;
112:6,7,11,23;113:2;
127:13;132:9
personal (1)
30:24
personnel (2)
49:22,24
persons (4)
21:1;36:18;93:24;
131:6
picked (1)
106:19

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 42 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

**picture (2)**
19:9,16

**place (15)**
9:16,24;10:6;26:3;
33:12;45:14,22,23,25;
52:8;67:10;80:16;
86:16;89:4;105:22

**plaintiffs (1)**
72:24

**play (1)**
117:12

**Please (5)**
30:16,22;38:24;
72:13,23

**pm (1)**
132:23

**point (6)**
36:2;47:1;53:18;
70:7;15;128:5

**police (52)**
6:25;8:5;10:15;
14:23;15:17;19:12,25;
20:2;22:24;28:14;33:2;
37:7,13;43:23;44:2,7;
56:11;57:13;65:11;
77:25;79:8;80:16;
82:20;83:2,7,10,13;
87:3;88:17;95:23;96:6;
99:2,3,20;101:11;
115:1,2;116:7,17,23;
117:1,23,24;118:7,9,
15,16,18,24;119:15;
122:17,24

**policing (2)**
57:14;89:8

**policy (1)**
99:25

**political (2)**
60:13,15

**porch (2)**
52:15,19

**position (1)**
95:25

**positions (1)**
8:4

**Positive (1)**
68:21

**possession (1)**
12:20

**possible (1)**
110:17

**practice (2)**
88:17;99:21

**preacher (1)**
92:14

**precedent (1)**
97:25

**Precinct (4)**
8:8,13,14,14

**precincts (1)**
8:7

**preliminary (1)**
65:12

**present (7)**
9:11,18,25;10:8;
23:22;79:5;99:19

**presented (4)**
10:13;61:25;68:6,12

**press (14)**
9:12,15,18;10:9;
66:13,14,16,17,25;
80:5,11,12;85:24;
121:9

**pretty (1)**
126:5

**prevented (1)**
61:25

**prior (1)**
115:3

**privilege (1)**
17:5

**privileged (1)**
17:4

**Probably (2)**
6:24;13:1

**procedure (9)**
80:16;81:2,4;88:10,
21;89:1;96:5;99:25;
109:7

**produce (6)**
64:24;65:1,6,25;
79:25;108:25

**produced (5)**
64:14;65:7,9,19;
66:11

**pulled (1)**
128:7

**purchaser (1)**
110:24

**put (22)**
9:25;14:20,24;23:22;
24:14;28:9,21,22;31:2,
12;38:12;41:23;45:15;
114:18,23;121:4,10;
122:12,24;123:6;
128:7;129:2

**putting (2)**
102:9;128:11

**Q**

**quiet (2)**
35:1,3

**R**

**Range (1)**
8:13

**rank (1)**
50:11

**Rawls (1)**
85:21

**Ray (1)**
85:15

**read (23)**
5:18,23;11:19;38:7,

10;39:9;69:12,22;
70:14,19,23,23;71:6,6;
72:5,13,18,19,19,20,
23;93:19;98:16

**reading (2)**
46:22;72:9

**ready (2)**
61:10;73:20

**Really (7)**
6:21;16:1,2;38:1;
75:10;85:9;112:20

**reason (5)**
20:8;45:24;106:5;
112:24;121:10

**reasons (1)**
104:18

**recall (19)**
14:16,19;18:3;66:23,
24,25;67:18;80:10,10;
84:2;85:13,14;89:14;
95:21;96:24;130:11,
25;131:9,12

**receive (1)**
18:8

**received (4)**
8:23;18:7;25:22;
47:20

**recess (1)**
95:17

**record (5)**
45:16;48:16;70:3,6;
97:21

**recorded (1)**
55:20

**records (4)**
49:18;123:17;
124:19;130:2

**recovered (3)**
112:2,4;125:22

**red (4)**
22:21;23:19;118:12;
119:4

**re-deposed (1)**
63:25

**redirect (1)**
70:2

**Reeves (7)**
96:16;97:23;98:4,7,
11,17,24

**reference (3)**
9:13;38:12;52:8

**referring (1)**
115:14

**refresh (1)**
113:24

**regular (2)**
48:16;51:18

**relates (5)**
10:14,22;11:16;
51:25;115:1

**relationship (5)**
82:24;83:1,2,4;
130:18

**released (3)**
125:10,15;126:19

**reliable (1)**
93:11

**repeat (3)**
5:16;46:15,17

**report (45)**
10:20;17:2;18:1;
28:16;31:22,24;37:24;
38:3,7,9;39:23;40:9,
25;42:7,21;43:2;46:3;
47:9,13,14,22;52:5,7,
10;58:18,20;60:25;
61:3,10,12,14,16;
65:13;66:2;77:11;
78:23;111:20;112:15;
113:8,24;114:12,14,16,
17;128:20

**reported (3)**
35:16;42:9;49:1

**reports (4)**
54:15,19;78:18;79:8

**request (10)**
11:7;12:13;26:20;
70:12;71:10,12,13;
79:22;108:22,24

**requested (4)**
9:9;10:25;11:14;
12:10

**requesting (2)**
11:15;12:16

**requests (2)**
10:4;71:14

**reserved (1)**
15:16

**residence (1)**
84:23

**resistance (1)**
128:11

**respect (1)**
115:24

**respond (1)**
113:14

**response (30)**
5:20;6:22;13:25;
14:4;17:17;22:3;44:8;
49:25;55:23;56:1,6;
69:5,9,12,15,20;70:7;
72:6,8,9;73:6,13,17;
74:2,16;100:4;125:17,
20;130:8,10

**responsible (3)**
75:18;82:1;89:24

**resulted (3)**
39:14,18;40:11

**results (1)**
37:4

**returned (1)**
42:8

**review (2)**
114:10;121:8

**reviewed (3)**
114:5,7,12

**ribs (4)**
39:22,25;76:21;
123:18

**Rick (18)**
21:20;22:15;23:4,13;
32:22;53:13;54:4,9;
75:23;76:2,6;83:19;
118:6,9,12,18;119:24;
120:2

**right (135)**
5:18;6:2,6;7:9;9:8,
17;13:22,23,24;14:5,6,
21;15:1,3;16:6;17:10;
18:2,13,15,17,20,20,
24;22:4,13,13,18,20;
23:3,14;24:17,25;
26:24;27:7,16;28:19;
29:11;36:10;37:7,13,
20;39:7;41:19;42:25;
43:1;46:19;49:3;50:17;
51:2,3;52:6;53:21,24,
24;54:1,2,6;55:25;
56:4,8,9,11,18,20;
57:22,23;58:8;60:13;
62:15;63:7,24;66:7,24;
67:24;68:8;69:12;
70:11;71:7,9;72:14;
75:4;76:19,23,25;78:5;
79:15;80:16;81:7,10,
12,15,18,22;84:3,9,12,
22;85:18;88:8;89:23;
94:6;95:14;96:9,13,15;
97:17,18;99:14,24;
100:3,6,8,9,14,18,22;
101:7;106:9;107:25;
109:9,15;110:20;
112:10,17;113:3,21;
114:8;115:18;117:1,
20;123:10;124:1;
126:2,5;132:11

**rights (8)**
10:18,21,24;11:3;
12:9;13:12;14:8;
113:18

**Robert (21)**
9:10,11;26:10,10,12;
29:5,7,15;30:23;31:5;
33:4,5,7,10;34:7,8;
35:12;36:7,8,25;74:25

**Robinson (22)**
9:7;19:5,7,17,25;
24:20;44:19;50:4;52:9;
53:5;83:20;84:23,24;
86:6;105:18;106:5;
111:2;112:25;113:21;
115:2,25;130:12

**Robinson's (2)**
16:22;111:4

**role (2)**
111:4,6

**room (8)**
25:4,6,19;58:11,14;
86:11,14,18

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 43 of 45

Bettersten R. Wade, et al. v                                                                                        Chief James E. Davis
City of Jackson, Mississippi, et al.

rooming (1)
    25:2
Ross (18)
    21:20;22:15;23:4,13;
    32:22;53:13;54:4,9;
    75:23;76:2,6;83:19;
    118:6,9,12,18;119:24;
    120:2
Rowland (1)
    85:15
ruled (1)
    40:4
rules (1)
    5:11
Ryan (2)
    49:8,10

            S

Safe (2)
    89:4,8
same (7)
    20:25;22:5;23:11,15;
    34:17;74:11;116:15
Samuel (1)
    85:21
saw (23)
    19:14,16;20:1,6,12;
    22:10;28:10;32:22;
    33:6;44:21;50:4;55:1;
    58:3,11;83:18;87:2;
    105:21;106:4;119:10,
    10,13,22;120:5
saying (29)
    12:7;13:11;23:6;
    24:11;26:22;27:11;
    28:17;32:15;42:20;
    43:22,22;54:22;56:10;
    63:20;66:12;71:2;
    73:20;74:24,24;75:3;
    77:15;94:16;99:24;
    101:5;110:1;113:11;
    117:20;118:7;128:16
scalp (1)
    39:12
scenario (2)
    34:6,6
scene (21)
    19:2,9,10,14,17,19,
    21,24;20:1;32:4;42:9;
    43:10;47:10;49:2,15,
    17;57:5;61:20;76:19,
    22;132:10
school (3)
    7:3,8,10
score (2)
    42:10;48:3
screen (3)
    14:17;16:19;61:2
screens (1)
    15:18
Second (7)
    6:18;17:13;48:23;

97:7,12,15;99:1
seem (1)
    16:1
seller (2)
    110:25;111:3
send (5)
    80:17;81:2,5;88:21;
    89:12
sent (9)
    10:17;22:11;32:17;
    49:4;81:6,9,14,17;
    103:17
September (1)
    8:19
sergeant (1)
    8:14
serve (1)
    8:16
service (5)
    48:8,9;49:1,12;50:2
serving (1)
    50:2
set (1)
    89:5
several (1)
    71:14
shape (1)
    126:19
shooting (1)
    100:9
shootout (1)
    92:5
short (1)
    95:17
shortly (1)
    9:16
shot (1)
    47:3
show (11)
    15:6;16:14;67:11,16;
    69:3,4,20;76:23;80:12;
    124:18,18
showed (13)
    19:22;44:19,21,24;
    53:3,4;57:18;62:14;
    67:14;80:7;88:4;
    116:20,20
showing (11)
    25:17,18,19;50:20,
    21;51:2;55:5;66:15,18,
    19;106:14
Shuler (15)
    29:5,7,16;30:23;
    31:5;33:4,5,7,10;34:7,
    8;35:12;36:7,8,25
side (6)
    123:19,24;124:1,15,
    17;125:1
sign (5)
    5:18,23;28:13;73:25;
    74:1
signed (1)
    17:4

signs (1)
    10:15
simple (1)
    28:4
sit (1)
    76:14
sitting (3)
    52:14,18;102:15
six (5)
    22:15;23:12,12;
    27:19;119:25
six-three (5)
    53:8;118:10,11,19;
    119:25
Smith (19)
    9:10,11;10:25;29:5,
    8,16;30:23;31:5;33:5,
    6,7,11;34:7,8;35:12;
    36:7,8,25;74:25
solving (1)
    43:19
somebody (9)
    40:20;41:19;43:2;
    47:2;53:6;54:2;82:17;
    123:1,22
someone (4)
    49:6;94:9;125:21;
    131:18
somewhere (1)
    6:15
sorry (2)
    19:6;115:8
sounds (1)
    91:14
source (1)
    93:11
South (2)
    7:4,8
speak (8)
    10:2;22:12;26:4,6;
    49:6;57:6;60:11;72:18
speaks (2)
    72:14,17
spoke (4)
    25:23;57:10;62:24;
    66:10
spot (2)
    96:7;99:4
SPRINGER (2)
    72:10;132:21
squad (4)
    88:11,13,15,16
squads (2)
    96:6;99:3
stand (1)
    101:18
started (6)
    7:15,17;13:11;25:8,
    15;66:12
starting (1)
    42:5
state (2)
    6:6;42:15

stated (4)
    11:15;12:16;22:22;
    98:5
statement (7)
    21:14;23:8,9,10,11,
    15;84:18
statements (6)
    28:12;43:8,9;54:20;
    55:18;78:1
States (1)
    98:24
stating (5)
    10:17;11:14;42:8;
    47:23;115:11
stay (2)
    41:9;128:24
steps (2)
    18:14;92:15
still (11)
    31:8;68:14,18;72:25;
    73:2,7,15;74:20;75:3,
    16,19
Stop (5)
    45:9,9;75:10;94:1,1
store (5)
    106:16;107:1,3,5,7
straight (3)
    59:5,21;76:24
strapping (2)
    127:5,18
Strayer (3)
    7:11,12;47:18
Street (35)
    20:16;56:3,8;57:10,
    12;75:23;76:3;81:7,10;
    84:4;86:13;89:13;90:7,
    8,10,11,21,24,25;92:1;
    93:9,10,23;94:22,25;
    95:5,9,12;105:4;
    106:10;121:4;122:13,
    15,25;123:7
streets (19)
    18:11,21;19:11,15;
    32:4,10;54:11;89:4;
    90:5,6,19;93:15,18,21;
    94:8;104:4;107:19;
    109:18;121:11
strike (1)
    65:13
stripe (3)
    22:21;118:12;119:4
stroke (10)
    124:8,11,13,21;
    125:5,22;126:20;
    127:12,20;128:9
stuff (7)
    65:19,21;76:21;
    79:14;83:12;106:19;
    114:13
subdural (2)
    39:13;40:13
subject (1)
    22:14

successful (1)
    33:24
suffered (2)
    124:21;128:8
summaries (1)
    79:10
summary (3)
    21:14;38:11;97:24
Sunday (2)
    18:16;90:16
supervisor (4)
    130:24;131:1,3,5
supposed (12)
    17:7;28:15;33:6;
    101:12,17;102:2,7;
    103:12,22;104:7;
    111:2;116:7
sure (5)
    25:16;68:20;90:9;
    102:16;126:15
surprise (2)
    125:1,2
surrounding (1)
    114:25
suspect (16)
    43:12,15,16;54:4;
    81:24;88:24;90:23;
    91:13,25;92:13;93:2;
    99:17;109:16;110:11,
    14,17
swallowed (3)
    128:16,17;129:5
SWAT (12)
    8:13;81:6;89:19,20;
    92:11,16,19,25;100:5;
    103:17;104:23;109:13
SWEET (206)
    5:4;11:22;12:22;
    13:3,8,10,19;14:12,13;
    15:12,15,22,25;16:6,7,
    18;17:14;24:9;27:16,
    20,23;28:3,7;30:7,10;
    33:20;34:5,11,16,20,
    25;35:4,5,11,13,17,20,
    23;36:1,6,11,13;37:12;
    38:5,14,20,23;39:2,7,8,
    21;40:8,17,23;41:4,6,8,
    14,15;45:6,10,15,19;
    46:4,6,14,17,18;48:10,
    14,22;50:16;51:1,9;
    52:22;53:11,16,20,22,
    23;55:10,16;58:5;59:4;
    63:16;64:20;65:9,16,
    21;66:6;69:11,13,18,
    19,25;70:5,9,13,18,21,
    22,25;71:5,11,15,19,
    22;72:1,7,12,16,22;
    73:19;74:1,5,8,11,14;
    76:12;77:4,13,19;
    78:22;80:3,14,22;81:1;
    82:12,16;83:21;84:8;
    85:8;86:4,19;87:14;
    88:2,7;89:17;91:7,19;

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

92:9,23;93:16;94:3,16,
23;95:16,18;96:12;
97:2,5,12,15;98:6;
100:12,17;102:1,12,18,
21;103:2,4,5,15,21;
104:1,11,16;105:24;
109:6,12;110:5,23;
111:11;112:1;114:1;
116:5;117:7,10;
120:14;121:24;122:5,
11,23;123:8,16;124:5,
24;125:9;126:1,12,17;
127:1,11,17;128:4,15;
129:12,20,24;130:1,3,
5;132:13,16,18
**swelling (1)**
39:14
**sworn (1)**
5:2
**system (10)**
14:25;15:6;16:9,14,
22;128:22,24;129:6,
14;130:4

**T**

**tab (2)**
128:17,17
**tactic (1)**
82:20
**tactics (2)**
105:3,14
**talk (22)**
13:23;33:8,20;47:24;
56:23,25;61:19;62:2,8;
87:11;88:10;94:13;
106:2,24;109:18,19,21,
22;120:6,9;121:8;
132:1
**talked (23)**
12:22;13:20;18:5;
32:11,20;54:13,22;
55:24;61:21;62:10,10;
63:8,21;87:1,15,16;
94:4,11;101:4;105:4;
106:23;107:6;108:5
**talking (20)**
20:7,10;21:19;32:4,
6;33:10,12,13;35:9,15,
18;43:1,12;63:5;105:5,
11;106:9;108:8;
119:24;124:17
**tape (2)**
23:6;117:18
**taped (1)**
21:14
**tape-recorded (1)**
32:12
**tape-recording (1)**
32:17
**tapes (2)**
79:11;108:18
**target (1)**

109:8
**targeted (3)**
99:19;100:8,13
**team (4)**
8:13;79:6;92:13,16
**telling (11)**
15:5;60:22;73:16;
89:16;91:11,12;93:12,
14,17;94:8;125:12
**tells (2)**
37:18;94:18
**ten (1)**
94:15
**terminated (1)**
120:25
**test (2)**
15:7;16:9
**testified (3)**
5:3;102:19;126:23
**testify (1)**
15:17
**testimony (1)**
99:2
**THAMES (174)**
9:21;12:18;13:1,5,
18;14:10;15:10,14,20,
24;16:5,17;17:13;24:4;
27:14,18,22;28:1,5;
30:5;33:16;34:3,9,15,
17,23;35:2,8,12,14,18,
21,25;36:5,9;37:10;
38:4,12,18,21,25;39:5,
20;40:6,15,21;41:1,5,7,
12;45:4,8,12,18,21;
46:11,16;48:19;50:13,
24;51:7;52:21;53:9,14;
55:6,13;58:1;59:2;
63:13;64:19;65:3,5,15,
20;69:10,14,16,24;
70:3,11,17,20;71:7,17,
21,25;72:4,14,21;
73:18,23,25;74:4,7,10;
76:8;77:2,8,18;78:20;
79:25;80:9,20,23;
82:11,15;83:16;84:6;
85:1,4;86:1,8;87:12,
22;88:5;89:15;91:5,18;
92:7,22;93:13;94:1,14;
95:14;96:10;97:11,14,
17;100:10,15;101:24;
102:9,16,20,25;103:3,
13,20,24;104:9,13;
105:20;109:2,11,25;
110:21;111:8,21;
113:22;116:2;117:4,9;
120:13;121:17;122:3,
8,22;123:4,14;124:2,
23;125:6,24;126:11,15,
22;127:8,14;128:1,13;
129:9;132:15,17,22
**thinking (3)**
46:23,25,25
**thorough (1)**

43:6
**though (1)**
70:4
**thought (2)**
26:12;107:16
**Three (6)**
22:16,17;126:7;
127:5;128:6;129:3
**threw (2)**
21:13;123:23
**throughout (1)**
9:2
**tied (1)**
7:17
**timeline (4)**
34:10;12;36:10,11
**times (13)**
9:14;18:6;23:21;
27:19;28:24,25;29:15;
30:23;36:22,23,24;
69:5;94:15
**tired (1)**
32:9
**today (5)**
51:6;114:3,6;115:25;
123:6
**told (19)**
21:24;22:11;23:11;
27:1;31:10;32:14,22;
39:24;44:20;45:16;
46:14;53:8;65:1,6;
95:8;104:23;115:16;
117:22;119:21
**took (13)**
9:16,24;10:6;16:12;
26:3;33:12;52:8;60:23;
67:10;86:16;105:22;
115:21;116:15
**top (1)**
85:18
**Totally (1)**
99:23
**tox (3)**
14:17;16:19;61:2
**toxicology (2)**
61:14;128:20
**tracked (1)**
25:16
**trained (3)**
105:21;106:3;113:9
**training (5)**
8:1,3,23;47:19,21
**trainings (2)**
8:25;9:2
**transaction (8)**
105:22;106:1,21;
110:20;111:7,9;113:7,
20
**transparent (5)**
29:20,22,24;30:8;
67:3,5,7,8
**traveled (1)**
26:2

trial (1)
50:10
**tried (2)**
20:5,5
**tries (1)**
10:4
**trouble (1)**
88:22
**trust (1)**
83:7
**truthful (1)**
83:18
**truthfully (1)**
38:1
**try (4)**
12:19;34:18;54:12;
97:25
**trying (9)**
34:3,4,9,20;38:25;
44:15;65:18;70:13;
116:8
**tune (1)**
57:14
**Turn (2)**
69:22;70:10
**turned (5)**
16:23;18:3;37:8;
40:1;77:14
**TV (3)**
13:14;18:10;43:10
**two (10)**
41:10;86:23,24,25;
110:20;112:9,17,18;
113:5;126:9
**type (1)**
99:25

**U**

**under (5)**
5:3;75:16,19;95:25;
130:24
**unfair (1)**
122:6
**unfortunately (1)**
102:17
**uniform (3)**
22:21;23:1,19
**unique (1)**
88:23
**United (1)**
98:24
**University (1)**
7:11
**unmarked (1)**
99:8
**unrest (1)**
29:25
**unsolved (1)**
75:7
**up (26)**
6:23;7:17;12:19;
15:6;18:7;25:10,11,17;

44:19,19;47:4;58:4,6;
59:21;65:10;71:3;
75:11,12,14;87:5;89:5;
100:20;106:19;115:6;
116:23;128:11
**use (2)**
105:3,14
**using (1)**
67:7
**usually (2)**
57:2;124:14

**V**

**Vance (2)**
95:22,25
**various (1)**
99:20
**vehicle (1)**
44:23
**vehicles (2)**
99:7,9
**versus (2)**
95:20;96:23
**video (71)**
18:23;19:1,2,2,21,23,
24;20:1,3,4,6,7,10,12,
13,15,18,19,23,24,25;
21:3,5;22:8;25:4,7,16,
17,18;32:25;33:1,4,5,6;
43:8;44:19;53:3,5;
55:2,2,3,5;57:24;58:3;
62:14,25;63:2,9,10;
66:9,19;67:15,17,19,
21;86:15;87:2,4;94:12;
115:7,9,10,11,22;
116:15,16,18,19,20;
118:3;119:10
**videotape (1)**
77:25
**viewed (1)**
115:3
**violation (8)**
10:19,21,24;11:3;
12:9;13:12;14:8;
113:18

**W**

**Wade (2)**
74:12,15
**wait (2)**
26:5;45:4
**waive (2)**
5:24,25
**walk (3)**
47:5;104:4;109:17
**walked (2)**
18:21;58:11
**walking (3)**
32:4;67:20;86:14
**Walks (2)**
58:9;60:22

AW REPORTING - 601-573-0961
AWREPORTING.COM

(9) swelling - Walks

Case 3:19-cv-00897-CWR-FKB   Document 141-5   Filed 10/13/20   Page 45 of 45

Bettersten R. Wade, et al. v
City of Jackson, Mississippi, et al.

Chief James E. Davis

**wants (2)**
27:24;34:5
**Washington (5)**
81:7,9,14;104:21;
107:21
**wasting (1)**
62:17
**watching (1)**
25:7
**way (2)**
9:5;34:24
**weak (2)**
124:14;125:1
**weapon (2)**
130:6,7
**wear (1)**
23:18
**week (1)**
35:19
**weeks (1)**
126:9
**weren't (1)**
121:4
**what's (9)**
12:1;17:11;21:16;
36:11;73:8;75:12;
80:23;126:15;130:4
**whatsoever (2)**
20:2;44:5
**whereabouts (1)**
25:15
**whole (15)**
19:10;43:25;57:11;
58:18,20;63:23;64:7;
66:3;70:14;74:25;79:7;
115:5;117:11,18;
120:11
**who's (1)**
113:2
**who've (1)**
124:10
**Wilson (2)**
49:8,10
**win (1)**
34:21
**withdraw (1)**
124:6
**within (1)**
129:3
**without (1)**
38:2
**WITNESS (15)**
33:18,20;34:16;46:2,
5,9,13;55:9;72:4;
73:24;85:4;87:13;
97:16;117:6;128:3
**witnessed (2)**
83:19;123:22
**witnesses (5)**
32:3;54:11;61:19;
78:10;79:21
**woman (8)**
61:20;62:8,24;63:9,

22;77:23;94:11,12
**word (2)**
60:7,9
**work (19)**
6:25;7:17;10:1;11:9;
17:19;23:23;26:24;
27:2,6;28:9,21;31:12;
41:24;57:16;65:17;
87:25;122:13,15;
130:22
**working (4)**
7:17;19:12;34:12;
95:23
**world (3)**
44:22;46:20,21
**worried (2)**
29:7;42:19
**writing (2)**
11:4,5
**written (1)**
23:7
**wrong (3)**
26:16,18;73:16
**wrongdoing (1)**
62:3
**wrote (1)**
98:17

## Y

**y'all (34)**
9:6;14:18;16:19;
42:3;43:19;52:17,19,
19;55:3;65:17,25;
67:23;70:14;71:1;73:7,
15;74:20;75:3;77:16;
78:10;79:11;80:5,15;
81:2,2;88:21,22;95:6;
104:21;109:24;117:13,
16,21;132:9
**yard (3)**
106:7;107:13,22
**Year (3)**
68:25;92:19,25
**years (7)**
6:15,24;7:15;8:21;
33:23;99:21;128:8
**you-all (4)**
25:12;67:2;80:15;
96:5
**young (4)**
18:22;19:22;126:5;
127:5

## 1

**1 (2)**
11:20,24
**12:12 (1)**
132:23
**13th (2)**
125:4,16
**15 (3)**

42:10;48:3,4
**16 (5)**
69:9,13,22;70:12;
71:10
**17 (5)**
96:3;125:3,5,18,22
**18 (2)**
8:19;125:18
**19 (4)**
12:3;68:22,24,25

## 2

**2 (4)**
38:15,16,23;46:12
**2019 (4)**
12:2;36:20;37:3;
73:21
**2020 (3)**
36:14,17;73:12
**25th (1)**
12:2
**26th (3)**
124:21;125:5,15
**2nd (2)**
7:25;73:12

## 3

**3 (4)**
8:8;48:12;132:16,17
**30 (1)**
6:24
**37 (1)**
6:24

## 4

**4 (1)**
97:3,6
**40 (1)**
33:23
**49 (1)**
68:1

## 5

**52 (1)**
6:10

## 6

**600 (1)**
23:7
**62 (4)**
126:13,14;127:12;
128:8
**62-year-old (1)**
126:8

## 8

**80 (2)**

92:18,20

## 9

**94 (1)**
7:25