EXHIBIT "G"

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE INSPECTOR GENERAL

OFFICE OF THE
CHIEF MEDICAL EXAMINER

FINAL REPORT OF INSPECTION



CHARLES C. MADDOX, ESQ.
INSPECTOR GENERAL

OIG No. 03-0011CM                                           SEPTEMBER 2003

# EXECUTIVE SUMMARY

# EXECUTIVE SUMMARY

## Background and Perspective

The Inspections and Evaluations (I&E) Division of the Office of the Inspector General (OIG) conducted an inspection of the District of Columbia (District) Office of the Chief Medical Examiner (OCME) from November 2002 to March 2003. OCME's mission is to investigate and certify all violent deaths, all deaths that occur unexpectedly, all deaths that occur in the absence of medical attention or in police custody, and all deaths that pose a threat to public health. OIG inspections comply with standards established by the President's Council on Integrity and Efficiency, and pay particular attention to the quality of internal control.[1]

OCME has 50 full-time employees. Its fiscal year (FY) 2003 budget was approximately $5.9 million. Annually, OCME investigates approximately 4,000 deaths, conducts approximately 1,400 autopsies, and performs 400 external examinations.

*The inspection team (team) found poor management of OCME operations and personnel; significant health and safety problems; a lack of written policies and procedures for all tasks and responsibilities; and low employee morale. The Chief Medical Examiner (CME) frankly acknowledged problems within the agency, as well as his accountability for his agency's performance.*

## Scope and Methodology

The inspection focused on the management and operations of key areas, including mortuary services, forensic investigations, record keeping, case management, laboratory services, communications, and administrative oversight of the District's Child Fatality Review Committee. The team reviewed best practices recommended by the National Association of Medical Examiners (NAME)[2] and the operations of medical examiner offices in surrounding jurisdictions. The team conducted 54 interviews, issued an anonymous and confidential employee survey, observed all work areas and key work processes, and visited surrounding jurisdictions to determine best practices. This report contains 41 findings and 74 recommendations. OCME management and employees were cooperative and responsive throughout the inspection.

---

[1] "Internal control" is synonymous with "management control" and is defined by the General Accounting Office as comprising "the plans, methods, and procedures used to meet missions, goals, and objectives and, in doing so, supports performance-based management. Internal control also serves as the first line of defense in safeguarding assets and preventing and detecting errors and fraud." STANDARDS FOR INTERNAL CONTROL IN THE FEDERAL GOVERNMENT, Introduction at 4 (Nov. 1999).

[2] The National Association of Medical Examiners (NAME) is the national professional organization of physician medical examiners, medical death investigators and death investigation system administrators who perform medicolegal investigations of deaths of public interest in the United States. NAME was founded in 1966 with the dual purposes of fostering the professional growth of physician death investigators and disseminating the professional and technical information vital to the continuing improvement of the medical investigation of violent, suspicious, and unusual deaths. NAME serves as a resource to individuals and jurisdictions seeking to improve medicolegal death investigation by continually working to develop and upgrade national standards for death investigation. The published *NAME Standards for a Modern Medicolegal Investigative System* provides a model for jurisdictions seeking to improve death investigation. *See* www.thename.org.

# EXECUTIVE SUMMARY

**Compliance and Follow-Up**

The OIG inspection process includes follow-up with inspected agencies on findings and recommendations. Compliance forms with findings and recommendations will be sent to OCME along with this Report of Inspection (ROI). The I&E Division Compliance Officer will coordinate with OCME on verifying compliance with the recommendations in this report over an established time period. In some instances, follow-up inspection activities and additional reports may be required.

## Key Findings

***Long-standing operational and personnel management problems continue under the current CME.*** (Page 24). The inspection team (team) found that the same problems reported in an independent study and by local media from 1998 to 2001 still exist today. Operational deficiencies, autopsy backlogs, a lack of basic polices and procedures, personnel problems, and low morale remain unresolved since the current CME assumed office in 1998.
**Recommendations:** (a) That the CME immediately write policies and procedures for the most critical operational areas. **(Agree.)** (b) That the CME adjust his management style and operational oversight to improve the overall performance of his agency. **(Agree.)** (c) That the Deputy Mayor for Public Safety and Justice work with the CME to develop specific plans for improvement in all OCME operations. **(Agree.) CME's comments to (a.):** I agree that OCME needs written policies and procedures for many aspects of the operation, and that we should give priority to writing and implementing them. It must be recognized that not all procedures are now inconsistent, inefficient or unsafe. Efforts have been made over several years to write policies, some successful, but frequently derailed by the pressing daily needs of managing the agency. As an example, I previously worked in the OCME for New York City, which went through a similar transformation effort to the District's OCME, and is now a premier office; the first comprehensive agency policy and procedure manual was issued about six years into the new CME's administration. **CME's comments to (c.):** I agree that I will take some valuable lessons from this report. I will make adjustments as needed to improve the functioning of the office.

***OCME is not an accredited facility.*** (Page 27). The team found that OCME has not been inspected and accredited by a nationally-recognized professional organization such as NAME, as have medical examiner offices in Maryland, Pennsylvania, and Virginia. As a result, District stakeholders cannot be assured that OCME meets established national standards and procedures and is capable of providing nationally-recognized levels of quality service to District citizens. **Recommendation:** That the CME take the necessary steps to be inspected and accredited by the National Association of Medical Examiners. **(Agree.) CME's comments:** This has been a stated agency performance goal for some time. However, to achieve this goal requires reaching a certain level of resources, infrastructure and operations, which takes considerable time while reforming an agency. It must also be seen in the context that NAME accreditation is voluntary, not mandatory, and that many major ME offices are not accredited, including New York City, Miami-Dade County, St. Louis and Wayne County, MI (Detroit).

# EXECUTIVE SUMMARY

***OCME has a significant backlog of autopsy reports.*** (Page 28). The team found that OCME does not complete autopsy reports in a timely manner, and documented 226 autopsies dating back to 1999 for which reports have not been written. **Recommendations:** (a) That the CME consider contracting with private pathologists to reduce the backlog of unwritten autopsy reports. **(Disagree.)** OIG Response: **We accept the CME's response as stated, and recommend that he consider hiring additional medical examiners.** (b) That the CME consider the concerns and suggestions of his medical examiner team regarding the reduction of the backlog. **CME's comments to (a.):** I do not see how this is possible, given the expertise needed and the legal constraints.

***The storage of unreleased bodies dating back to the year 2000 violates District regulations and creates unsanitary conditions.*** (Page 30). OCME does not dispose of unidentified and unclaimed bodies in a timely manner and in accordance with District regulations that require disposition within 30 days. Some bodies have been at OCME since 2000 and the body storage room is overcrowded and unsanitary. **Recommendation:** That the CME takes steps to immediately eliminate the backlog of body releases and disposal, and ensure that bodies are released or disposed of within 30 days following their reception in OCME. **(Disagree.) CME's comments:** I agree that eliminating the backlog and disposing of bodies timely is important. Efforts begun before the inspection have resulted in significant progress in making public disposition of unclaimed bodies, and has reduced the backlog considerably. As of 10 September, there were 88 bodies (81 adults and 7 infants/fetuses) stored at OCME, down from the 189 cited during the inspection. In calendar year 2003, 130 bodies were sent for public disposition (85 adults and 45 infants/fetuses), and the week after this writing, 16 more adults will be sent out, leaving 43 public disposition bodies (37 adults, 6 infants/fetuses) in-house. At that time, approximately 40% of all bodies at OCME will have been in-house less than 30 days. There is no legal or practical mechanism to "otherwise transfer" bodies from OCME. Further, the recommendation to dispose of bodies *within 30 days* incorrectly states the regulations. In fact, OCME cannot make disposition until AFTER 30 days have passed, according to the regulations. OIG Response: **OIG concurs with the CME that the recommendation should state after 30 days instead of within 30 days. However, OIG continues to recommend the timely release of bodies after 30 days to prevent the overcrowded and unsanitary conditions documented in November 2002 when the cold storage room was 69 bodies over capacity.**

***Procedures for autopsies and postmortem examinations are neither adequate nor standardized.*** (Page 31). Procedures for conducting external examinations, partial autopsies, and complete autopsies are inconsistent and do not cover all aspects of the autopsy process, such as autopsy methods, responsibilities of autopsy technicians, family requests, and retention of organ specimens. **Recommendations:** (a) That the CME collaborate with his team of medical examiners to review the sufficiency of policies and procedures pertaining to autopsies and other OCME operations, as pertinent, and give full consideration to their input. **(Agree.)** (b) That the CME establish written criteria for agreeing to requests for special autopsy procedures based on consideration of a family's religious, cultural, or ethnic concerns. **(Agree.)** (c) That the CME develop policies and procedures for retaining and disposing of organ and tissue specimens. **(Agree.) CME's comments to (a.):** My agreement is conditional on the term "full consideration." I will obtain their input, but reserve the right to exercise proper discretion to set

# EXECUTIVE SUMMARY

agency policies. **CME's comments to (b.):** I agree to establish a written policy with appropriate guidelines for considering family requests or objections to autopsies. However, each of these requests is a special case, actually an exception to the more general autopsy policy, and so will commonly involve a judgment call that will ultimately be the responsibility of the CME.

*The Executive Office of the Mayor (EOM) closed the Histology Laboratory because of dangerous chemical fumes.* (Page 34). The Histology Laboratory is not properly vented and waste chemicals are improperly stored and disposed of. A Management Alert Report (MAR 03-I-003) was provided to the CME on safety problems found in various areas of the OCME building. Subsequent to a recommendation in our report, an occupational safety and health investigation was conducted which confirmed levels of volatile organic compounds in the Histology Laboratory that significantly exceeded those considered immediately dangerous to life and health. As a result, the EOM's Office of Risk Management closed the Lab until OCME develops appropriate remediation recommendations. Remediation actions should focus on correcting problems in the heating, ventilation, and air conditioning systems.
**Recommendations:** (a) That the CME order and install adequate fumigation hoods in the Histology Laboratory. **(Agree.)** (b) That the CME establish policies and procedures for the storage and disposal of waste chemicals. **(Agree.)** **CME's comments to (a.):** This will be done as a part of a plan to remediate conditions in this laboratory.

*The CME's relationship with the Child Fatality Review Committee (CFRC) is marred by problems.* (Page 35). The team found that the CME, who houses and oversees the CFRC Administrative Staff, has failed to fill critically needed administrative staff positions. In addition, he does not provide adequate administrative support to CFRC, and does not attend all CFRC meetings as required by District regulations. In addition, CFRC members perceive a conflict of interest because the CME edits and revises information in CFRC reports that may concern OCME, and that has been agreed upon by all other CFRC members.
**Recommendations:** (a) That the CME make the appropriate personnel transfers and fill critically needed administrative staff positions for the CFRC. **(Agree.)** (b) That the CME provide the Inspector General (IG) a detailed accounting of all funds spent providing administrative support to the CFRC. **(Agree.)** (c) That the CME allow CFRC members to participate in the oversight and development of the CFRC administrative support budget to ensure the efficient use and proper accountability of funds. **(Agree.)** (d) That the CME provide the CFRC administrative staff with OCME policies and procedures. **(Agree.)** (e) That the Mayor review the appropriateness of the CME's oversight of the CFRC's administrative support staff and consider a more independent oversight location. **(Disagree.)** (f) That the CME attend all CFRC meetings or send a designee as required by the D.C. Code. **(Agree.)** **CME's comments to (a.):** Already done or in progress. **CME's comments to (b.)** (As possible, given that the CFRC funds are embedded in the OCME NPS budget.) **CME's comments to (c.):** See comments (b) above. CFRC members may serve in an advisory capacity to set priorities for CFRC budgeting. **CME's comments to (e.):** The OCME is by definition and statute a neutral party, which is also involved in the investigation of nearly all deaths coming to the attention of the CFRC. It is a logical place for a fatality review process, and the decision to locate CFRC there came from the EOM. **OIG Response: The OIG stands by its recommendation for a Mayoral review.**

# EXECUTIVE SUMMARY

*Staffing is inadequate in key operational areas.* (Page 39). Critical areas such as autopsy assistance, investigations, body handling, and custodial services lack the number of employees needed for efficient operations. Employees must cover multiple shifts by working extensive overtime, many death scenes that should be investigated are not covered, the Communications Unit is not adequately staffed, and there is only one custodial employee for the entire facility. The team noted that one of the CME's vacant positions is for a DS-3 custodial worker. The CME has failed to fill vacant positions in a timely manner, and employees complain of excessive overtime, burnout, and low morale. A number of positions remain vacant as a result of inattention to recruiting and hiring. **Recommendations:** (a) That the CME hire enough medicolegal investigators (MLIs) to conduct on-site death scene investigations as required. **(Agree.)** (b) That the CME provide adequate staffing to ensure the timely transport of decedents. **(Agree.)** (c) That the CME increase Communication Unit staffing of the midnight tour for the 24-hour phone number. **(Agree.)** (d) That the CME increase staffing for maintenance and upkeep of the OCME facility. **(Disagree.)** (e) That the CME work with the Office of Property Management to ensure that structural and equipment repairs are completed as required by the renovation contract. **(Agree.) CME's comments to (a.):** Subject to availability of resources. **CME's comments to (b.):** Subject to availability of resources. **CME's comments to (c.)** Actually, should increase the staffing in the unit to assure adequate coverage on all tours, not just midnights. **CME's comments to (d.)** Done by contractual services, which is more efficient and effective. OIG Response: **OIG accepts the CME's response. CME's comments to (e.)** OCME is expending huge efforts to obtain needed assistance from OPM, with limited success.

*The CME is not producing annual reports on deaths and autopsies.* (Page 44). The CME has not produced annual reports containing statistics on deaths and autopsies as required by District law. **Recommendation:** That the CME provide the Mayor with an annual report as required by the D.C. Code and as recommended by NAME. **(Agree.)** OIG Response: **OIG accepts the CME's response. CME's comments:** None.

## Health and Safety Issues

*Improper handling of x-ray equipment endangers employees.* (Page 47). OCME employees are not properly trained to operate radiographic (x-ray) equipment.[3] The team also found that x-ray equipment has not been inspected and monitored regularly, that there are no policies and procedures for storing and securing x-rays, and that employees are not properly monitored for radiation exposure. The IG sent a Management Alert Report (Management Alert Report, 03-I-005) to the CME regarding handling of x-ray equipment. The team will follow-up on the CME's progress in correcting the problems cited. **(Agree.) CME's comments:** None.

*Stretchers and carts used to move bodies are old, rusted, and dangerous.* (Page 49). Stretchers and carts used to move bodies are over 20 years old, are rusted and unstable with sharp edges, and have wheels that do not roll freely, as well as brakes that do not work properly.

---

[3] *Radiographs* are synonymous with *x-rays*. The term x-rays will be used throughout this report.

## EXECUTIVE SUMMARY

Body fluids were observed in the fibers of the fiberglass tops. **Recommendation:** That the CME expedite the replacement of old and malfunctioning body carts. **(Agree.) CME's comments:** This was done. The carts have been delivered.

***OCME employees are not trained to properly dispose of biohazardous waste.*** (Page 49). The team found that OCME has no written policies or procedures for the disposal of biohazardous waste as required by the federal Occupational Safety and Health Administration (OSHA), and does not provide training in the disposal of this waste as recommended by NAME. **Recommendation:** That the CME provide employees with written policies and procedures and training for the proper disposal of biohazardous waste. **(Agree.) CME's comments:** None.

***Employees are exposed to biohazardous contamination during body handling and transport.*** (Page 50). The team found that due to a lack of policies and procedures, training, and equipment, autopsy assistants are unnecessarily exposed to health and safety hazards. Employees are not trained to avoid biohazardous contamination and have no protective gear. **Recommendation:** That the CME establish written policies and procedures, and provide training and protective equipment to body transport employees to prevent biohazardous contamination. **(Agree.) CME's comments:** Agreed as to policies and training; protective equipment has been supplied.

***OCME does not have a federally-required written hazardous communication program.*** (Page 50). The team found that OCME has not developed, implemented, and maintained a hazardous communication program for employees working with and in the proximity of hazardous materials, as required by federal law. **Recommendation:** That the CME oversee completion and implementation of a written hazardous communication program as required by 29 CFR § 1910.1200(e)(1) (LEXIS *through July 23, 2003*). **(Agree.) CME's comments:** None.

***The tissue storage area is not adequately ventilated as recommended by NAME.*** (Page 51). The autopsy suite tissue storage area has inadequate ventilation, and employees state that during dissections, the odor in this area is almost unbearable. The formaldehyde and putrefied tissue odors make them sick. **Recommendation:** That the CME have the ventilation system in the autopsy suite tissue storage area inspected and upgraded as required. **(Agree.) CME's comments:** Agree to monitor and inspect. However, I do not agree that this room is not properly ventilated. Measurements were taken by DOH and subsequently by the OCME Chief Toxicologist (who is also the ARMR), and no excessive levels of chemicals were detected.

***OCME employees' handling of personal protective equipment (PPE) is unsafe.*** (Page 51). The team found that OCME does not provide cleaning of employees' PPE worn during autopsies or when handling bodies, as required by federal regulations. OCME employees often take their PPE to public laundromats or private cleaners without informing these establishments of potential contamination. **Recommendations:** (a) That the CME immediately forbid removal of PPE from the OCME facility. **(Agree.)** (b) That the CME provide on-site or contract for

# EXECUTIVE SUMMARY

laundry services for PPE. **(Agree.)** OIG Response: **We recommend that the CME ensure that the PPEs used by mortuary technicians are included in the laundry service. CME's comments:** Since the inspection, OCME has contracted with a laundry service to provide scrub suits.

*Mortuary lab workers lack adequate shower facilities.* (Page 53). The shower facilities for employees to remove body fluids and contaminants prior to leaving OCME are dirty and in disrepair. Consequently, employees often leave the facility with contaminants on their skin and clothing. **(Agree.) Recommendation:** That the CME have the shower facilities repaired and ensure that they are cleaned and disinfected daily. **CME's comments:** None.

*Odors from the autopsy suite and body storage room permeate public areas.* (Page 53). The team found that the elevator used by OCME employees and visitors has an unpleasant odor that seems to emanate from the autopsy suite and/or body cooler area. The IG sent a Management Alert Report (MAR) to the CME on poor air quality in the OCME building, and the team will follow-up on the CME's progress in correcting the problems cited. **No Recommendation. CME's comments:** None.

## Mortuary

*Bodies are not always officially pronounced dead prior to their arrival at OCME.* (Page 55). The team found that due to inadequate staffing and inadequate District regulations, OCME cannot always ensure that bodies are officially pronounced dead prior to their arrival at the OCME facility. This causes problems in documenting the time of death, and in accurately investigating the cause of death in criminal cases. **Recommendations:** (a) That the CME consider contracting with private physicians to pronounce death at the scene in the event a medical examiner or MLI is not available. **(Disagree.)** OIG Response: **The team found that contract physicians in Fairfax, VA pronounce death, and contract physicians in Baltimore pronounce and investigate deaths.** (b) That the CME consider resumption of the practice of having autopsy technicians take bodies to a medical emergency room for pronouncement of death prior to arrival at OCME. **(Agree.)** (c) That the CME consult with the OCC about proposing legislation which would permit qualified paramedics to pronounce death. **(Agree.) CME's comments:** None.

*Autopsy assistants who handle and transport bodies work without procedures and training.* (Page 56). OCME has no written policies and procedures, and does not provide formal training to autopsy assistants who handle and transport bodies. NAME recommends that body transporters be trained in the best methods of body handling to show respect for the deceased, and to avoid personal injuries when lifting and transferring bodies. Some have reportedly sustained injuries because they lack this training. **Recommendation:** That the CME expeditiously establish written body handling policies and procedures, and provide formal training for employees who handle and transport bodies. **(Agree.) CME's comments:** Agree to establishing policy and training employees to it; checklist will be part of the case tracking system.

## EXECUTIVE SUMMARY

*Body intake and processing procedures are insufficient.* (Page 57). The team found that due to a lack of written policies and procedures, OCME employees sometimes fail to take all of the steps necessary to properly check bodies into the facility. **Recommendation:** That the CME establish written policies and procedures for processing bodies into the morgue, including a checklist to be maintained with the decedent's case file. **(Agree.) CME's comments:** Agree to establishing policy and training employees to it; checklist will be part of the case tracking system.

*OCME has unidentified and unlabeled skeletal remains.* (Page 57). The team observed an open cardboard box of skeletal remains at OCME that had not been properly labeled. Employees said they could not locate a case file for these remains. **Recommendation:** That the CME identify, label, and dispose of any unidentified and unclaimed skeletal remains as appropriate. **(Agree.) CME's comments:** The box containing these remains was labeled. It is not best practice to label each bone individually when skeletonized. The case in question was an old case being researched by the mortuary supervisor at the time; it had been retained for about 10 years under prior administrations. The mortuary supervisor did obtain the consultant anthropologist's report on this skeleton. He has provided me with a cover memo describing the actions taken with these remains, copies of the documents referenced, and photographs of the box.

*OCME does not fingerprint bodies in a timely manner.* (Page 58). OCME does not have employees who are trained to fingerprint bodies upon arrival at the mortuary. This causes delays in identifying bodies, prevents expeditious release or other disposition, and creates overcrowded and unsanitary conditions. **Recommendations:** (a) That the CME draft a Memorandum of Agreement or Memorandum of Understanding with the Metropolitan Police Department (MPD) for expeditious fingerprinting of all decedents or provide equipment and training to OCME employees for fingerprinting. **(Agree.)** (b) That the CME require fingerprinting of all decedents upon arrival at OCME. **(Disagree.)** OIG Response: **OIG stands by its recommendation for fingerprinting all bodies upon arrival at OCME.** (c) That the CME ensure that all bodies presently stored at OCME are fingerprinted. **CME's comments to (a.):** OCME employees have received fingerprint training, and are beginning to take useful prints for identification purposes. MPD has provided this service, but it is outside of their mission, and so they have not been able to commit to this fully. Some assistance has also been received from the FBI. **CME's comments to (b.):** Fingerprinting of all decedents is one valid policy, but is not agreed upon as a best practice. It is not clear that the investment of time or resources is justified. **CME's comments to (c.)** OCME is currently fingerprinting or arranging same for all public disposition bodies. If this is the intent of the recommendation, then I agree.

*OCME does not have consistent policies and procedures for identification of decedents.* (Page 59). The team found that the CME allows selected families to view decedents for identification, while others are only allowed to see photographs. In addition, viewings are conducted in an open hallway rather than a private viewing area as recommended by NAME. **Recommendations:** (a) That the CME clarify the body identification policy and commit it to writing. **(Agree.)** (b) That the CME provide a viewing area that will give family members or others privacy when identifying decedents. **(Disagree.) CME's comments:** This is physically

## EXECUTIVE SUMMARY

impossible in our facility. We provide the most privacy possible if we allow viewing, which virtually never happens any more. **OIG Response: Actions planned and taken by OCME should adequately address the conditions noted.**

*Body release policies and instructions are not written and are often unclear.* (Page 61). Autopsy technicians release bodies from OCME and receive only verbal instructions, rather than the detailed written procedures and instructions recommended by NAME, that would verify case numbers and body identification numbers. Consequently, some technicians have inadvertently released bodies to the wrong families and funeral homes. **Recommendation:** That the CME provide detailed written policies and procedures for the release of bodies. **CME's comments:** Technicians have been instructed to compare the name and OCME case numbers to verify that they are releasing the correct body. Written procedures from December 1998 are attached. Even detailed written procedures in place do not assure that employees carefully read and compare names and numbers. **OIG Response: OIG recommends that the CME post and provide a copy of these procedures to each technician.**

*OCME has no written policies and procedures to properly safeguard and transfer decedents' personal effects.* (Page 61). OCME does not transfer decedents' personal effects to MPD as required by the D.C. Code, and has property of decedents dating back to 1990 that was not returned to the next of kin. The team also found that OCME does not have proper forms to preserve the chain of custody for decedents' personal effects. **Recommendations:** (a) That the CME establish policies and procedures for the transfer of property at death scene investigations. **(Agree.)** (b) That the CME inform the next of kin how to claim personal property by creating an information sheet or pamphlet. **(Agree.)** (c) That the CME revise OCME property and evidence transfer procedures to protect the chain of custody. **(Agree.)** (d) That the CME work with the Chief of Police to develop and document a secure means of transferring property to MPD as required by the D.C. Code. **(Agree.)** **CME's comments:** None. **MPD Comments:** See Appendix 14.

*Mortuary technicians exposed to hazardous conditions do not receive environmental differential pay.* (Page 64). The team found that mortuary technicians exposed to unusual physical hardships and health and safety hazards are not paid environmental differential pay that may be allowed by the District Personnel Manual. **Recommendation:** That the CME work with DCOP to determine if the exposure of mortuary technicians to environmental hazards warrants their receipt of environmental differential pay. **(Agree.)** **CME's comments:** The previous request by the technicians was for "hazardous duty pay," which was represented to the CME as having been researched by the previous Deputy for Administration, and allegedly denied by DCOP. The CME has met with the Director of DCOP to explore this issue, specifically environmental differential pay, which is currently under consideration.

### Forensic Investigations

*MLIs complain that some MPD Officers impede death scene investigations.* (Page 67). MLIs complain that some MPD officers disturb death scenes prior to OCME's arrival. The team also found that some MPD officers do not promptly notify OCME when a death has occurred, as required by District regulations. **Recommendations:** (a) That the CME collaborate with the

## EXECUTIVE SUMMARY

Chief of Police on clarifying, in writing, the responsibilities of OCME and MPD personnel at death scenes, and that oversight procedures be implemented that will ensure that the integrity of all death scenes is maintained. **(Agree.)** (b) That the CME collaborate with the Chief of Police to ensure that OCME is promptly notified of all deaths subject to investigations as required by the D.C. Code. **(Agree.) CME's comments:** None.

*OCME does not have written policies and procedures for on-site death investigations.* (Page 68). The team found that MLIs make their own determinations as to whether an on-site investigation is to be conducted, and base an examination of the body and death scene on individual experience rather than on standard policies and procedures. Such policies and procedures have not been developed by the CME. **Recommendations:** (a) That the CME provide written policies and procedures for death scene investigations. **(Disagree.)** (b) That the CME require that all MLIs be formally trained and certified. **(Disagree.) CME's comments to (a.):** I cannot agree with a recommendation couched in absolute terms, e.g., "all aspects," although clearly written policies are necessary. The National Institute of Justice guidelines have been distributed and used at OCME since 1998. OIG Response: **Actions planned and taken by OCME should adequately address the conditions noted. CME's comments to (b.):** The recommendation does not define its terms precisely enough to allow agreement. Training is obviously important, but a blanket agreement as written does not specify how much training, or what type. Certification is desirable, but not necessarily required for the job. OIG Response: **OIG recommends that the CME provides training based on criteria established by the American Board of Medicolegal Death Investigators.**

*OCME does not obtain investigative reports from MPD, Fire and Emergency Medical Services (FEMS), and other investigative agencies.* (Page 70). OCME does not have an effective system for obtaining information from other investigative agencies that would assist in determining the cause and manner of death, as required by District regulations. **Recommendation:** That the CME work with MPD, FEMS, and other investigative agencies, as appropriate, to ensure that all relevant investigative reports are provided to OCME promptly when requested. **(Agree.) CME's comments:** OCME does often obtain such reports. Compliance with requests is not perfect, and they are not necessary in all cases, but they are frequently requested and received.

### Office of the CME

*OCME does not have a workplace health and safety program in accordance with federal regulations.* (Page 72). OCME does not have a program that addresses overall workplace health and safety as required by OSHA. There are no specific standard operating procedures for decontamination of autopsy instruments and surfaces, and autopsy workers do not have sufficient protective equipment while working in the autopsy suite. There are no procedures covering exposure to blood-borne or airborne pathogens, and employees are not provided with immunizations and health screenings. **Recommendations:** (a) That the CME establish written policies and procedures in accordance with OSHA guidelines. **(Agree.)** (b) That the CME provide hepatitis B vaccinations to all at-risk employees. **(Agree.)** (c) That the CME provide alternative protection for employees allergic to latex gloves and masks. **(Agree.)** (d) That the CME provide periodic tuberculosis screenings for all at-risk employees. **(Agree.)**

## EXECUTIVE SUMMARY

(e) That the CME provide adequate training in universal precautions when performing autopsies and handling biological specimens. **(Agree.)** (f) That the CME provide powered respirators for use in the autopsy suite. **(Agree.)** (g) That standard operating procedures be written, and arrangements made, for employees to obtain immediate access to appropriate health care, at no cost, after exposure to blood-borne and airborne pathogens. **(Agree.) CME's comments to** (b.): If possible. Will explore availability through DOH. **CME's comments to (c.):** This is being done. **CME's comments to (d.):** Has been done recently. **CME's comments to (f.):** These are available.

*OCME does not have a Mass Fatality Plan.* (Page 76). OCME has not developed a Mass Fatality Plan as recommended by NAME, and employees do not participate in mass disaster planning seminars or classes. Without such a plan, OCME is not prepared for natural disasters, terrorist attacks, large-scale accidents such as nightclub fires, or other catastrophic events in which more bodies must be recovered and examined than OCME routinely handles. **Recommendations:** (a) That the CME develop a written Mass Fatality Plan as soon as possible. **(Agree.)** (b) That the CME send appropriate OCME employees to training on mass fatality and disaster planning. **(Agree.) CME's comments to (a.):** The CME is appointed by the Mayor to the Emergency Preparedness Council, and has participated in the preparation of the District Response Plan (DRP). The CME supplied the DRP pocket guide materials for Mass Fatalities under ESF-8. The CME, with the assistance of the Deputy Mayor for Public Safety and Justice, has identified a consultant who can create a mass fatality plan for OCME, with expected delivery date in November. **CME's comments to (b.):** Some OCME employees have participated in disaster training and exercises. Several employees are participants in D-MORT, which includes mandatory training.

*OCME is not prepared to handle after-hours autopsies in response to requests from other investigative agencies or District authorities.* (Page 77). OCME is not sufficiently staffed and has no employees on standby to handle special investigative requests for after-hours autopsies or postmortem examinations. Following the sniper shooting that occurred in the District, the CME advised he was unable to comply with a special request from MPD to conduct an immediate autopsy because he could not put an autopsy team together after normal duty hours. **Recommendation:** That the CME, in collaboration with affected agencies and officials, consider development of an after-hours plan for conducting autopsies and providing other OCME services that might be required by investigative agencies such as MPD, or other District or federal authorities. **(Disagree.) CME's comments:** Some OCME services are available on a 24-hour per day basis. There is always a medical examiner on call, either for telephone consultation, or to respond to exceptional death scenes. The CME is on call every night, and has responded to death scenes when needed. As noted in 8a above, OCME needs additional MLIs to cover investigations and scenes 24-hours per day. After-hour autopsies are generally bad practice. When done, they often compromise procedures, use fatigued staff, and jeopardize documentation and evidence collection. Under rare circumstances, exceptions may become necessary, but this should not rise to the level of an after-hours plan, as if anticipating this becoming a frequent occurrence. Even in a mass fatality disaster, autopsies are not typically done 24 hours per day. The statement in the first paragraph above in #33 mischaracterized my statement to the inspectors. I did inform them that I could not put together the usual team in the middle of the night, although I also informed them that I made the judgment not to perform the

## EXECUTIVE SUMMARY

autopsy for the reasons enumerated above about why after-hour autopsies are not good policy. The details found in the OIG investigation into the OCME handling of the sniper shooting (Appendix 11) also demonstrate that the time-course of transporting the body to OCME (arriving at 0230), performing check-in procedures, taking instant photos and multiple X-rays would have not made the body available for autopsy until close to 0400- not that long before the start of the next workday. Trying to do this overnight would not have gained much time, but would have entailed some risks. OIG Response: **OIG continues to recommend that the CME develop an after-hours autopsy plan for contingencies such as the 2002 sniper events.**

*OCME does not adequately track and respond to public complaints and inquiries.* (Page 78). The team found that since October 2002, OCME has not had a designated employee to track and investigate public complaints and inquiries, and cannot efficiently respond to questions and concerns raised by District stakeholders. **Recommendation:** That the CME assign complaint and inquiry tracking and response duties to a responsible staff person immediately. **(Agree.)** CME's comments: This has already been done. The complaints and inquiries are being tracked better under this employee than they have ever been during the tenure of this CME.

*OCME does not have a quality assurance program.* (Page 79). NAME recommends that all medical examiner offices have a quality assurance program that includes a daily discussion of cases completed, policies and procedures governing the autopsy report process, and annual evaluations of professional employees. Although OCME has daily morning meetings in which autopsies are scheduled, there are no end-of-day sessions to review the day's events and discuss completed cases. There are no policies and procedures governing the autopsy report process, and professional employees are not evaluated annually as recommended. **Recommendations:** (a) That the CME consider holding conferences at the end of the day to address cases and backlogs, and to solicit employee views and ideas on improving OCME operations. **(Agree.)** (b) That the CME establish and implement an autopsy report evaluation program that makes medical examiners responsible for the conduct and results of all autopsies without interference by the CME. **(Disagree.)** CME's comments to (a.): Being done. **CME's comments to (b.):** I have stated my desire to implement a QA program, but have not yet had the chance to implement one. I cannot concur with the judgmental language of the recommendation, as the involvement of the CME does not constitute "unwarranted interference." OIG Response: **The OIG recommendation was not intended as a judgment, but as a recommendation for a systematic review process.**

*The CME's extensive use of term employees may be contrary to District regulations.* (Page 82). The CME has filled positions intended to meet permanent support requirements with term employees, and has been accused of arbitrarily terminating their employment. The team found that an inordinate number of employees have worked under term appointments for more than a year. They claim the CME uses the threat of termination to demand additional work hours. District regulations allow term appointments "when the needs of the service so require." **Recommendation:** That the CME consult with the D.C. Office of Personnel on the regulatory requirements and proper use of term appointments, and ensure that he and all current and future term employees are fully versed on their separate responsibilities and entitlements. **(Agree.)**

## EXECUTIVE SUMMARY

**CME's comments:** The CME has met with the DCOP Director recently to discuss this, among other issues. OCME was already in the process of converting most term positions to permanent, and has begun hiring all new positions as permanent.

*The CME has given supervisory and managerial responsibilities to an IT consultant hired to automate OCME operations in violation of District regulations.* (Page 83). The Office of the Chief Technology Officer (OCTO) provided OCME with a contractor to develop an automated case management system for death reporting and death investigations. The contractor supervises District government employees and makes managerial decisions unrelated to and outside the scope of the contract and that are not permitted by District regulations. **Recommendation:** That the CME revoke supervisory and management responsibilities assigned to the OCTO contractor that are outside the scope of the consultant contract in violation of District regulations, and ensure that these responsibilities are assigned to the appropriate employee(s). **(Disagree.) CME's comments:** When the consultant started at OCME, the state of the IT environment was miserable, due to neglect by the computer specialist, and the lack of supervision of him by anyone within OCME who had IT subject-matter expertise. Therefore, the agency attempted to follow the model implemented District-wide by the Chief Technology Officer (CTO) of having an Agency Chief Information Officer (CIO), which will be required of all agencies as of FY04. (Note: in the memo cited in Appendix 12, this title was mistakenly listed by the CME as "Agency CTO," when it should have been "Agency CIO.") The consultant brought to the CME's attention that the hardware purchases made by the computer specialist (and approved by the then Deputy for Administration) were not within the District standards. Because of this improper purchasing, OCME was not getting the best prices, and thousands of dollars of unused computer equipment was in storage. In the Agency CIO model, the CIO reviews purchases and makes recommendations to keep within District guidelines and standards. This brings consistency within systems and the broader District IT environment, provides economy of scale for purchases, and minimizes waste. The CME did not grant the contractor full authority to make management decisions. Her role to coordinate IT functions and purchases was to make the professional assessment of the IT environment and needs, and to make recommendations to OCME administration, which then made the management decisions. All of these conclusions were reached jointly between the consultant and the computer specialist before being forwarded to the OCME Management Services Officer. The reference in that memo (Appendix 12) to supervising the computer specialist specifies for technical issues (i.e., IT matters) only. The computer specialist was administratively supervised (time and attendance, performance evaluation, etc.) by OCME administration. The computer specialist was not denied the authority and flexibility to perform his duties independently; his position was never entitled to such independence. The Agency CIO duties did not distract the contractor from completing the CMS. They created the environment that allowed the project to continue. Without the CIO accomplishments, the CMS project would have failed. (Note: Since February 2003, the contactor has been a District employee. OCME continues to follow the OCTO Agency CIO model.) OIG Response: **The OIG stands by its findings, but accepts the CME's comments that the original conditions described have been rectified.**

*Annual employee performance evaluations are not conducted in accordance with the District Personnel Manual.* (Page 86). The team found that many OCME employees do not receive annual performance evaluations, while other employees complained that the evaluations

## EXECUTIVE SUMMARY

are prepared without their participation. **Recommendation:** That the CME ensure that employees receive annual performance evaluations in a timely manner, and that the evaluations are discussed with each employee in accordance with District personnel regulations. **(Agree.) CME's comments:** OCME has had prior deficiencies completing performance evaluations. This year, all were completed timely. All were discussed with the employees when completed.

### Administration

*OCME records are not properly secured and controlled.* (Page 88). The team often found the doors of record storage areas unlocked and access to these areas uncontrolled. Visitors and funeral directors are allowed to visit employees in the record storage areas, and can easily remove a case file. The team also found 28 case files that the records staff was not aware of in a vacant, locked office. **Recommendations:** (a) That the CME establish written policies and procedures in line with the District's records schedule for the maintenance and security of records. **(Agree.)** (b) That all spaces for sensitive record storage be secured at all times, and that only authorized personnel have access. **(Agree.)** (c) That OCME implement a sign-in and sign-out policy for all case files and investigative reports. **(Agree.) CME's comments to (a.):** A records policy was drafted for OCME. It will be reviewed for consistency with the District schedule. **CME's comments to (b.):** This is a part of the drafted OCME policy. **CME's comments to (c.):** This exists.

*OCME remains paper-driven as installation of its new case management system falls behind schedule.* (Page 89). OCME remains 100 percent dependent on paper, and vital information on decedents is often handwritten without back-up documentation. Files and documents are frequently misplaced and lost. At this writing, the IT consultant contracted to install a new case management system has not met any of the key milestones set forth in the contract. **Recommendation:** That the CME give priority to coordinating with OCTO to ensure that the case management system is completed expeditiously and meets the terms of the contract. **(Disagree.) CME's comments:** The CME has coordinated with OCTO. It was a joint decision that progress on the CMS be slowed due to the necessity to remediate environmental issues. OCTO was aware of and agreed to all modifications. The project is back on track now, with over 80% of the workflow captured on the system. The monthly agency statistical reporting is coming from this system now. The project continues to be under budget. The agency is getting more than it contracted for originally, and the product will be more successful. The implementation could not have been done without the remediation efforts first; otherwise the project would have failed, resulting in waste and inefficiency. OIG Response: **OIG stands by its original recommendation.**

*The Toxicology Laboratory lacks sufficient electrical power to be fully operational.* (Page 91). The team found that due to insufficient electrical power sources, only 5 of 12 computer-based toxicology instruments are operational. Also, there are no surge protectors to protect laboratory computers from electrical spikes that could damage expensive equipment. **Recommendation:** That the CME hire a contractor to correct the power and electrical surge deficiencies in the Toxicology Laboratory. **(Agree.) CME's comments:** The electrical

## EXECUTIVE SUMMARY

capacity of the renovated laboratory was exceeded because we now have more instruments than were anticipated in the design plans. The problem has been rectified, as electrical contracting is now complete, increasing capacity and installing uninterrupted power supplies to protect the equipment.