**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**BETTERSTEN R. WADE et. al**                                                   **PLAINTIFFS**


**v.**                                                      **CAUSE NO. 3:19-cv-897CWR-FKB**


**CITY OF JACKSON, MISSISSIPPI et. al**                              **DEFENDANTS**

**MEMORANDUM IN SUPPORT OF ANTHONY FOX'S,**
**LINCOLN LAMPLEY'S AND DESMOND BARNEY'S**
**<u>COMBINED MOTION FOR SUMMARY JUDGMENT</u>**

The Defendants, Anthony Fox ("Officer Fox"), Lincoln Lampley ("Officer Lampley")

and Desmond Barney ("Officer Barney"), submit this Memorandum in Support of their

Combined Motion for Summary Judgment. All claims in this case alleged against each of these

Defendants should be dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**PROCEDURAL HISTORY**

This case arises out of events surrounding the lawful arrest and field release of George

Robinson ("Mr. Robinson") on January 13, 2019.  This matter was initially filed in state court on

October 24, 2019. A First Amended Complaint was filed the same day.  The case was removed

to this Court on December 6, 2019.

Discovery is now completed. At this time, these Defendants respectfully submit that there

are no genuine issues of material fact with respect to key elements of the claims being made

against each of them, and therefore, that each of them is entitled to the entry of summary

judgment in their favor.[1]

---

[1]All cites to exhibits refer to the exhibits filed in support of Officer Fox's separate Motion for
Summary Judgment.

# I.  FACTS

<u>THE OFFICERS</u>

Officer Fox is a lifelong resident of Jackson. He graduated from Forrest Hill High School. He started his law enforcement career in 2010 when he was hired by the Jackson Police Department. After graduating from the police academy in early 2011, he started as a patrol officer in Precinct 1. After his third year, he was promoted to vice and narcotics, K9. He is currently employed as a narcotic and K9 detective with the Clinton Police Department.[2]

Officer Lampley has been a City of Jackson police officer since attending the police academy in 2010. He has lived in Jackson his entire life, graduating from Lanier High School in Jackson. He has a degree in accounting from Jackson State University.[3] He has worked various assignments as a police officer, including patrol, vice, and narcotics. He has also worked on the Jackson Police Department's joint task force with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Lincoln is also a member of the SWAT team.[4]

Officer Barney was born in Saginaw, Michigan. He has been in Mississippi since his parents moved to Utica when he was five years old. He attended high school at Hinds HS.  He has been in law enforcement since attending the police academy in early 2010.[5] After graduating from the academy, he started in Patrol at Precinct 1.[6] In 2015 he was promoted to major investigations where he was a narcotics officer. He is currently employed as a patrol officer with the Clinton Police Department.[7]

---

[2] Exhibit 1, Anthony Fox Deposition pp. 7-14.
[3] Exhibit 7, Lincoln Lampley Deposition pp. 7-9.
[4] Ex. 7, p. 16.
[5] Exhibit 8, Desmond Barney Deposition pp. 7-10.
[6] Ex. 8, p. 8.
[7] Ex. 8, pp. 8-10.

THE JANUARY 13, 2019, INTERACTION

On January 13, 2019, Officers Fox, Lampley and Barney were employed by and on duty with the Jackson Police Department as SWAT operators.[8] On that particular day, they were searching for a person suspected of being involved in the murder of Pastor Anthony Longino.[9] They had reason to believe that the suspect was on Jones Street, and by chance pulled up and stopped near the car that was occupied by Mr. Robinson.[10] Officer Barney was driving with a K9 in a Ford Explorer while Officers Lampley and Fox were in a Chevy Tahoe.[11] While driving on Jones Street, Officer Barney saw two people walking and radioed for Officers Lampley and Fox to stop so Officer Barney could talk to the two people he saw walking. [12]  After stopping, Officer Barney went to speak with these two people.[13] During this time, Officer Fox observed what he suspected was a hand-to-hand drug transaction taking place in a parked car.[14] Specifically: (1) he observed a black female standing at the driver's side window; (2) she was clutching US currency inside her right hand as she leaned inside the driver's side window and handed the money to the driver.[15]

After exiting his vehicle, Officer Fox began to walk toward the vehicle where the hand-to-hand transaction was occurring.[16] At some point, the female at the driver's side window saw

---

[8] Ex. 7, p. 48 lines 5-6; Ex. 8, p. 70 lines 5-7.
[9] Ex. 7, p. 66 lines 3-4; Ex. 8, p. 73 lines 5-12; Ex. 1, p. 76 lines 4-6, 13-14, p. 79 lines 8-9, p. 105 lines 1-4.
[10] Ex. 7, p.137 lines 9-19; Ex. 8, p. 76 lines 9-13.
[11] Ex. 8, p. 70 lines 10-25, p. 71 lines 1-3.
[12] Ex. 8, p. 76 lines 17-24, p. 77 lines 17-25, p. 78 lines 2-5, 10-12, p. 79 lines 2-11, p. 81 lines 10-17.
[13] Ex. 8, p. 78 lines 1-12.
[14] Ex. 1, p. 68 lines 24-25, p. 87 lines 17-18, p. 88 lines 1-4, p. 99 lines 15-17.
[15] Ex. 1, p. 60 line 25, p. 61 lines 1, 6, p. 62 lines 15-16, p. 97 lines 11-13, 15-19; Ex. 8, p. 104 lines 15-23.
[16] Ex. 1, p. 99 lines 15-17.

him approaching and began walking away quickly.[17] Officer Fox told her to stop, but she

ignored him.[18] Officer Fox then observed the person in the driver's seat, later identified as Mr.

Robinson, look at Officer Fox. Mr. Robinson then turned to his right and began reaching with his

right hand between his seat and the center console.[19] Officer Fox perceived this to be an

immediate threat to his safety.[20] Officer Fox did not know what Mr. Robinson was reaching

for.[21] Officer Fox gave Mr. Robinson verbal commands to "stop reaching and show me your

hands."[22] When Mr. Robinson failed to comply, Officer Fox for his safety made the decision to

remove Mr. Robinson from the vehicle.[23] Officer Fox opened the driver's side door and grabbed

Mr. Robinson by his elbow.[24] Mr. Robinson then twisted his body toward the center console

pulling Officer Fox partially into the vehicle.[25] Mr. Robinson did this so that he could use both

hands to try to gain possession of whatever he was trying to get.[26]

Officer Lampley became involved in the interaction with Mr. Robinson when Officer

Lampley approached Mr. Robinson's vehicle to see if he could assist Officer Fox after hearing

Officer Fox giving Mr. Robinson loud commands.[27] Officer Lampley heard Officer Fox saying

"let me see your hands" when Officer Fox was attempting to get Mr. Robinson out of the car.[28]

---

[17] Ex. 1, p. 94 lines 4-5, p. 99 lines 21-22.
[18] Ex. 1, p. 62 lines 22, 24, p. 64 lines 18, 19, p. 65 lines 7, 12.
[19] Ex. 1, p. 64 lines 21-25, p. 66 lines 3-5, 18-20, p. 68 lines 2-5, p. 94 lines 10-12, p. 100 lines 13-24; Ex. 8, p. 110 lines 12-13.
[20] Ex. 1, p. 101 lines 14-25.
[21] Ex. 1, p. 64 lines 24-25, p. 68 lines 6-8, 10, 12-14, p. 81 lines 17-25, p. 82 lines 1-17.
[22] Ex. 1, p. 94 lines 14-16, p. 19, 21-24, p. 95 line 1, p. 100 lines 2-4, p. 101 lines 14-16.
[23] Ex. 1, p. 85 lines 9-24, p. 86 lines 8-15, p. 95 lines; p. 96 lines 23-24.
[24] Ex. 1, p. 102 lines 6-7.
[25] Ex. 1, p. 95 lines 15-16, p. 102 lines 8-10, p. 132 lines 7-9.
[26] Ex. 1, p. 95 lines 11-13, p. 101 lines 17-19.
[27] Ex. 7, p. 38, lines 16-23.
[28] Ex. 8, p. 48 lines 9-14, p. 83 lines 17-25, p. 89 lines 1-9, p. 97 lines 7-23.

When Mr. Robinson turned pulling Officer Fox into the vehicle, Officer Fox unholstered his weapon and again told Mr. Robinson to "Stop reaching, stop reaching."[29] Officer Lampley came to the driver's side door to assist Officer Fox.[30] Officer Lampley reached inside the car to help pull Mr. Robinson back.[31] During this time Officer Barney was in front of the car and saw Mr. Robinson reaching for something while Officers Lampley and Fox were trying to get him out of the car.[32] He also drew his weapon to make sure that Mr. Robinson did not have a weapon.[33]  Eventually, Officers Fox and Lampley were able to remove Mr. Robinson from the car.[34]

After getting Mr. Robinson out of the vehicle, Mr. Robinson was clutching his left hand to his chest tight with his right hand on top.[35] Mr. Robinson went to his knees and then to the ground while being held by Officers Lampley and Fox.[36] While on the ground, Mr. Robinson continued clutching with his hands held tightly together underneath him.[37] At some point, Officer Barney assisted with trying to gain control of Mr. Robinson's hands.[38] Mr. Robinson resisted while working to get his hands to his mouth.[39] Mr. Robinson was tucking his head to try and get his mouth closer to his hands.[40] Despite the efforts of all three Officers, Mr. Robinson was ultimately successful in getting his hand to his mouth swallowing whatever he had.[41]

---

[29] Ex. 1, p. 95 lines 15-16, p. 102 lines 8-10, p. 132 lines 7-9.
[30] Ex. 8, p. 84 lines 2-3.
[31] Ex 1, p. 95 lines 17-19.
[32] Ex. 8, p. 88 lines 3-12, p. 103 lines 1-4, 19-25, p. 104 lines 4.
[33] Ex. 8, p. 84 lines 2-16.
[34] Ex 1, p. 95 lines 19-21; Ex. 8, p. 84 lines 17-18; Ex. 8, p. 87 line 10.
[35] Ex. 8, p. 84 lines 17-22.
[36] Ex. 8, p. 84 lines 17-22, p. 90 lines 12-25, p. 142 lines 1-16.
[37] Ex. 8, p. 87, lines 11-16, p. 89 lines 11-16.
[38] Ex. 8, p. 90 lines 6-11, p. 122 lines 1-25, p. 123 lines 1-25, p. 124 lines 16-24.
[39] Ex. 8, p. 84 lines 23-25, p. 85 lines 1-4.
[40] Ex. 8, p. 85 lines 1-11.
[41] Ex. 1, p. 117 lines 14-18, p. 70 lines 5, 14; Ex. 8, p. 91 lines 3-6, p. 105 lines 23-25.

When the Officers stood Mr. Robinson up after handcuffing him, Officer Fox recognized Mr. Robinson.[42] At that time, Mr. Robinson said: "Fox, man, you know I respect you, bro… man that's my bad… I didn't mean to do all of that… I ain't want to go to jail… so I just swallowed that tab."[43] Mr. Robinson was standing on his own and was talking normally.[44]

While Mr. Robinson was struggling to get his hand to his mouth, Mr. Robinson sustained a minor superficial abrasion above his right eye.[45]  When Officer Fox saw the abrasion, he told Mr. Robinson that he was going to call AMR. In response, Mr. Robinson said "Man Fox, I don't need no AMR. I just want to go home."[46] However, because Mr. Robinson had a slight abrasion, Officer Fox called dispatch to request AMR come evaluate Mr. Robinson.[47]

<u>ASSESSMENT BY AMR</u>

At 19:43, AMR received a call and arrived at Jones/Washington Avenues at 19:55.[48] Upon arrival, AMR found Mr. Robinson handcuffed and standing beside an unmarked police SUV.[49] The records show that Mr. Robinson had a single abrasion on his right forehead that had stopped bleeding.[50] He was neurologically intact and had no complaints.[51]  He was alert and oriented with a normal Glasgow Coma Scale (GCS) score of 15 out of 15.[52] Mr. Robinson declined medical care other than permitting them to put a bandage over the abrasion. At 20:03

---

[42] Ex. 1, p. 114 lines 4-5, p. 117 lines 14-25, p. 118 lines 1-6, 15-23, p. 119 lines 1-10.
[43] Ex. 1, p. 130 lines 4-12. A "tab" is street slang for a drug.
[44] Ex. 1, p. 144 lines 1-7; Ex. 8, p. 91 lines 3-6.
[45] Ex. 1, p. 73 lines 3-7, p. 119 lines 14-20, p. 129 line 2, p. 149 lines 6-9; Exhibit 2, UMMC Medical Records, p. 209; Exhibit 3, Dr. Arden Affidavit, ¶18; Exhibit 4, Dr. Usey Declaration, ¶13; Exhibit 8, p. 91 lines 7-19, p. 141 lines 2-25.
[46] Ex. 1, p. 130 lines 1-2, p. 143 lines 19-25, p. 144 lines 1-2; Ex. 8, p. 139 lines 9-18, p. 143 lines 12-22.
[47] Ex. 1, p. 127 lines 15-16, p. 128 lines 3, 12-16, p. 146 lines 1-4.
[48] Ex. 3, ¶6; Exhibit 6, AMR Records, p. 1.
[49] Ex. 3, ¶18. Ex. 6, p.1.
[50] Ex. 6 p. 1.
[51] Ex. 3, ¶18. Ex 6 p. 1.
[52] Ex. 6, p. 1.

AMR left the scene.[53]

Mr. Robinson was then field released after being charged with disobeying a police officer and with resisting arrest.[54] Mr. Robinson was field released because the Hinds County Detention Center was not taking arrestees other than for felonies, DUIs and domestic violence.[55]  During the entire time Mr. Robinson was detained by JPD until he drove off, Mr. Robinson was standing on his own power, he was not stumbling, and he did not have any slurred speech.[56]

THE MUSTANG INN

After being field released, Mr. Robinson got in his vehicle and drove himself to the Mustang Inn located on Highway 80 in Jackson, Mississippi.[57] Video from the Mustang Inn shows Mr. Robinson arrive in the parking lot and pull into a parking space.[58] Mr. Robinson then got out of his car and walked to the front of his car.  He pushed and sat on the hood in an apparent attempt to close the hood. Mr. Robinson walked to his hotel room and went inside. Several minutes later, Mr. Robinson came out of his room and walked back to his car. He then opened the door and looked inside. Minutes later, Mr. Robinson walked back into his hotel room. Sometime later, Mr. Robinson can be seen opening the door to his room to let someone come inside. On multiple occasions before and after this time, people are seen going in and out of Mr. Robinson's hotel room. At 23:12, over three (3) hours after Mr. Robinson's interaction with JPD, EMS was called and advised that Mr. Robinson was in his hotel room unresponsive.[59] Mr. Robinson was subsequently transported to UMMC.

---

[53] Ex. 6, p. 1.
[54] Ex. 1, p. 80 line 24, p. 81 lines 1-2, 7-8, 12, 14, p. 137 lines 11-12.
[55] Ex. 1, p. 130 lines 15-21, p. 131 lines 6-9, p. 133 lines 1-10.
[56] Ex. 1, p. 144 lines 1-7; Ex. 8, p. 140 lines 7-24.
[57] Ex. 1, p. 144 line 7.
[58] Exhibit 5, Lampley Affidavit.
[59] Ex. 6, p. 6.

THE MEDICAL EVIDENCE

Mr. Robinson arrived at the University of Mississippi Medical Center ("UMMC") at 23:47.[60] He was found to be markedly hypertensive with a blood pressure of 215/90. His urine drug screen was positive for cocaine.[61]  Mr. Robinson ultimately died on January 15, 2020, as a result of a subdural hemorrhage.

After arriving at UMMC, CTs were performed on Mr. Robinson's head and neck, chest, abdomen, and pelvis. These scans present the definitive and indisputable picture of Mr. Robinson's physical condition upon arrival.[62] The head and neck CT showed that Mr. Robinson had an acute right frontal subdural hematoma.[63] Importantly, the fact that Mr. Robinson had a subdural hematoma when he arrived at UMMC does not establish that Mr. Robinson was the victim of excessive force at the hands of Officer Fox or any of the other JPD Officers.[64]

A subdural hemorrhage most commonly results from blunt impact head trauma. But while the words "blunt impact head trauma" may create an image of some significant trauma in the mind of a layperson, these words have a much more limited medical meaning.  Medically speaking these words simply mean that there was some impact between a blunt object and a person's head that caused some injury. They indicate nothing about the force of the impact. They indicate nothing about the nature of the injury.  This is critically important in this case because a subdural hemorrhage can and often does develop without significant trauma depending on a person's preexisting conditions.[65]

---

[60] Ex. 6, p. 6.
[61] Ex. 4, ¶10.
[62] Ex. 4, ¶11.
[63] Ex. 4, ¶12.
[64] Ex. 3, ¶16, 18, 19, 20.
[65] Ex. 4, ¶19, 20.

The multiple CTs done at UMMC show that the only physical injury Mr. Robinson had to his body on arrival was a small superficial soft tissue injury.[66] There were no broken bones and no other soft tissue injuries to his head, face, or neck. There were not any bruises even though Mr. Robinson was on a dual antiplatelet regimen that made him particularly susceptible to bruising.[67] The absence of any other injuries to Mr. Robinson's head, face, or neck shows that he was not beaten or kicked about his head, face, or neck.[68]

The CT of Mr. Robinson's cervical spine, chest, abdomen, and pelvis showed no injury at all. More specifically, there were no broken bones, bruises, or other soft tissue injuries of any kind anywhere on his back, abdomen, and pelvis. While there is an indication in the UMMC records that Mr. Robinson had nondisplaced rib fractures of the right 10th and 11th ribs, the undisputed medical testimony is that there were no rib fractures and that this was likely a misread by a resident.[69] Again, the absence of any injury to his cervical spine, chest, abdomen, and pelvis shows that Mr. Robinson was not body-slammed to the ground or that he was beaten or kicked about his back, chest, abdomen, or pelvis.[70]

There is no dispute in this case that Mr. Robinson had many factors that put him at risk for developing a subdural hemorrhage.[71] He was on two anticoagulant medications which inhibited the ability of platelets to aggregate. He was hypertensive, increasing the risk of prolonged intracranial bleeding. He regularly used stimulant drugs, including cocaine, which cause increased blood pressure. He had diabetes mellitus which along with hypertension causes

---

[66] Ex. 3, ¶20.
[67] Ex. 3, ¶20.
[68] Ex. 4, ¶13, 22.
[69] Ex. 4, ¶15.
[70] Ex. 4, ¶14.
[71] Ex. 3, ¶176. Ex. 4, ¶19.

chronic damage to small blood vessels in the brain and increases the risk for stroke and hemorrhage.[72]

THE AUTOPSY

A post mortem examination was done on January 17, 2019, by J. Brent Davis, MD. However, the Post Mortem Report was not issued by Dr. Davis. Rather, this report was issued more than a year later by Mark LeVaughn, MD. Dr. LeVaughn issued the report without the benefit of actually examining Mr. Robinson's body. The report issued by Dr. LeVaughn contains multiple significant errors.[73]

Dr. LeVaughn's post mortem report refers to findings in the brain, including contusions, basal ganglia hemorrhage, and subarachnoid hemorrhage. None of these were present at the time of the CT of Mr. Robinson's head on January 14, 2019. Dr. LeVaughn's report also describes scalp contusions and scalp hemorrhage.[74]  None of these were present at the time of Mr. Robinson's CT of the head on January 14, 2019. The CT of the head was done before the right craniotomy at UMMC. Importantly, the autopsy was done after Mr. Robinson had undergone this craniotomy.[75]

### III. THE CLAIMS ASSERTED

The Plaintiffs, Bettersten R. Wade and Vernice Robinson, have filed the claims in this case both individually and on behalf of the wrongful death beneficiaries of George Robinson. The First Amended Complaint alleges that "[t]his is a wrongful death action brought as a result of the collective assault… by law enforcement personnel… through the use of unreasonable and

---

[72] Ex. 4 ¶19.
[73] Ex. 4, ¶16, 17, 18. Ex. 3. Neither Dr. Davis nor Dr. LeVaughn is currently employed with the State Medical Examiner's Office.
[74] Ex. 4, ¶17, 18.
[75] Ex. 2, p. 226.

unjustifiable force… and that as a direct and proximate consequence, George Robinson was severely injured and died…."[76]  The Plaintiffs' current complaint also includes claims for (1) common law negligence; (2) civil assault and battery; (3) the tort of outrage; and (4) wrongful death 11-17-13.  The Plaintiffs seek damages both individually and as wrongful death beneficiaries.

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.,* 404 F.3d 938, 940 (5th Cir.2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 325. Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Id.* at 324–25. "[W]hen a motion for summary judgment is made and supported ...

---

[76] First Amended Complaint ¶¶ 1 and 2.

an adverse party may not rest upon ... mere allegations or denials ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In reviewing the evidence, facial controversies are to be resolved in favor of the nonmovant, "but only when ... both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the District Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

## IV.  LAW AND ARGUMENT

### A.      There Was No Excessive Force

The Plaintiffs allege violations of the Fourth, Eighth and Fourteenth Amendments. However, the law is settled that the Plaintiffs only have a Fourth Amendment claim. This is because they alleged that excessive force occurred during an arrest.  In the case *Graham v. Connor*, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under [the Fourteenth Amendment]." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This is because "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to

be secure in their persons...against unreasonable...seizures' of the person." *Id.* at 394. *see also* U.S. Cont. amend. IV ("The right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause....").

Concerning Plaintiffs' Fourth Amendment excessive force claim, the legal question before this Court is whether the conduct of Officer Fox, Officer Lampley and Officer Barney was reasonable. To establish an excessive force claim, the Plaintiffs must show "(1) [an] injury, (2) which resulted **directly and only from a use of force that was clearly excessive**, and (3) **the excessiveness of which was clearly unreasonable**." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). Therefore, "[e]xcessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).  However, "the use of force must be evaluated '**from the perspective of a reasonable officer on the scene**, rather than with the 20/20 vision of hindsight.'" *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (quoting *Poole*, 691 F.3d at 627) (emphasis added) (other citations omitted). The Court's "inquiry is 'whether the officer['s] actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.' " *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citing *Graham*, 490 U.S. at 397).

The Plaintiffs' excessive force claim fails for multiple reasons. The only injury from the interaction with these three JPD officers was a minor abrasion. Mr. Robinson's death did not result "direct and only" from the force used.[77] In addition, the force used was not excessive. Finally, as a matter of law, the force used was not clearly unreasonable under the circumstances.

---

[77] Ex. 3, ¶19, 20, 21.

Officer Fox observed what appeared to be a hand-to-hand drug transaction. He saw a female interacting with a male who was sitting in the driver's seat of a parked car. The female had cash in her hand and was in the process of handing it to the driver. These observations gave Officer Fox reasonable suspicion that criminal activity was afoot.[78] As a result, Officer Fox had the right to approach and detain the individuals involved.

When Mr. Robinson saw Officer Fox, he began reaching between the seat and the console in a manner that was consistent with someone reaching for a weapon. Mr. Robinson disobeyed commands to stop and show his hands. Under these circumstances, it was objectively reasonable for an officer to open the door and remove the driver from the vehicle. The force used in doing so was objectively reasonable. During the entire interaction with these Officers, the only physical injury sustained by Mr. Robinson was a small abrasion. Moreover, this was the result of Mr. Robinson resisting arrest and fighting to swallow what he was holding in his hand. But regardless of the cause of the abrasion, the fact that the only injury was an abrasion shows that neither excessive force nor deadly force, was used.

The Plaintiffs are also unable to show that Mr. Robinson's death "resulted directly and only from a use of force that was clearly excessive." Again, the only injury attributable to the interaction with these Officers is the superficial abrasion. This existence of no other physical injury is directly contrary to any conclusion that excessive force was used. The medical evidence

---

[78] Reasonable suspicion exists if the officer can "point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). It cannot be unparticularized or founded on a mere hunch. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). Instead, "a minimal level of objective justification" is required. *Id.* Observations capable of innocent explanation, when considered alone, might rise to the level of reasonable suspicion in the aggregate. *United States v. Arvizu*, 534 U.S. 266, 277–78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Likewise, an officer can have a reasonable suspicion without ruling out every innocent explanation. *Id.* at 277, 122 S.Ct. 744.

conclusively shows that given Mr. Robinson's pre-existing conditions, the superficial injury sustained in the interaction with JPD, and the time that elapsed, Mr. Robinson's subsequent death did not result "directly and only" from a clearly excessive use of force.[79] For all these reasons, the entry of Summary Judgment is appropriate at this time.

**B.     Mr. Robinson's Death Was Not Foreseeable**

The proximate cause question asks whether the allegedly wrongful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury. W. Page Keeton et al., *Prosser and Keeton on Torts* § 42 (5th ed. 1984). Proximate cause is "said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* It is a question of "whether the duty includes protection against such consequences." *Id.* Therefore, "the touchstone of proximate cause in a §1983 action is foreseeability." *Phillips v. Hust*, 477 F.3d 1070, 1077 (9th Cir. 2007), *vacated on other grounds*, 555 U.S. 1150, 129 S.Ct. 1036, 173 L.Ed.2d 466 (2009).

The United States Supreme Court has also observed that "[p]roximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States*, 572 U.S. 464, 134 S.Ct. 1710, 1719, 188 L.Ed.2d 714 (2014). "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.*

Before any civil liability can attach individually to either Officer Fox, Officer Lampley, or Officer Barney, there must be a finding that Mr. Robinson's death was the foreseeable result of some alleged wrongful conduct by each of them. The Mississippi Supreme Court has

---

[79] Ex. 3, ¶20, 21. Ex. 4, ¶20-22.

previously addressed this foreseeability requirement in *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 713 (Miss. 2005). In the *Estate of Stewart* case, the City operated a van to transport people to an adult daycare center at UMMC. On August 11, 1997, Otha Stewart was transported in the van to UMMC. After getting out of the van, Mrs. Stewart "took a few steps" and fell to the ground and hit her head on the pavement. Mrs. Stewart was taken to the emergency room where, according to the emergency room doctor, she had no swelling, her blood pressure was normal, and she seemed fine. Mrs. Stewart was released to go home. Days later she had a stroke and died.

In analyzing the facts, the Mississippi Supreme Court explained that "foreseeability presents the question of whether a stroke is a type of damage which reasonably should be *anticipated* (or foreseen before the fact) as a result of negligently allowing an elderly person to fall in a parking lot." The Court then went on to find that the stroke was "not a foreseeable consequence of the alleged negligence that led to the [plaintiff's] fall." *Id.* at 715.

In Mr. Robinson's case, his subdural hemorrhage and death were not a foreseeable result of the interaction with these Officers, or from the superficial abrasion that Mr. Robinson sustained. Again, this was a minor injury that is inconsistent with a finding that any of these Defendants used deadly or clearly excessive force on Mr. Robinson. The trained AMR responders who assessed Mr. Robinson found that Mr. Robinson was neurologically intact. Given the nature of the injury to Mr. Robinson following his interaction with JPD, no one on the scene had any reason to know or suspect that he was going to subsequently develop a subdural hemorrhage.[80]

For these reasons as well, the entry of Summary Judgment is appropriate at this time.

---

[80] Ex. 3, ¶19, 20, 21.

### C.     Plaintiffs' Claims Are Barred By Qualified Immunity

Each of these Defendants also moves for summary judgment based on the qualified immunity defense. The qualified immunity doctrine protects a defendant acting under color of state law "insofar as his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). The goal of qualified immunity is to balance the: (1) "need to hold public officials accountable when they exercise power irresponsibly"; and, (2) "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Anderson v. Valdez*, 845 F.3d 580, 599-600 (5th Cir. 2016).  The protection of qualified immunity applies regardless of whether there was a mistake of law and/or fact. *Groh v. Ramirez*, 540 U.S. 551, 567 (2004). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Importantly, once asserted by the defendant, the burden shifts to the plaintiff to show that the defense is inapplicable. *See McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013).

Courts employ a two-step procedure to gauge the applicability of qualified immunity. These steps can be reviewed in any order, but the underlying inquiries are whether the plaintiff has alleged facts sufficient to state a constitutional violation and whether, at the time of the incident, the contours of the right were clearly established so that every reasonable officer would understand what he was doing violates that right. *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 471 (5th Cir. 2014). On the other hand, the clearly established prong does not necessarily require a case "'directly on point.'" *See Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Still, precedent must have

placed the pertinent constitutional issue beyond debate. *Ashcroft*, 563 U.S. at 741. Indeed, the qualified immunity defense will protect all but the "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 340 (1986).

The second prong of the analysis asks whether the right at issue was clearly established at the time of the allegedly unconstitutional conduct. Courts have held that an officer has fair notice of the factors used in gauging whether force is excessive in the constitutional context. *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam)). The reasonableness of an officer's actions is "judged against the backdrop of the law at the time." *Brosseau v. Haugen*, 543 U.S. 194, 198, 124 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam).

In excessive force cases, "the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citations and quotations omitted). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.*

Looking at the first prong of this test under the facts of Mr. Robinson's case, undesigned counsel have not found a case on point or even involving a substantially similar use of force. As such, the Plaintiffs cannot establish that: (1) the force used by Officer Fox and Officer Lampley in removing Mr. Robinson from his vehicle; or (2) that the force used by Officer Fox, Officer Lampley and Officer Barney in trying to restrain Mr. Robinson and keep him from getting his

clenched hand to his mouth or handcuffing him; was such "that every reasonable officer would understand" that what they were doing violated any right Mr. Robinson had.

The Plaintiffs are likewise unable to establish the second prong necessary to overcome qualified immunity. This is because: (1) the specific conduct of Officer Fox during the interaction with Mr. Robinson was objectively reasonable under established law; (2) the specific conduct of Officer Lampley during the interaction with Mr. Robinson was objectively reasonable under established law; and (3) the specific conduct of Officer Barney during the interaction with Mr. Robinson was objectively reasonable under established law. Officer Fox had reasonable suspicion, if not probable cause, to approach and temporarily detain Mr. Robinson. When Mr. Robinson acted in a manner that indicated a possible threat to officer safety, Officer Fox had the right to respond to that threat by forcibly removing him from the vehicle. Officer Lampley and Officer Barney each had the duty, the obligation, and right to assist Officer Fox in detaining and arresting Mr. Robinson.

As a matter of law, there was nothing objectively unreasonable about the conduct of any one of these officers during this interaction. Moreover, officers of reasonable competence could not disagree as to whether Mr. Robinson's rights were violated. Therefore, each of these Defendants is entitled to qualified immunity.

**D.     Plaintiffs' State Law Claims Must Also Be Dismissed**

The Plaintiffs' have asserted state law claims for: (1) negligence; (2) civil assault and battery; (3) the tort of outrage; and (4) wrongful death 11-17-13. These state law claims must also be dismissed for three separate and distinct reasons.

First, there is no dispute that Officer Fox, Officer Lampley and Officer Barney were each acting in the course and scope of their employment with JPD at the time of the interaction.

According to paragraph 23 of the Plaintiffs' First Amended Complaint: "[a]t all relevant times, the Defendant officers were acting under color of law and… as police officers, employees, and agents of the Jackson Police Department."  The Mississippi Tort Claims Act specifically provides that:

> **no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.**  For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

Miss. Code Ann. § 11-46-7(2) (emphasis added).  Accordingly, Officers Barney, Lampley, and Fox cannot be held individually liable on the state law claims and the same must be dismissed.

Second, Officers Barney, Lampley, and Fox each have full immunity under §11–46–9(1)(c) of the Mississippi Code. Section 11–46–9(1)(c) provides immunity against any claim arising out of any act or omission to police officers while performing activities relating to police protection unless they acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury. In this case, there is no dispute that these Officers were engaged in police activities at the time of their interaction with Mr. Robinson. There is no dispute that Mr. Robinson was engaged in criminal activity at the time of his interaction with JPD. And irrespective of Mr. Robinson's criminal activity, the Plaintiffs cannot prove that any of these Officers acted in reckless disregard for Mr. Robinson's safety and wellbeing. For these reasons as well, all Plaintiffs' state law tort claims must be dismissed with prejudice.

Third, the state law tort claims must be dismissed because the Plaintiffs failed to give the required statutory notice before filing their lawsuit. The Mississippi Supreme Court has

unequivocally held that §11-46-11(1) provides a "mandatory notice requirement...." *S. Cent. Reg'l Med. Ctr. v. Guffy*, 930 So.2d 1252, 1259 (Miss. 2006) (quoting *Black v. City of Tupelo*, 853 So.2d 1221, 1226 (Miss. 2003); *see Arceo v. Tolliver*, 19 So.3d 67, 72 (Miss. 2009) ("The MTCA requires written notice of a claim in advance of the filing of a lawsuit, a requirement which ... is strictly applied"; *Price v. Clark*, 21 So.3d 509, 518 (Miss. 2009) ("strict compliance with statutory notice is required ..."; *Univ. of Mississippi Med. Ctr. v. Easterling*, 928 So.2d 815, 820 (Miss. 2006) (quoting *Ivy v. GMAC*, 612 So.2d 1108, 1116 (Miss. 1992)) ("The ninety day notice requirement ... is a 'hard edged, mandatory rule which the Court strictly enforces'").

The Amended Complaint fails to set forth facts demonstrating that Plaintiffs complied with the MTCA's mandatory pre-suit notice requirements. Upon information and belief, Plaintiffs never served any of these Officers with a pre-suit notice of claim.  Accordingly, Plaintiffs' state law claims are improperly before the Court and should be dismissed as a matter of law.

## V.  CONCLUSION

Each of these Defendants has shown that Plaintiffs are unable to raise a genuine issue of material fact for trial that (1) his actions were excessive under the circumstances; (2) his actions were objectively unreasonable under the facts and circumstances; (3) the death of Mr. Robinson was the foreseeable result of the force used; or (4) is sufficient to overcome qualified immunity. Accordingly, each of these Defendants is entitled to summary judgment on Plaintiffs' federal claims.

Each of the Plaintiffs' state law claims also fails for the same reasons that the federal claims fail. In addition, each of these Defendants has also shown that there are no material issues of fact concerning the Plaintiffs' state law claims, and the summary judgment is appropriate

because (1) they each have state law immunity against those claims; and (2) because the Plaintiffs did not give the required statutory notice.

For all of these reasons, these Defendants are entitled to the entry of summary judgment in their favor and dismissing all claims against them with prejudice.

**THIS** the 1st day of April 2021.

Respectfully submitted,

**ANTHONY FOX**

BY: /s/ *Michael V. Cory, Jr.*_____
    Michael V. Cory, Jr.
    Paul M. Luckett
    *Attorneys for Defendant, Anthony Fox*

**LINCOLN LAMPLEY**

BY: /s/ *Francis Springer*_____
    Francis Springer
    *Attorney for Defendant, Lincoln Lampley*

**DESMOND BARNEY**

BY: /s/ *Dale Danks, Jr.*_____
    Dale Danks, Jr.
    *Attorney for Defendant, Desmond Barney*

**OF COUNSEL:**

Michael V. Cory, Jr. (MSB#9868)
213 S. Lamar Street (39201)
P.O. Box 1759
Jackson, MS  39215-1759
Telephone: (601) 957-3101
Facsimile: (601) 957-3160

Dale Danks, Jr. (MSB#5789)
Danks, Miller, & Cory
213 S. Lamar Street (39201)
P.O. Box 1759
Jackson, MS  39215-1759
Telephone: (601) 957-3101

Facsimile: (601) 957-3160

Paul M. Luckett (MSB #10224)
1121A Delaware Avenue
McComb, MS 39648-3829
Phone 601-250-1144

Francis Springer (MSB #103974)
Springer Law Office, PLLC
213 S. Lamar St.
Jackson, Mississippi
Post Office Box 1280
Madison, MS 39130-1280
Phone 601.605.5004
Fax 877.605.5004

## **CERTIFICATE OF SERVICE**

I, Michael V. Cory, one of the attorneys for Anthony Fox, do hereby certify that I have

this day delivered a true and correct copy of the foregoing via electronic mail and/or U.S. mail to

the all attorneys of record in this matter.

This the 1st day of April, 2021.

/s/*Michael V. Cory, Jr.*
MICHAEL V. CORY, JR