```
          IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT

                    OF HINDS COUNTY, MISSISSIPPI



STATE OF MISSISSIPPI                              PLAINTIFF

VERSUS                                            NO. 20-0-541
                                                  NO. 20-0-627

DESMOND MARCELLOUS BARNEY
LINCOLN CHALMERS LAMPLEY                          DEFENDANTS



*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE TRIAL

IN THE ABOVE-STYLED AND NUMBERED CAUSE BEFORE THE

HONORABLE E. FAYE PETERSON, CIRCUIT COURT JUDGE,

BEGINNING ON THE 17TH DAY OF MAY, 2021.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *



                      (Appearances noted herein.)




REPORTED BY:   LINDSEY McINTOSH, CCR
               Official Court Reporter
               Post Office Box 327
               Jackson, Mississippi  39205
               CCR # 1732
```



EXHIBIT 3

```
 1   APPEARANCES:

 2
       Present and Representing the Plaintiff:
 3
           HONORABLE JAMES KURT GUTHRIE
 4         HONORABLE TAMETRICE E. HODGES
           HONORABLE DAVID F. LINZEY
 5         Hinds County District Attorney's Office
           Post Office Box 22747
 6         Jackson, Mississippi  39225-22747

 7
       Present and Representing the Defendant
 8       Desmond Marcellous Barney:

 9         HONORABLE MICHAEL V. CORY, JR.
           HONORABLE CHRISTIAN MEDINA
10         Danks, Miller & Cory
           Post Office Box 1759
11         Jackson, Mississippi  39215-1759

12
           HONORABLE PAUL M. LUCKETT
13         Attorney at Law
           Post Office Box 1055
14         McComb, Mississippi  39649-1055

15
       Present and Representing the Defendant
16       Lincoln Chalmers Lampley:

17         HONORABLE FRANCIS S. SPRINGER
           Springer Law Office, PLLC
18         213 South Lamar Street
           Jackson, Mississippi  39201
19

20

21

22

23

24

25
```

COURT REPORTER'S CERTIFICATE

STATE OF MISSISSIPPI

COUNTY OF HINDS

    I, Lindsey P. McIntosh, CCR, Official Court Reporter for Hinds County Circuit Court, do hereby certify that the foregoing 440 pages, and including this page, constitute a true and correct transcript of the proceedings had upon the trial testimony in the above entitled and numbered cause before the Honorable E. Faye Peterson, Circuit Court Judge, beginning on the 17th day of May, 2021.

    I do further certify that my certificate annexed hereto applies only to the original and certified transcript. The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

    Witness my signature, this the 14th day of June, 2021.

*Lindsey P. McIntosh*
LINDSEY P. McINTOSH, CCR
Official Court Reporter
CCR NO. 1732

1    BY THE COURT: Yes. That'll be fine.
2    BY MR. GUTHRIE: Yes, Your Honor.
3    (FOLLOWING THE BENCH CONFERENCE, THE
4    TRIAL CONTINUED AS FOLLOWS IN THE PRESENCE
5    AND HEARING OF THE JURY:)
6    BY THE COURT: All right. State may
7    call its next witness.
8    BY MR. GUTHRIE: Your Honor, the State
9    calls Dr. Mark LeVaughn.
10   BY THE COURT: Before this witness
11   begins, Ladies and Gentlemen of the Jury, I
12   am going to advise you that because this
13   witness may be tendered as an expert, we're
14   going to go into the lunch hour so that he
15   can complete his testimony. So please bear
16   with, and I hope you brought your water in
17   the courtroom with you to take a sip of. So,
18   please, if you'll work with us on this
19   witness, we do need to allow him to complete
20   his examination. All right.
21   All right. Dr. LeVaughn, if you'll just
22   remain standing for a moment, my clerk will
23   swear you in.
24   MARK LEVAUGHN, M.D.,
25   called as a witness on behalf of the State, having first

1  been duly sworn, was examined and testified as follows,
2  to-wit:
3              BY THE COURT:  You may be seated.  And
4      do I need him to go ahead and warm up the
5      overhead?  Is it ready?
6              BY MR. GUTHRIE:  Please, Your Honor.
7              BY THE COURT:  Could I get the bailiff
8      to go ahead and warm up the overhead?  We'll
9      turn the lights when you're ready.
10             All right, Counsel.  You may proceed.
11             BY MR. GUTHRIE:  Yes, Your Honor.  Do
12     you want to wait just a minute on the lights?
13             BY THE COURT:  Just wait, yes.  Just
14     wait.  All right.  You may proceed.
15             BY MR. GUTHRIE:  Yes, Your Honor.
16 DIRECT EXAMINATION BY MR. GUTHRIE:
17     Q.   Please state your name for the record.
18     A.   Mark LeVaughn, L-E- capital -V-A-U-G-H-N.
19             BY THE COURT:  Dr. LeVaughn, you can
20     remove your face covering while you testify?
21     I have mine on.
22             BY THE WITNESS:  Thank you, Your Honor.
23 BY MR. GUTHRIE:  (Continuing)
24     Q.   Dr. LeVaughn, where are you employed?
25     A.   I'm employed at the Mississippi Department of

1    Q.    And that there were actually two broken ribs;
2  is that correct?
3    A.    That was also described in the investigation
4  material that we received.
5    Q.    And Dr. Davis -- well, as part of an autopsy,
6  if you have a history of broken ribs, you're going to
7  look for broken ribs, aren't you?
8    A.    Yes.
9    Q.    And you're relying on Dr. Davis here today
10 because you didn't do the autopsy, correct?
11   A.    That's correct, yes, sir.
12   Q.    And you know Dr. Davis?
13   A.    I do.
14   Q.    Would he have checked the ribs if they -- if
15 it was an assault victim with purportedly broken ribs?
16   A.    In my opinion, he would.
17   Q.    And if you check them, are they visible?  Are
18 you going to see them?
19   A.    Well, if they are visible, then they would be
20 documented, yes.
21   Q.    Which broken ribs are going to be visible
22 postmortem, correct?
23   A.    Yeah.  Not always but, again, it depends on
24 the amount of force and the appearance of the rib.
25 These were, I believe, described as nondisplaced.  That

1  A.  Well, I documented three blunt injuries to
2  the head.  Could be a result of being struck.  But there
3  were no other injuries anywhere else on the chest that
4  were any -- there were no blunt injuries on the chest.
5  Q.  And likewise, there were no injuries on the
6  chest or head that indicate kicking?
7  A.  You can't -- you know, I described a blunt
8  injury --
9  Q.  Right.
10  A.  -- which could be from punching, kicking,
11  head hitting something.  I can't define how these
12  injuries occurred, but they were only to the head.  They
13  were not -- there were no injuries to the chest.
14  Q.  But we can agree that a blunt force trauma
15  can be a very minor trauma.  It just means the -- it
16  just describes the nature of what the impact was.  Blunt
17  force doesn't mean it's a heavy force, correct?
18  A.  No.  It just means nonsharp.
19  Q.  Right.  Nonsharp.  So if a witness testified
20  that somebody raised their foot up off the ground and
21  stomped on Mr. Robinson's face, do you see any injury
22  consistent with that on these photographs?
23  A.  Well, again, I can't differentiate a shoe
24  injury from a baseball bat injury, but there was injury.
25  All I'm describing is injuries to his face.  I cannot

1     BY THE COURT: So I'll let you rephrase
2  and proceed.
3     BY MR. SPRINGER: Sure.
4  BY MR. SPRINGER: (Continuing)
5     Q.   Do you know of anything that Dr. Davis had
6  that you used to draw your conclusions and complete this
7  autopsy report that showed the fractured ribs as you
8  reported from the coroner? Would he have had that,
9  that's the first part of the question, and I think you
10 answered that. The second part of -- or what I'm asking
11 now is, did you have that, that he had?
12    A.   What I used to generate the report was what
13 he had in the case file.
14    Q.   Okay. And your final report had nothing
15 about fractured ribs?
16    A.   That's correct.
17    Q.   Okay. Did you talk to Dr. Davis about any of
18 this?
19    A.   I did not.
20    Q.   Did anything prevent you from talking to him
21 about any of this?
22    A.   Would anything prevent me from talking --
23    Q.   Did anything prevent you from calling him,
24 e-mailing him, anything like that with any questions or
25 anything about this?

1                BY THE WITNESS:  Let me back up.  I know
2         in 2018 I did over 700 autopsies.
3  BY MR. SPRINGER:  (Continuing)
4       Q.   Okay.  That's all right.
5       A.   In 2019, it was maybe a little less but --
6       Q.   Okay.  That's fine.  That's fine.
7       A.   -- several hundred.
8       Q.   That's fine.
9                BY MR. SPRINGER:  That's all the
10        questions I have, Your Honor.  Thank you,
11        Dr. LeVaughn.
12               BY THE COURT:  All right.  Any redirect?
13               BY MR. GUTHRIE:  Yes, Your Honor.
14  REDIRECT EXAMINATION BY MR. GUTHRIE:
15      Q.   Dr. LeVaughn, there's been several questions
16  about rib fractures.  Were there any notes in Dr. Davis'
17  reports about a rib fracture?
18      A.   No.
19      Q.   Were there -- and there were many more
20  pictures of the autopsy than what we actually went
21  through today.  But did you take those pictures?
22      A.   No.
23      Q.   Did those pictures show a rib fracture?
24      A.   In my opinion, no.
25      Q.   Okay.  Is that why you did -- chose not to