1            BY THE COURT:  Yes.  That'll be fine.

2            BY MR. GUTHRIE:  Yes, Your Honor.

3            (FOLLOWING THE BENCH CONFERENCE, THE

4    TRIAL CONTINUED AS FOLLOWS IN THE PRESENCE

5    AND HEARING OF THE JURY:)

6            BY THE COURT:  All right.  State may

7    call its next witness.

8            BY MR. GUTHRIE:  Your Honor, the State

9    calls Dr. Mark LeVaughn.

10           BY THE COURT:  Before this witness

11   begins, Ladies and Gentlemen of the Jury, I

12   am going to advise you that because this

13   witness may be tendered as an expert, we're

14   going to go into the lunch hour so that he

15   can complete his testimony.  So please bear

16   with, and I hope you brought your water in

17   the courtroom with you to take a sip of.  So,

18   please, if you'll work with us on this

19   witness, we do need to allow him to complete

20   his examination.  All right.

21           All right.  Dr. LeVaughn, if you'll just

22   remain standing for a moment, my clerk will

23   swear you in.

24           MARK LEVAUGHN, M.D.,

     called as a witness on behalf of the State, having first

EXHIBIT
"3"

tabbies

Mark LeVaughn, M.D. -- Direct                    318

```
 1   been duly sworn, was examined and testified as follows,
 2   to-wit:
 3                    BY THE COURT:  You may be seated.  And
 4            do I need him to go ahead and warm up the
 5            overhead?  Is it ready?
 6                    BY MR. GUTHRIE:  Please, Your Honor.
 7                    BY THE COURT:  Could I get the bailiff
 8            to go ahead and warm up the overhead?  We'll
 9            turn the lights when you're ready.
10                    All right, Counsel.  You may proceed.
11                    BY MR. GUTHRIE:  Yes, Your Honor.  Do
12            you want to wait just a minute on the lights?
13                    BY THE COURT:  Just wait, yes.  Just
14            wait.  All right.  You may proceed.
15                    BY MR. GUTHRIE:  Yes, Your Honor.
16   DIRECT EXAMINATION BY MR. GUTHRIE:
17       Q.   Please state your name for the record.
18       A.   Mark LeVaughn, L-E- capital -V-A-U-G-H-N.
19                    BY THE COURT:  Dr. LeVaughn, you can
20            remove your face covering while you testify?
21            I have mine on.
22                    BY THE WITNESS:  Thank you, Your Honor.
23   BY MR. GUTHRIE:   (Continuing)
24       Q.   Dr. LeVaughn, where are you employed?
25       A.   I'm employed at the Mississippi Department of
```

Mark LeVaughn, M.D. -- Direct                                319

1   Public Safety with the medical examiner's office as a

2   contract forensic pathologist.

3        Q.    Okay.  And in January of 2019, in -- where

4   were you employed?

5        A.    I was employed at the same facility.  At that

6   time I was the chief medical examiner.  I recently

7   retired.

8        Q.    Okay.  And does that position require special

9   education or training?

10       A.    Yes, sir.

11       Q.    What does that entail?

12       A.    I'll just -- my education, I graduated from

13  high school and college in Ohio.  I graduated from the

14  University of Tennessee College of Medicine in 1983.  I

15  completed a pathology residency training program at

16  West Virginia University.  And following that I

17  completed a forensic pathology fellowship training

18  program at the University of Tennessee, and I think that

19  was in 1988 or '89.

20       I'm board certified in anatomic pathology and

21  forensic pathology, and I'm licensed to practice

22  medicine in Indiana and Mississippi.

23       Q.    Okay.  And how long have you been working as

24  a medical examiner?

25       A.    Approximately 33 years.

```
1        Q.      Okay.

2                BY MR. GUTHRIE:  At this time, Your

3                Honor, the State would tender Dr. Mark

4                LeVaughn as an expert in forensic pathology.

5                BY THE COURT:  Any objection by Defense

6                Barney?

7                BY MR. CORY:  No, Your Honor.

8                BY THE COURT:  Any objection by Defense

9                Lampley?

10               BY MR. SPRINGER:  No, Your Honor.

11               BY THE COURT:  The witness may be so

12               admitted as an expert in the field of

13               forensic pathology.  You may proceed.

14               BY MR. GUTHRIE:  Yes, Your Honor.

15   BY MR. GUTHRIE:  (Continuing)

16       Q.    Dr. Mark LeVaughn, in your capacity as the

17   chief medical examiner for the State of Mississippi, did

18   you issue a report for George Robinson?

19       A.    Yes, sir, I did.

20               BY MR. GUTHRIE:  May I approach,

21               Your Honor?

22               BY THE COURT:  You may.

23   BY MR. GUTHRIE:  (Continuing)

24       Q.    Dr. LeVaughn, I've handed you a document.

25   Have you seen that before?
```

Mark LeVaughn, M.D. -- Direct                                      321

1         A.    (Examining.)  Yes, sir, I have.

2         Q.    And is this document in the same form as it

3  was when you saw it?

4         A.    It's the same form as the time that I created

5  it, yes, sir.

6         Q.    Has it been manipulated, changed or altered

7  in any way?

8         A.    I do not see that it has, no, sir.

9         Q.    And what is this document that we're looking

10  at?

11        A.    This is the final autopsy or postmortem

12  report that I generated on our patient, George Robinson.

13              BY MR. GUTHRIE:  At this time, Your

14              Honor, the State would move to have this

15              exhibit or have this document admitted into

16              evidence.

17              BY THE COURT:  Any objection by Defense

18              Barney?

19              BY MR. CORY:  No, Your Honor.

20              BY THE COURT:  Any objection by Defense

21              Lampley?

22              BY MR. SPRINGER:  No, Your Honor.

23              BY THE COURT:  It may be so admitted.

24  (SAID REPORT OF POSTMORTEM EXAMINATION SIGNED BY MARK

25  LEVAUGHN, M.D., AND DATED JULY 27, 2020 WAS MARKED

1    EXHIBIT NUMBER 6, WAS RECEIVED INTO EVIDENCE, AND MAY BE

2    FOUND APART FROM THE RECORD.)

3    BY MR. GUTHRIE:   (Continuing)

4        Q.    Dr. LeVaughn, just to make it somewhat easy,

5    but in your hands, is this the same document that you

6    have?

7        A.    Excuse me.   The image is the front page.

8    Yes, sir.

9        Q.    Correct.   And how many pages do you have?

10   I'll tell you what, I'll trade with you.   Let me have

11   the marked copy, and I'll give you the copy.   And I'm

12   going to let you keep that in your hand just in case

13   it's difficult for you to read from the overhead

14   projector.

15        Is this the report we were talking about just a

16   second ago?

17        A.    Yes, sir.

18        Q.    Okay.   And can you tell us a little bit about

19   just the cursory information that this -- at the top?

20   The Case Number, what is that?

21        A.    The Case Number is ME19-0058.   That is the

22   unique postmortem or autopsy number for the patient,

23   George Robinson.

24        Q.    And the date of the examination?

25        A.    January 17, 2019.

Mark LeVaughn, M.D. -- Direct                     323

1        Q.    And the date of the report?

2        A.    July 27, 2020.

3        Q.    All right.  Did you actually do the

4   examination?

5        A.    No, sir, I did not.

6        Q.    And who did the examination?

7        A.    Dr. Brent Davis.

8        Q.    Okay.  And was he employed by the state

9   medical examiner's office?

10       A.    Yes, sir.  Correct.

11       Q.    And what was his position?

12       A.    He was a deputy chief medical examiner for

13   the State of Mississippi.

14       Q.    Okay.  And he performed the actual autopsy?

15       A.    That is correct.

16       Q.    All right.  But you generated the report?

17       A.    Yes, sir.

18       Q.    What did you use to generate this report?

19       A.    I used the entire case file, all of the

20   documents that was in the case file.  I examined autopsy

21   photographs.  I examined the coroner's investigative

22   report.  There were medical records available, and I

23   examined the toxicology report and generated microscopic

24   slides of the -- some of the tissues of Mr. Robinson.

25       Q.    Okay.  And were you able to use that

Mark LeVaughn, M.D. -- Direct                              324

1   information in order to generate an opinion?

2       A.    Yes.

3       Q.    Okay.  And before we get into the cause and

4   manner of death, what I'd like for you to do is tell us

5   in your examination of Mr. George Robinson what you

6   found.  And first start out with, how tall was

7   Mr. Robinson?

8       A.    He was documented at the medical examiner's

9   office to be 67 inches tall.

10      Q.    And that's five-foot-seven?

11      A.    Yes, sir.

12      Q.    And weight?

13      A.    His weight was recorded as 210 pounds.

14      Q.    And age?

15      A.    Sixty-two years old.

16      Q.    Yes, sir.  All right.  And we go down to the

17  evidence of injury, and what do you have there?

18      A.    The external evidence of injury, I described

19  three contusions on the forehead and right side of his

20  face and head.

21      Q.    Okay.  And --

22      A.    I'm sorry.  Abrasions, not contusions.

23      Q.    Okay.  All right.  So you noticed three

24  abrasions on the right side?

25      A.    That's correct.

Mark LeVaughn, M.D. -- Direct                              325

1      Q.    And did you notice any swelling also there?

2      A.    I observed swelling around the soft tissue or

3  what's called the periorbital tissue around the right

4  eye.

5      Q.    Okay.

6            BY MR. GUTHRIE:  Your Honor, I'm going

7       to show counsel opposite some photos.  May we

8       approach, Your Honor?

9            BY THE COURT:  You may.  Mr. Kinnard,

10      give me just a little light, please.

11      (Examining photos.)

12           (THE FOLLOWING BENCH CONFERENCE OCCURRED

13      BETWEEN THE COURT, COUNSEL AND THE COURT

14      REPORTER OUTSIDE THE HEARING OF THE JURY:)

15           BY THE COURT:  Huh-uh (negative

16      response).  Huh-uh (negative response).  Two

17      things we need to do -- what says -- okay --

18      these four --

19           BY MR. GUTHRIE:  I can't hear you,

20      Judge.  I'm sorry.

21           BY THE COURT:  These four, obviously,

22      the Court has no concerns about them being

23      presented to the jury.  These two are

24      extremely graphic (indicating).  Do you

25      have -- sometimes they have an anatomic or

1    sketch or something else that could be used,

2    but --

3         BY MR. GUTHRIE:  And I -- I understand

4    that they are graphic in nature, Your Honor,

5    but they are the only photos from the autopsy

6    report that show the injury and specifically

7    what we're dealing with is the scalpal (sic)

8    contusion, which means on the skin in between

9    the skull and the face.  And one picture

10   shows the scalpal contusions that they've

11   contested prior -- but existed.

12        The second picture shows the subdural

13   hematoma and it also shows the location of

14   the abrasion, the contusion and the subdural

15   hematoma, the location all being in the exact

16   same spots.  So I wanted to show them to the

17   jury so that the witness, Dr. LeVaughn, could

18   specifically identify what he saw, why he saw

19   it and then the location of it.

20        BY THE COURT:  What says the defense?

21        BY MR. CORY:  Judge, for that purpose, I

22   don't think it's proper.  I don't think --

23   the CT shows where the contusions were.

24   There is a diagnostic device that does it on

25   that.  I don't think he can extrapolate

Mark LeVaughn, M.D. -- Direct                          327

 1                  location of injuries based on that picture.

 2                  BY THE COURT:  Do you have any other

 3          photos the Court can look at?

 4                  BY MR. GUTHRIE:  I don't, Your Honor.  I

 5          didn't bring them down.  I pared them all

 6          down.

 7                  BY THE COURT:  Let me get the -- let me

 8          get the jury to step out for just a moment.

 9                  BY THE BAILIFF:  All rise.

10  (THE JURY WAS EXCUSED FROM THE COURTROOM AND THE

11  FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE PRESENCE AND

12  HEARING OF THE JURY:)

13                  BY THE COURT:  All right.  You all may

14          be seated.

15          Dr. LeVaughn, in an assistance to the

16          Court -- there are some photos that are

17          extremely graphic even for the Court, and I'm

18          rather seasoned at looking at medical

19          reports.  And I need the district attorney's

20          office to advise the Court -- I have to ask

21          this.  Have you all shown these photographs

22          to the victim's family at any time prior to

23          this trial?

24                  BY MR. GUTHRIE:  I have not, Your Honor.

25                  BY MS. HODGES:  I have not either.

Mark LeVaughn, M.D. -- Direct                    328

1       BY THE COURT:  All right.  So to the

2   family members of Mr. Robinson, we're now at

3   a point where we are looking at some graphic

4   images that were reproduced during his

5   autopsy.  You have not seen these

6   photographs.  I know that you are here

7   present in the courtroom, but at this time

8   I'm going to allow you an opportunity if you

9   want to excuse yourself while the jury is out

10  to go ahead and do so.  You may.

11      Now, if you stay in the courtroom, you

12  may see some images that may be very

13  disturbing to you, so I do want to give you

14  all this opportunity not to have to see those

15  images.

16      Now, Dr. LeVaughn, as an assistance to

17  the Court, he is trying to show depictions of

18  the scalp area where there was some

19  hemorrhaging and also of the subdural

20  hematoma.  Do you know if there were any

21  black -- were there any black and white

22  anatomical drawings created of those images

23  that might not be so graphic that you could

24  use to exhibit to the jury in this case?

25      BY THE WITNESS:  The only drawings are

Mark LeVaughn, M.D. -- Direct                               329

1          made of the external body injuries, not of

2          the internal.

3               BY THE COURT:  Not of the internal

4          injuries.  Okay.  And looking at -- and this

5          is why -- looking at this image, that's hard

6          for me to look at.  Is there anything else of

7          these that maybe depicts that that's a little

8          less graphic?  And if I have to show just

9          one, I will show just one.

10              BY THE WITNESS:  (Examining photos.)

11         (Indicating.)

12              BY THE COURT:  That would give you

13         everything that you needed to show to

14         testify?

15              BY THE WITNESS:  If I have to pick just

16         one, I would use it --

17              BY THE COURT:  That one?

18              BY THE WITNESS:  Yes, ma'am.

19              BY THE COURT:  All right.  Because with

20         that one it would show the hematoma, the

21         scalp, everything else he -- he discussed?

22              BY THE WITNESS:  That's correct.  Yes,

23         ma'am.

24              BY THE COURT:  Okay.  Thank you.  Is

25         this that image (indicating)?

1           BY THE WITNESS:  That's correct.  Yes,
2    ma'am.
3           BY THE COURT:  All right.  Well, so
4    here's what I'm going to do.  After
5    consultation with Dr. LeVaughn in order to
6    give the Court some guidance on this matter,
7    I am going to -- this -- I've been handed two
8    exhibits.  This one he does not need.  He has
9    provided -- and I don't know who's going to
10   be doing the cross-examination.
11          BY MR. CORY:  I will be doing it.
12          BY THE COURT:  So just those parties
13   who -- those attorneys who will be
14   participating in this -- the examination of
15   this witness, if you'll just come forward.
16   Mr. Guthrie --
17          BY MR. GUTHRIE:  Yes, Your Honor.  I'm
18   just making sure I put that picture -- I
19   didn't want to inadvertently --
20          BY THE COURT:  Okay.  So this -- he says
21   that with this image he can -- put it down.
22   I'm not trying to publish it on the stream.
23   Do you all see the one?
24          BY MR. CORY:  Yes, ma'am.
25          BY MR. SPRINGER:  Yes, ma'am.

1          BY THE COURT:  He said that it would

2     cover all areas that he needed to discuss.  I

3     am not going to display that.  I mean, you

4     can -- I'm not going to put that on the

5     overhead.  I may have to -- yeah, I got to.

6     Mr. -- take this.

7          BY MR. CORY:  While we're discussing

8     it --

9          BY THE COURT:  It was graphic enough

10     even to the Court, so I can imagine -- and

11     I'm going to have to warn the jury about that

12     before they see it because it is --

13          BY MR. CORY:  Judge, just on -- so we

14     don't have to come back up, we don't plan to

15     use any of the open body pictures.

16          BY THE COURT:  No.

17          BY MR. CORY:  But as far as the rest of

18     the pictures we may use, I just want to make

19     sure if we're -- if there was -- (examining.)

20          BY THE COURT:  Why do you need that?

21          BY MR. CORY:  To show no bruising on his

22     legs.  I think there's another -- I mean,

23     both of those pictures -- the fact that he

24     has no injuries anywhere other than his --

25          BY MR. GUTHRIE:  Objection, Your Honor.

Mark LeVaughn, M.D. -- Direct                                    332

1       BY THE COURT:  No, we're not -- no.

2       BY MR. CORY:  Yeah, I'm fine with that

3  one coming out.  But there's not another

4  picture that shows the legs or there's no

5  other abrasions on his body.

6       BY MR. GUTHRIE:  Objection, Your Honor.

7       BY THE COURT:  Okay.  The only thing

8  about this one, it only shows one -- one of

9  his legs -- doesn't show the other one.

10      BY MR. CORY:  I don't mind pulling that

11  one out just because we have others.  If the

12  Court's going to exclude it because of the

13  ankle monitor --

14      BY MR. GUTHRIE:  This one I've got in.

15      BY MR. CORY:  Okay.

16      BY MR. GUTHRIE:  This one would be

17  repetitive and I object to it.

18      BY MR. CORY:  Agree.

19      BY MR. GUTHRIE:  This one I have in.

20      BY THE COURT REPORTER:  Y'all speak up,

21  please.

22      BY MR. GUTHRIE:  I'm not sure of the

23  relevance, Your Honor.

24      BY MR. CORY:  I'm fine with that one.

25      BY MR. GUTHRIE:  This appears -- and I'm

1    not sure of the relevance, Your Honor.  It

2    doesn't show any of the injuries in the

3    autopsy photo --

4         BY MR. CORY:  The affidavit says he was

5    struck in the chest.  I think it shows

6    there's just no bruises to the back or

7    anywhere.

8         BY THE COURT:  Okay.

9         BY MR. CORY:  But, I mean, we can --

10        BY THE COURT:  So my understanding is

11   that you --

12        BY MR. GUTHRIE:  This is -- I think

13   shows the rear end, Your Honor.

14        BY MR. CORY:  I'm not trying to show

15   that but --

16        BY THE COURT:  That could be postmortem

17   settling.

18        BY MR. GUTHRIE:  That's his waistline

19   right here.

20        BY MR. CORY:  Let me see what else we've

21   got.  I don't need that one.

22        BY THE COURT:  Okay.  So after you all

23   have flipped through all of those, what's

24   remaining that he -- that the defense intends

25   to use?

Mark LeVaughn, M.D. -- Direct                                334

1          BY MR. GUTHRIE:  He has an additional

2     picture of the top of the head, which we've

3     already got one of, and then this is a

4     picture of the other side with -- the left

5     side where there wasn't supposed to be any

6     injuries.

7          BY THE COURT:  That's okay.

8          BY MR. GUTHRIE:  Okay.  And I don't have

9     any objection --

10         BY THE COURT:  You don't have any

11    objection to that one.

12         BY MR. GUTHRIE:  This one, I think, is

13    duplicitous, but I chose to cut it out

14    because I could show the same things in the

15    other ones.  But that was why I took it out.

16         BY MR. CORY:  It just shows a different

17    angle of the head and no other injuries on

18    the top of the head.

19         BY MR. GUTHRIE:  Which was shown in --

20         BY MR. CORY:  I don't think it's

21    duplicative.

22         BY THE COURT:  All right.  So how many

23    cranial views do we have?

24         BY MR. GUTHRIE:  As a matter of fact,

25    I've got it --

1          BY THE COURT:  They have it.

2          BY MR. CORY:  That's it.  That's good.

3     The only question, then, will be one of those

4     two.

5          BY THE COURT:  Which of these two?

6          BY MR. CORY:  Or -- yes, ma'am.  Just to

7     show there were no bruises on the legs.

8          BY MR. GUTHRIE:  The State's position is

9     there's never been any allegations of bruises

10    on the legs either in the reports of any of

11    the people or the --

12         BY THE COURT:  Okay.  Let me ask this

13    question.  So we have the views of the head.

14    We have the views of the thoracic area, the

15    chest/back, chest/front -- thank you --

16    chest/back.

17         BY MR. GUTHRIE:  That was in one of the

18    photos he wanted to come in.

19         BY THE COURT:  Do you have one of the

20    back of the decedent?

21         BY MR. CORY:  I don't need to show the

22    back.

23         BY THE COURT:  Okay.  All right.  So,

24    now, the lower portion, all we need are the

25    legs?  Let's do -- is there any objection to

1          this one?  I think it's less graphic.

2               BY MR. GUTHRIE:  Which one?  The one you

3          hand -- yes, Your Honor.  It shows the ankle

4          monitor.

5               BY THE COURT:  Can't help it.  I can

6          instruct the jury on that issue.

7               BY MR. GUTHRIE:  There's never been an

8          allegation of any injuries to the legs.

9               BY MR. CORY:  The wit- --

10              BY MR. GUTHRIE:  So what would be the

11         relevance to showing a picture of the legs

12         when we've never -- no -- nobody --

13              BY THE COURT:  Tell you what we'll do,

14         reserve your objection.  But the ones you all

15         can agree on, let's go ahead and we have

16         those admitted and marked, premarked, so when

17         the jury comes I don't have to waste -- not

18         waste -- we don't have to spend time marking

19         those.  On the ones -- the one you have an

20         objection on, I'll reserve ruling on that

21         until he attempts to admit it.  How about

22         that?  Can we do that?

23              BY MR. GUTHRIE:  Yes, Your Honor.

24              BY MR. CORY:  May I say one thing?  If

25         it doesn't change your ruling, then I won't

Mark LeVaughn, M.D. -- Direct                                337

1    put it in.  The witnesses have been unclear

2    about what -- there are witnesses who said

3    they didn't know he was struck, things of

4    that nature.  I don't want the jury to think,

5    I mean, that there were bruises -- injuries

6    somewhere else.  There is inconsistent

7    witness testimony on this issue.

8         BY MR. GUTHRIE:  And that could be

9    cleared up verbally by asking Dr. LeVaughn,

10   "Did you find any other signs of bruising or

11   assault?"  And he can go one by one to the

12   left leg, to the right leg.  And Dr. LeVaughn

13   can answer that.  Because there -- in my mind

14   there is no point in showing a picture of

15   something that doesn't exist, but there is a

16   point to showing a picture of something that

17   does exist.

18        BY THE COURT:  Well -- okay.  That may

19   be the State's position; however, the defense

20   is entitled to craft their defense on all

21   issues and one of these in according --

22   because this is second degree, that use of

23   force issue becomes an element of the initial

24   charge and whether or not there were any

25   strikes or blows and where -- so I can't omit

Mark LeVaughn, M.D. -- Direct                        338

1    the defense's right to proceed on that issue.

2    I can understand the State's objection, but I

3    need to balance that with everything else

4    that we hear.

5         So I would suggest to the parties that as

6    to that last exhibit since the State has a

7    position on the record, the defense has a

8    position on that, I'll reserve ruling on that

9    one until that one exhibit of the thoracic

10   area -- of the lower lumbar area -- is that

11   what it is -- until presented by the defense.

12   Can we do that?

13        BY MR. GUTHRIE:  Yes, Your Honor.

14        BY THE COURT:  All right.  So let's go

15   ahead and have the court reporter to premark

16   the other exhibits that -- to which there are

17   no --

18        BY MR. CORY:  For ID on this one

19   (indicating)?

20        BY MR. GUTHRIE:  I think at the

21   appropriate time when you will try to admit,

22   then we can make the objection --

23        BY THE COURT:  You can mark it for ID.

24   Just say it's been previously marked for

25   identification purposes only.

1             BY MR. GUTHRIE:  Okay.

2             BY THE COURT:  I'm just trying to save

3        some time because these people are going to

4        get hungry on all of us.  All right?

5             BY MR. GUTHRIE:  These to be marked

6        for -- admitted into evidence; this for ID

7        only.

8             BY THE COURT REPORTER:  Are these yours

9        or his?

10            BY THE COURT:  They're just marked.

11       They're just marked.

12  (SAID AUTOPSY PHOTOS WERE MARKED EXHIBIT NUMBERS 7-12,

13  WERE RECEIVED INTO EVIDENCE, AND MAY BE FOUND APART FROM

14  THE RECORD.)

15  (SAID AUTOPSY PHOTO WAS MARKED EXHIBIT NUMBER 13 FOR

16  IDENTIFICATION PURPOSES ONLY, WAS RECEIVED INTO

17  EVIDENCE, AND MAY BE FOUND APART FROM THE RECORD.)

18            BY THE COURT:  Are we ready?

19            BY THE COURT REPORTER:  Yes, ma'am.

20            BY THE COURT:  All right.  We can bring

21       the jury back in.

22            BY THE BAILIFF:  All rise.

23  (THE JURY RETURNED TO THE COURTROOM AND THE FOLLOWING

24  PROCEEDINGS WERE HAD IN THE PRESENCE AND HEARING OF THE

25  JURY:)

Mark LeVaughn, M.D. -- Direct                           340

1              BY THE BAILIFF:  The jury's in the

2      courtroom.

3              BY THE COURT:  All right.  You all may

4      be seated.  Mr. Guthrie, you may proceed.

5              BY MR. GUTHRIE:  Yes, Your Honor.

6   BY MR. GUTHRIE:  (Continuing)

7      Q.    Dr. LeVaughn, where we left off you were

8   telling us about the evidence of the injuries and the

9   external -- and just briefly what was it you found?

10     A.    On the external exam there was evidence of

11  three abrasions in the area of the right forehead.

12     Q.    Okay.  And furthermore what did you find?

13     A.    There was also swelling around the soft

14  tissue of the right eye.

15     Q.    Okay.  And -- well, go on down to the

16  internal examination.  Tell us what you found there.

17     A.    I'm just going to follow along in the

18  description, but the most obvious was the craniotomy,

19  the surgical procedure.

20     Q.    Tell us what that is.  What did you find?

21     A.    Well, a craniotomy is an examination of the

22  internal skull.  It's a surgical procedure.  They make

23  an incision on the scalp.  They peel the scalp away from

24  the bone, and they actually cut into the bone, remove a

25  portion of the bone and then expose the actual brain for

1   the therapeutic procedure.  In this case, it was for

2   removal of a blood clot.  So that was evident.  The

3   result of that was evident.  The surgical procedure had

4   ended, and it was closed and was -- the skin was sealed

5   with surgical staples.

6          Further examining in -- through that there was

7   evidence of what I described as diffuse subcutaneous

8   soft tissue hemorrhage, which is blood in the scalp.

9   And the locations were on the anterior, lateral and

10  posterior, the back of the scalp on the right side of

11  the head.

12         Q.    Okay.  And let me first stop you there.  The

13  diffuse subcutaneous soft tissue hemorrhage, is that

14  supposed to be there?

15         A.    Well, it's seen in the craniotomy procedure.

16  But in addition to my opinion, under the areas of the

17  abrasion on the right forehead there was also hemorrhage

18  in that area and there was no clear line of distinction

19  between the two.  But in my opinion, some of that

20  hemorrhage towards the front of the right side of the

21  head was a result of the impact that caused the

22  abrasions.

23         Q.    Okay.  All right.  And going on to the next

24  line.

25         A.    The next line?  There's --

1      Q.    Well, really the next finding.  The next line

2   doesn't appear to have much but --

3      A.    Okay.  So the next finding would be that the

4   brain had -- the cerebral hemispheres, the right and

5   left actually halves of the brain, they're symmetric or

6   the same size.  The surfaces of the brain appear

7   normally developed.  There was a very thin layer of

8   blood on the surface of the brain itself, the

9   subarachnoid blood.

10      The brain was -- the right side of the brain was

11   described as being soft.  There was description of some

12   hemorrhage internal in -- in the brain itself, a basal

13   ganglia, which is an internal structure.  And then I

14   made the comment that there was no other documented

15   pathologic changes in the brain and there was no

16   evidence of any skull fractures.

17      Q.    Okay.  Now, just going quickly through the

18   other areas, the neck, the heart, the lungs, the GI

19   tract, did you find any other abnormalities in any of

20   that?

21      A.    There was no evidence of any documented

22   injury to the neck.  There was documented evidence of

23   heart disease, atherosclerotic disease.  There was

24   severe narrowing of the left anterior, one of the

25   coronary artery branches.  The heart was somewhat

Mark LeVaughn, M.D. -- Direct                                    343

1  enlarged due to the weight.  It was 490 grams, and

2  that's, I don't know, moderately -- mild to moderately

3  enlarged as far as just the weight of the heart.

4       The examination of the lungs didn't show any

5  pathologic findings.  The GI tract and organs in the

6  abdomen showed no other documented pathologic findings.

7       Q.   Okay.  The next page has microscopic

8  examinations.  What did you find there?

9       A.   The microscopic examination means that we

10  took small portions of tissue from the organs and

11  examined those under a higher magnification, a

12  microscope.  The heart showed changes consistent with

13  hypertensive disease.  The other lungs and abdominal

14  organs didn't show any pathological findings.  And then

15  examination of the brain tissue showed small areas of

16  hemorrhage, evidence of edema and some of the brain

17  cells, the neurons, were starting to degenerate.  And

18  there was a small amount of inflammation also present.

19       Q.   Okay.  And after going through this report,

20  were you able to -- do you have a summary or

21  interpretation of everything?

22       A.   Yes, I do.

23       Q.   And can you give that to the Court?

24       A.   You want me just to read it?

25       Q.   If you'd like, yes.

Mark LeVaughn, M.D. -- Direct                        344

1      A.    Okay.  It reads:  "This 62-year-old male

2   identified as George Robinson died as a result of

3   multiple blunt injuries to his head.  This is evidenced

4   by facial abrasions, scalp contusions, brain contusions,

5   subdural hematoma and brain swelling.  These injuries

6   resulted in his death.

7      In addition, there was evidence of hypertensive

8   and atherosclerotic cardiovascular disease.  Toxicology

9   was noncontributory in his death.  Medical records were

10  reviewed.  With the currently available information and

11  postmortem findings, the cause of death is multiple

12  blunt head trauma and the manner of death is homicide."

13     Q.    All right.  Dr. LeVaughn, you've stated some

14  of these injuries, and I'm going to go through some

15  pictures now so that you can explain to us your report

16  kind of in the picture form so that we can see what

17  these injuries are.

18     And the first thing I want to show is what's

19  marked as Exhibit 7.  And can you tell us what we're

20  looking at here?

21     A.    Exhibit 7 is a photograph of Mr. Robinson

22  prior to the internal or surgical examination portion of

23  the autopsy.

24     Q.    Okay.  So this is how he was presented to the

25  medical examiner's office?

1      A.     That's correct.

2      Q.     And this is the condition of his body as you

3  received it?

4      A.     That's correct.

5      Q.     Okay.  In Exhibit 8, Dr. LeVaughn, tell us

6  what it is we're looking at here.

7      A.     Exhibit 8 is a photograph of the face of

8  Mr. Robinson.  And in my opinion, there's swelling

9  around the tissue of the right eye.  It's called the

10 periorbital soft tissue.  And this area, in my opinion,

11 is swollen (indicating).

12     Q.     Okay.  And that's --

13     A.     In addition --

14     Q.     Is that on the left side of the photograph

15 where you were using a red laser pointer?

16     A.     Well, as we look at it, yes, it's on the left

17 side of the photograph, but it's on the anatomic right

18 side of his body.

19     Q.     His right side but our left side of the

20 photograph.  And you're showing us what now with that

21 pointer?

22     A.     The pointer is on the actual anatomic upper

23 right eyelid which, in my opinion, shows swelling.  And

24 then above that on the right forehead, it's only

25 partially visible, but there is one of the abrasions

1   that I also described.

2         Q.    Okay.  And, Dr. LeVaughn, going into that

3   abrasion that you just described, are you able to see

4   that?  There's a glare on there but --

5                     BY THE COURT:  What number is this?

6                     BY MR. GUTHRIE:  This is Exhibit 9.  I

7               was trying to get it in such a way there

8               didn't appear to be so much glare.

9   BY MR. GUTHRIE:  (Continuing)

10        Q.    All right.  Dr. LeVaughn, can you show us

11  what we're looking at here?

12        A.    Yes.  Exhibit 9 is a photograph of

13  Mr. Robinson lying on the examination table and the

14  photograph is directed towards the top of his head.  The

15  obvious findings are the closed craniotomy incision on

16  the top and kind of going towards the back of his head.

17        Q.    That's what appears to be the metal staples?

18        A.    Yes.  And those objects across the incision

19  are surgical staples to hold the skin together.

20        Q.    And that's from the surgical procedure, the

21  craniotomy?

22        A.    That is correct.

23        Q.    Okay.  So that's not what we're focused on,

24  but it is what you found in the autopsy.  But what is

25  on -- is there any injuries in this photo?

Mark LeVaughn, M.D. -- Direct                                    347

1        A.      In my opinion, yes, sir.  So on the right

2   forehead -- the laser pointer is not illuminating -- but

3   on the right forehead, this is an abrasion, right -- a

4   little bit behind it is an abrasion and a little bit in

5   front, below it is an abrasion.  So those are the three

6   skin injuries or abrasions, blunt injuries that I

7   described.

8        Q.      And I'm going to put Exhibit 10 on.  Does

9   that show these same abrasions and injuries a little

10  better --

11       A.      Yes.

12       Q.      -- or at a different angle?

13       A.      Exhibit 10, did you say?

14       Q.      Yes.

15       A.      Okay.  Exhibit 10 is a photograph of the

16  right side of Mr. Robinson's shoulder, head and neck and

17  facing the top of the head.  So in this photograph, the

18  pointer is on abrasions on the top of his head and then

19  also on the kind of the right lateral side of his head

20  and the face.  These are blunt impact type injuries, and

21  there's also some swelling of the soft tissue of the

22  right eye and most common in the right upper eyelid.

23       Q.      Okay.  Dr. LeVaughn, the next photo is more

24  graphic and I --

25                       BY THE COURT:  Just a moment.  I'm going

Mark LeVaughn, M.D. -- Direct                                    348

1              to pause the stream for this.  You may --

2              Ladies and Gentlemen of the Jury, the next

3              photo is rather graphic.  Bear with the

4              State.  You may proceed.

5                   BY MR. GUTHRIE:  Yes, Your Honor.

6    BY MR. GUTHRIE:  (Continuing)

7         Q.   Dr. LeVaughn, and just in preparation of the

8    photo, it's more graphic and it is a picture -- and let

9    me --

10             BY MR. GUTHRIE:  May I approach the

11             witness first, Your Honor?

12             BY THE COURT:  You may.

13             BY MR. GUTHRIE:  And it'll help to

14             alleviate some of the...

15   BY MR. GUTHRIE:  (Continuing)

16        Q.   Do you see which photo it is, Dr. LeVaughn?

17        A.   Yes, sir, I do.

18        Q.   Okay.  Now, in this photo, before we get to

19   it, is this a picture of -- please describe the picture

20   first so that we'll know what we're looking at.

21        A.   Okay.  During the autopsy examination we take

22   continuous photos throughout the entire procedure.  So

23   the upcoming photo is a photograph of the internal

24   examination of the head or cranial cavity which displays

25   the skull bone that was removed, the scalp tissue with

1    hemorrhage and the brain as present in the cranial

2    cavity.

3         Q.    Okay.  Dr. LeVaughn, so in this photo, do

4    we -- you'll be showing us where the abrasion was on the

5    outside -- on the outside of his skin?

6         A.    Well, the photo shows, in my opinion, that

7    there is hemorrhage from the surgical procedure and also

8    hemorrhage in this scalp under the abrasions.

9         Q.    And that's where I was going with it.  So in

10   the exact same location as where the external abrasions

11   were, this photo is going to show the scalpal (sic)

12   contusion; is that correct?

13        A.    In my opinion, yes, sir.

14        Q.    And also it will show the subdural hematoma?

15        A.    Yes, sir, what was left of it after removal.

16   But some of it is still present, yes.

17        Q.    Okay.  Then I'm going to show the photo for

18   that reason.  And, Dr. LeVaughn, can you point us to

19   where the scalpal contusions are that you saw?

20        A.    In the photograph towards the actual top of

21   the photograph, that depicts the skin of the forehead.

22   You're looking at the top of the head downward, so the

23   area that is under the laser pointer is hemorrhage in

24   the scalp and that is underlying the abrasions that were

25   demonstrated earlier.

Mark LeVaughn, M.D. -- Direct                                    350

1          The brain is exposed, the middle portion of the

2     photograph, so we're looking towards the internal

3     contents of the cranial cavity.  But the bottom of the

4     photograph is what we call the skull cap or the top of

5     the skull.  On the internal surface of this on the right

6     side, this dark area is blood and that's in the area of

7     what's called the subdural space.  So that's some of the

8     remaining subdural hemorrhage that was -- that remained

9     after the surgical procedure.

10         And in the middle, the right cerebral hemisphere

11    is on the right.  And you'll see kind of a division in

12    the middle, and this is the left cerebral hemisphere.

13    And on the surface of the hemispheres, it has kind of a

14    reddish-brown discoloration and that's what I've

15    described as subarachnoid hemorrhage.

16         Q.    Okay.  Dr. LeVaughn, I'm going to remove that

17    photo, but I want to talk about what you saw in that.

18    The contusions of the scalp were directly in line with

19    the abrasions; is that correct?

20         A.    In my opinion, it was directly below the

21    abrasions, yes.

22         Q.    Okay.  And then the subdural hematoma

23    appeared to be in the same location as the contusions?

24         A.    Well, no.  The subdural hematoma was in the

25    subdural space of the cranial cavity.  So the top of the

Mark LeVaughn, M.D. -- Direct                          351

1   skull, the skull cap was removed so you were looking at

2   the internal surface of the skull.  And on the right,

3   that darkened reddish-brown area was some of the

4   residual hemorrhage.

5        Q.    Okay.  All right.  So did Mr. George Robinson

6   die from the abrasions?  And, I mean, if the abrasions

7   alone were the only thing, is that the cause of his

8   death?

9        A.    No, sir.

10       Q.    Are the contusions to the scalp, if that were

11  alone, would that be the cause of his death?

12       A.    I don't think so, no.

13       Q.    Okay.  So is the subdural hematoma the cause

14  of his death?

15       A.    Yes, sir.

16       Q.    Okay.  And then the subdural hematoma, in

17  your opinion, was caused by what?

18       A.    Caused by blunt impact to the head.

19       Q.    Okay.  Explain to us what a subdural hematoma

20  is.

21       A.    The brain sits within the skull, the cranial

22  cavity.  The brain has vascular supply, arteries and

23  veins.  So on the surface of the brain, there are small

24  veins that drain the brain and they go to the dura which

25  lines the internal skull.  And there are larger veins in

1    that dural tissue.

2         So the subdural space is the space between the

3    surface of the brain and the internal skull, and in that

4    space are these small veins.  So when those veins are

5    torn and bleed, the bleeding occurs in the subdural

6    space which is actually on the surface of the brain.

7    And as that blood accumulates, it causes pressure on the

8    brain and clinical effects due to that pressure.

9         Q.    What kind of symptoms can an individual show

10   from the swelling on the brain?

11        A.    They complain of a headache.  You could be

12   dizzy.  You could be nauseated, vomiting.  You could

13   have what's called an unsteady gait were you could not

14   walk properly.  You could be what's called somnolence or

15   tiredness or sleepiness.  You could have seizure

16   activity.  You can have -- and as the pressure increases

17   and more structures of the brain have pressure on them,

18   you can have what's called posturing which is an

19   abnormal positioning of the body.  It's involuntary and

20   it's due to the pressure on the brain.  And then you can

21   ultimately have what's called herniation where the brain

22   is squeezed into the places where it shouldn't be

23   internally in the skull, and it can also maybe result in

24   death of the patient.

25        Q.    And you said the posturing.  Is there two

Mark LeVaughn, M.D. -- Direct                          353

1   types of posturing or one type or multiple types?

2       A.   Well, there's two general types.  One's

3   called decorticate and the other is called decerebrate

4   posturing.  And they can occur separately or together,

5   and they just indicate anatomic regions of the brain

6   that are injured or have pressure.

7       Q.   And can you tell us generally what this

8   posturing is?

9       A.   Posturing is a position of the body.  It's

10  involuntary and it's muscles contract and extend due to

11  the pressure on the brain.  So the arms can be drawn to

12  your chest and abdomen, and then you can have extension

13  of the extremities, extension of the feet, flexion of

14  the ankles.  These are all posturing -- positions of the

15  posturing.  And it's due to a head injury.

16      Q.   Okay.  And, Dr. LeVaughn, are you able to

17  render an opinion as to the amount of force that's

18  required to cause the abrasions to Mr. George Robinson?

19      A.   I don't think I can quantitate it with any

20  number or value, no.  It was just some amount of impact

21  injury to the head that caused the abrasion, caused the

22  contusion and caused enough movement of the brain inside

23  the skull to tear the small veins and initiate bleeding

24  inside the skull.

25      Q.   So the impact had to be significant enough to

Mark LeVaughn, M.D. -- Direct                              354

1    cause -- the second step after the abrasion was a

2    contusion of the scalp?

3        A.    That's correct.

4        Q.    And then it needed to be significant enough

5    to then go further to cause the subdural hematoma inside

6    the -- between the brain -- if I understood right -- to

7    tear the veins -- the brain had to shift enough to tear

8    the brains (sic) from the scalp?

9        A.    Well, tear the vessels that are on the

10   surface of the brain --

11       Q.    Okay.

12       A.    -- inside the skull, yes.

13       Q.    So the impact would need to be significant

14   enough to cause the brain to shift?

15       A.    Yes.

16       Q.    Dr. LeVaughn, at the time that you rendered

17   this report, had you reviewed all the medical records?

18       A.    I come to find out, no.

19       Q.    Okay.

20       A.    Did not.

21       Q.    You had reviewed some of the medical records?

22       A.    Yes, sir.

23       Q.    When you do autopsy reports, do you always

24   have all of the medical records?

25       A.    No, sir.

Mark LeVaughn, M.D. -- Direct                          355

1      Q.    Now that -- have you since that time reviewed

2  all medical records?

3      A.    I believe I have, yes.

4      Q.    And when I say "all medical records," I mean,

5  the time when George Robinson was admitted to the

6  hospital on the 13th of January, 2019, to the time that

7  he passed away on January the 15th, 2019?

8      A.    Yes.  I have reviewed medical records that

9  dealt with two prior examinations and in addition the

10 hospitalization due to the subdural hematoma.

11     Q.    Okay.  So you've actually gone further back

12 than just his visit that -- from this incident?  You

13 went back further to a previous incident?

14     A.    That's correct.

15     Q.    Okay.  All right.  Dr. LeVaughn, has your

16 opinion changed in any way from when you rendered it on

17 July 27th, 2020, as to the matter of cause of death or

18 the manner of death?

19     A.    No, sir.

20     Q.    What is the cause of death?

21     A.    By definition or in this particular case?

22     Q.    In this particular case.

23     A.    In this particular case, I stated the cause

24 of death was multiple blunt head injury.

25     Q.    And you stated the manner of death is what?

Mark LeVaughn, M.D. -- Cross                                    356

1          A.      Homicide.

2          Q.      Dr. LeVaughn, the opinion to the cause of

3    death and the manner of death for Mr. George Robinson,

4    are you rendering that today to a reasonable degree of

5    medical certainty?

6          A.      In my opinion, yes, sir.

7          Q.      Okay.

8                  BY MR. GUTHRIE:  No further questions,

9          Your Honor.

10                 BY THE COURT:  All right.  Cross by

11         counsel for Barney.

12   CROSS-EXAMINATION BY MR. CORY:

13         Q.      Good afternoon, Dr. LeVaughn.

14         A.      Good afternoon, sir.

15         Q.      I'm Michael Cory.  We've met before.  I

16   represent Desmond Barney in this case.

17         So it's my understanding that you didn't become

18   involved in the autopsy until 18 months afterwards, or

19   you didn't become involved in preparing the report until

20   18 months after the autopsy was done?

21         A.      Well, I didn't finalize the report until that

22   date.  I can't remember what involvement I had in

23   between that time, but that's when I gave my final

24   opinion, yes, sir.

25         Q.      And you weren't actually involved in the

Mark LeVaughn, M.D. -- Cross                            357

1   autopsy.  That was done by Dr. Davis?

2        A.    Yes, sir.

3        Q.    And you testified that you've reviewed some

4   additional medical records since you prepared a report,

5   but you have not reviewed the CT scans, have you?

6        A.    I have not reviewed the actual images.  I've

7   reviewed the reports from those images.

8        Q.    And the history you had at the time you made

9   the determination in this case was of an assault; is

10  that correct?

11       A.    That was the adjective that was used to

12  describe an interaction this person had, yes.

13       Q.    And you had no information about resisting

14  arrest or exactly what happened?  The only information

15  you had about what happened was that Mr. Robinson was a

16  victim of an assault?

17       A.    That's the way it was written down, yes.

18       Q.    And certainly that history of what happened

19  can affect your determination as to the manner of death?

20       A.    It can, yes.

21       Q.    And by that you're telling the jury that if

22  the facts are different than an assault, it may or may

23  not be a homicide?

24       A.    That's possible, yes.

25       Q.    Is it -- I mean, is it possible or is

Mark LeVaughn, M.D. -- Cross                                358

1  actually a true statement?  I mean, just generally

2  speaking, if you have an assault, a fall --

3              BY MR. GUTHRIE:  Objection, Your Honor.

4         He gave his answer.

5              BY THE COURT:  Overruled.  You may

6         proceed.

7  BY MR. CORY:  (Continuing)

8      Q.   I'm sorry, Dr. LeVaughn.  If you have an

9  assault, somebody's beat up, thrown to the ground, body

10 slammed, all of that, that's one set of events that's --

11 well, let me back up.

12     A homicide, as I understand it, is when the death

13 is the result of the hands of another.  Somebody else

14 does it, somebody else inflicts the injury; is that

15 right?

16     A.   From the actions of another person, yes.

17     Q.   Right.  And if the actions of another person

18 didn't cause the injury, then it wouldn't be a homicide?

19     A.   That's correct.

20     Q.   Thank you.  Now, you also didn't -- at the

21 time you did your report, you didn't have all the

22 medical records; is that correct?

23     A.   I did not have the total amount of records

24 that I currently possess.  That's correct.

25     Q.   And as we sit here today, are you aware that

1   Mr. Robinson was on blood thinners?

2        A.    I am now, yes.

3        Q.    Now, I want to talk to you for a minute about

4   subdural hematomas because that's important here in this

5   case because that's -- obviously what Mr. Robinson died

6   of was the fact that he had a subdural hemorrhage and --

7   is that correct?

8        A.    Yes, sir.

9        Q.    And so that was bleeding of the brain.  His

10  brain was bleeding?  A vessel --

11       A.    Bleeding on the surface of the brain.  The

12  brain --

13       Q.    Right.

14       A.    -- itself -- but, yes.

15       Q.    And my question was poor.  I apologize.

16       A.    No.  That's fine.

17       Q.    It was a vein that ruptured and started

18  bleeding?

19       A.    Yeah.  Well, I'd say plural veins in --

20  plural, but, yes, on the surface of the brain, not in

21  the brain.

22       Q.    And so you've done a lot of autopsies in your

23  career, obviously, that involved subdural hemorrhages?

24       A.    That's correct.

25       Q.    And you're familiar with subdural

1   hemorrhages, aren't you?

2        A.    Yes, sir.

3        Q.    And would you agree with me that a subdural

4   hemorrhage is often caused by a major trauma, a

5   significant trauma, a violent hit?

6        A.    Well, the -- there's a spectrum of minor

7   injury that can -- a subdural hemorrhage can result from

8   a wide spectrum of injury from being severe to less

9   severe and minor.  But usually in massive head injuries,

10  that's usually associated with a subdural hematoma, yes.

11       Q.    Right.  But you talked about the spectrum.

12  They can actually result from a very minor trauma?

13       A.    That's correct.

14       Q.    And there's even literature and case reports

15  where subdural hemorrhages resulted spontaneously with

16  no evidence of trauma?

17       A.    That's been published, yes, sir.

18       Q.    And so the fact that Mr. Robinson had a

19  subdural hematoma, that doesn't mean he was beaten up by

20  anybody, does it?

21       A.    I never used the term "beaten," no.

22       Q.    And I understand that.  I'm just asking you

23  that -- I want to make sure the jury understands the

24  fact that Mr. Robinson had a subdural hematoma is not

25  evidence that he was beaten up by anybody.

Mark LeVaughn, M.D. -- Cross                                    361

1      A.    Well, in my opinion, there was traumatic

2  injury that resulted it, but I never said that he was

3  beaten.

4      Q.    So we can agree that it doesn't -- that you

5  can't deduce from the presence of a subdural hematoma

6  that there was a beat down, a beating?

7      A.    That's correct.

8      Q.    Now, some people are actually more at risk

9  than others for developing subdural hemorrhages, aren't

10 they?

11     A.    Correct.

12     Q.    What are some of the known risk factors in

13 the literature that predispose people to having subdural

14 hemorrhages as a result of even a minor trauma?

15     A.    I don't know the exact percentage of which is

16 more, but age is a factor.

17     Q.    And how old was Mr. Robinson?

18     A.    Sixty-two.

19     Q.    Okay.  So that would -- that's certainly not

20 elderly, but it's getting up there -- it's more advanced

21 age?

22     A.    Yes.

23     Q.    Okay.  What else, Dr. LeVaughn?

24     A.    Medications, anticoagulants.

25     Q.    Okay.  Would you explain to the jury when you

1    say anticoagulants, what -- what that means?

2         A.    A blood clot is formed by a series of

3    chemical processes called coagulation and that leads to

4    a blood clot.   There are numerous medications that

5    diminish the ability of the blood to clot.   And those

6    are called anticoagulants.   So anticoagulants could be a

7    risk factor for a subdural hemorrhage.

8         Q.    And what anticoagulants was Mr. Robinson on?

9         A.    There were two, aspirin and Plavix.

10        Q.    Okay.   I know the jury knows what aspirin is,

11   and some of them may know what Plavix is.   But what is

12   Plavix?

13        A.    Aspirin and Plavix affect a component of the

14   blood called platelets.   They're not actually cells but

15   they're particles in the blood that initiate the

16   beginning of a blood clot.   These little particles, they

17   adhere to the bleeding site.   They clump together.   As

18   they clump together, it initiates chemical reactions,

19   then the ultimate goal is to form a protein called

20   fibrin and the fibrin is kind of the glue that holds it

21   together so the healing process can start.

22        So aspirin is -- that affects platelets, and

23   Plavix affects platelet aggregation.   They do it by two

24   different chemical pathways, but they both affect the

25   platelet aggregation at the site of an injury.

Mark LeVaughn, M.D. -- Cross                                          363

1        Q.    And as a layman, is it fair to say that

2   Plavix is a pretty strong blood thinner?

3        A.    It's -- yeah.  Sure.

4        Q.    And you reviewed the medical records from

5   UMC, so you saw the medical record where the lab work

6   was done.  There was a test performed that confirmed

7   that Mr. Robinson was actually on Plavix and that his

8   platelets were dysfunctional?

9        A.    There was a laboratory test that showed -- it

10  was actually specific for a Plavix type anticoagulant

11  that showed that that was present because of the value

12  of that test result was less than the normal range.  So

13  it showed that there was a Plavix effect --

14       Q.    Which --

15       A.    -- in his blood.

16       Q.    -- to the jury means he was taking Plavix?

17       A.    Yes.

18       Q.    Which means he was taking a blood thinner?

19       A.    That's correct.

20       Q.    And Plavix, anticoagulant therapy, makes a

21  person much more at risk for -- particularly combined

22  with other risk factors, but it certainly increases your

23  risk for developing a subdural hematoma?

24       A.    It can, yes.

25       Q.    What about hypertension?

Mark LeVaughn, M.D. -- Cross                              364

1        A.      Hypertension is also a risk factor for a
2    subdural.
3        Q.      And Mr. Robinson had hypertension?
4        A.      That's correct.
5        Q.      And he also had chronic diabetes?
6        A.      He was diabetic.  I don't think diabetes is a
7    strong risk factor, but he was diabetic.
8        Q.      And I believe you -- talking about the three
9    abrasions that you saw, it's fair to say that those are
10   similar to scrapes or scuff marks?
11       A.      Well, abrasions are superficial injuries to
12   the surface of the skin, yes.
13       Q.      Superficial injuries; is that correct?
14       A.      Correct.
15       Q.      And the fact that Mr. Robinson had a
16   craniotomy, that's a pretty significant procedure?
17       A.      That's correct.
18       Q.      And even though typically crani- -- do you
19   know how a craniotomy is performed?  I'm not talking
20   about in detail, but you know the positioning of the
21   body?
22       A.      The patient -- and according to the medical
23   records, he was supine, lying face up, and then his head
24   was rotated to expose the right side of his head.
25       Q.      Did you read the surgical note that said he

Mark LeVaughn, M.D. -- Cross                    365

1   was actually face down in a donut?

2        A.   I didn't.  I just saw multiple references

3   that he was supine, which to me he's face up, that he

4   was -- in order to have access to the right side of his

5   head, his head was rotated somewhat to the right.

6        Q.   And somebody on Plavix and aspirin, because

7   it's a blood thinner, that predisposes you or

8   predisposes a person to bruising.  Is that fair to say?

9        A.   When you use the term "bruising," I think of

10  a traumatic injury.

11       Q.   Well, not spontaneous bruising, but -- but if

12  they --

13       A.   It predisposes the person to bleed in certain

14  patterns, yes.

15       Q.   But I think most people have seen people that

16  are on blood thinners.  They're older.  They bump their

17  knee, they bump their arm on a door, they bump

18  something, they usually develop a -- or they're much

19  more likely to develop a bruise when they're on blood

20  thinners than when they're not?

21       A.   It's possible, yes.

22       Q.   And I want to be sure I understand.  As far

23  as the history that you had and that Dr. Davis had was

24  an assault, correct?

25       A.   Yes, sir.

Mark LeVaughn, M.D. -- Cross                          366

1      Q.    And that there were actually two broken ribs;

2    is that correct?

3      A.    That was also described in the investigation

4    material that we received.

5      Q.    And Dr. Davis -- well, as part of an autopsy,

6    if you have a history of broken ribs, you're going to

7    look for broken ribs, aren't you?

8      A.    Yes.

9      Q.    And you're relying on Dr. Davis here today

10   because you didn't do the autopsy, correct?

11     A.    That's correct, yes, sir.

12     Q.    And you know Dr. Davis?

13     A.    I do.

14     Q.    Would he have checked the ribs if they -- if

15   it was an assault victim with purportedly broken ribs?

16     A.    In my opinion, he would.

17     Q.    And if you check them, are they visible?  Are

18   you going to see them?

19     A.    Well, if they are visible, then they would be

20   documented, yes.

21     Q.    Which broken ribs are going to be visible

22   postmortem, correct?

23     A.    Yeah.  Not always but, again, it depends on

24   the amount of force and the appearance of the rib.

25   These were, I believe, described as nondisplaced.  That

Mark LeVaughn, M.D. -- Cross                                    367

1   means the rib wasn't separated, so those would be more

2   difficult to see at times.

3        Q.    So -- but he looked and didn't note any, did

4   he?

5        A.    Well, he didn't note any.

6        Q.    So you're saying that --

7        A.    I assume that he looked, but, I mean, they

8   were not noted.

9        Q.    And a lot of your -- you're making

10  assumptions based on his report on everything, other

11  than what you see on the photographs, correct?

12       A.    Correct.   Yes.

13       Q.    So why are you differentiating all of the --

14  this particular moment?   Why are you hesitating when it

15  comes to the fact that he didn't document broken ribs?

16       A.    Well, you asked me if he saw them.   I --

17       Q.    Well --

18       A.    -- I can't tell you whether he saw them.   He

19  just -- as far as the documentation, they were not

20  documented.

21       Q.    That's fair.   And you would have expected him

22  to look for them?

23       A.    Yes.

24             BY MR. CORY:   Court's indulgence.

25  (PAUSE IN PROCEEDINGS)

Mark LeVaughn, M.D. -- Cross                                    368

1   BY MR. CORY:   (Continuing)

2        Q.    Now, I'm going to get some exhibits of the

3   photographs that have been admitted into evidence and

4   just run through them real quickly with you.

5        The first one is Exhibit 7, and that's a picture

6   of Mr. Robinson's -- well, you describe it for the jury.

7   What is that a picture of?

8        A.    Exhibit 7 is a photograph of the front chest,

9   abdomen, neck and head area of Mr. Robinson before the

10  internal or surgical portion of the autopsy.

11       Q.    In looking at that photo, is there any

12  evidence of any blunt force trauma or bruising or

13  anything to his chest or arms that are visible in this

14  photo?

15       A.    No, sir.

16       Q.    And this is Exhibit 12.   Is there any

17  evidence there of any bruise -- well, let me back up.

18  Would you describe that briefly?

19       A.    Exhibit 12 is a photograph of the left side

20  of Mr. Robinson's head, his face, neck and shoulder.

21       Q.    And is there any evidence of any blunt force

22  trauma there that you can see?

23       A.    No, sir.

24            BY MR. CORY:  And, Judge, at this time I

25            would like to use the photograph that was

1            marked for identification.

2                    BY THE COURT:  What says the State?

3                    BY MR. GUTHRIE:  The State objects,

4            Your Honor.

5                    BY THE COURT:  Objection has previously

6            been noted on the record.  It'll be

7            overruled.  You may proceed.  You may mark it

8            and be admitted.

9  (SAID AUTOPSY PHOTO WAS MARKED EXHIBIT NUMBER 13, WAS

10  RECEIVED INTO EVIDENCE, AND MAY BE FOUND APART FROM THE

11  RECORD.)

12  BY MR. CORY:  (Continuing)

13      Q.    Now, ladies and gentlemen, this is

14  Exhibit 13.  And would you describe that photo,

15  Dr. LeVaughn?

16      A.    Exhibit 13 is a photograph at the medical

17  examiner's office, one of the early photographs that we

18  take.  And it shows the identification scale with the

19  number on it and also the identification bracelet with

20  his identification on it which is placed around his

21  right ankle.  But the photograph anatomically shows his

22  lower extremities, legs.

23      Q.    And as far as looking at his legs, is there

24  any indication of any trauma to his legs?

25      A.    No, sir.

Mark LeVaughn, M.D. -- Cross                                    370

1      Q.    Now, Dr. LeVaughn, based on everything you've

2   reviewed in these photographs, is it fair to say that

3   you don't see evidence consistent with Mr. Robinson

4   being body slammed head first into the roadway pavement?

5      A.    Well, he had blunt injury to his head.

6      Q.    But that blunt injury, we're talking about

7   the abrasions, correct?

8      A.    Well, the abrasion and the contusion.

9      Q.    Right.

10     A.    But he had -- in my opinion, he had impact

11  injury to his head.  I don't -- I never -- I wouldn't

12  use -- I just said blunt injury.  I didn't say body

13  slammed or anything.  I just -- it's an impact injury.

14     Q.    No.  And I understand you didn't say it.  I'm

15  just saying, in fairness to these defendants, these

16  photos are not consistent with somebody who was picked

17  up off the ground, driven into the ground head first,

18  body slammed into the pavement.  Is that fair to say?

19     A.    Well, I mean, I described head injury, but I

20  can't really define what a body slam injury is.

21     Q.    It sounds like a pretty serious injury,

22  though, doesn't it?

23     A.    Well, it seemed like -- I mean, it would --

24  take some --

25                  BY MR. GUTHRIE:  Objection, Your Honor.

Mark LeVaughn, M.D. -- Cross                                       371

1            Calls for speculation.

2                 BY THE COURT:  What says the defense?

3                 BY MR. CORY:  Judge, body slam is just a

4         common term.  It's been testified to.  I

5         think everybody understands what body

6         slamming means.

7                 BY THE COURT:  I'm going to overrule the

8         objection.  This witness has been qualified

9         as an expert in forensic pathology, and so

10        the question would be something in scope as

11        to whether or not those types of injuries

12        would be consistent with that type of

13        descriptive.  So the witness may answer if he

14        can.

15   BY MR. CORY:  (Continuing)

16      Q.    And I'll give you a little background.  If a

17   witness testified that Mr. Robinson was picked up off

18   the ground, turned over and driven into the ground head

19   first to the pavement --

20                 BY MR. GUTHRIE:  Objection, Your Honor.

21   BY MR. CORY:  (Continuing)

22      Q.     -- would that be --

23                 BY MR. GUTHRIE:  Mischaracterization of

24        the witness's testimony.

25                 BY THE COURT:  Okay.  First of all, only

Mark LeVaughn, M.D. -- Cross                          372

1              one person can speak at a time.  What is your

2              objection?

3                   BY MR. GUTHRIE:  Objection is it's a

4              mischaracterization of the prior witnesses'

5              testimony.

6                   BY THE COURT:  All right.  Counsel, he

7              did not complete his question.  Let me allow

8              him to complete his question before I rule on

9              your objection.

10  BY MR. CORY:  (Continuing)

11      Q.    Let me rephrase.  If somebody testified that

12  Mr. Robinson was picked up off the ground and driven

13  into the -- or slammed head first into the pavement or

14  into the road, these photos would not be consistent with

15  the type of injury you would expect to see in all your

16  experience as a medical examiner, is it?

17                   BY THE COURT:  The objection will be

18              overruled.  You may answer if you can.

19                   BY THE WITNESS:  You said body slammed

20              head first into the ground.  I described

21              blunt head injuries.

22  BY MR. CORY:  (Continuing)

23      Q.    Right.

24      A.    I don't know how those exactly occurred.

25      Q.    Right.  But they're not consistent with what

Mark LeVaughn, M.D. -- Cross                                    373

1    I described, are they?

2         A.    I'm not sure if I can answer that.

3         Q.    These injuries are consistent with somebody

4    having a -- hitting the ground, having a -- scraping the

5    ground.  They're not consistent with somebody being body

6    slammed into the ground, are they, in your experience?

7    You've been a medical examiner a long time.

8         A.    Again, I'm not trying to dance the issue, but

9    the injuries, the abrasions are blunt injuries.

10        Q.    We agree.

11        A.    They're not only caused by lateral scraping

12   movement.  They can be direct impact injuries.

13        Q.    Sure.

14        A.    Cause a sequence of events.  I don't know

15   that there's any library of injuries about body

16   slamming.  To me that means there's multiple areas of

17   the body that could be injured.

18        Q.    Well, let me rephrase it a different way.

19   You're not here today to testify that this injury was

20   the result of being body slammed, are you?

21        A.    No.

22        Q.    And if Mr. Robinson was struck multiple times

23   in the head and chest, would you have expected to see

24   evidence of that on autopsy in addition to the three

25   abrasions you -- that are documented?

1        A.    Well, I documented three blunt injuries to

2   the head.   Could be a result of being struck.   But there

3   were no other injuries anywhere else on the chest that

4   were any -- there were no blunt injuries on the chest.

5        Q.    And likewise, there were no injuries on the

6   chest or head that indicate kicking?

7        A.    You can't -- you know, I described a blunt

8   injury --

9        Q.    Right.

10       A.    -- which could be from punching, kicking,

11  head hitting something.   I can't define how these

12  injuries occurred, but they were only to the head.   They

13  were not -- there were no injuries to the chest.

14       Q.    But we can agree that a blunt force trauma

15  can be a very minor trauma.   It just means the -- it

16  just describes the nature of what the impact was.   Blunt

17  force doesn't mean it's a heavy force, correct?

18       A.    No.   It just means nonsharp.

19       Q.    Right.   Nonsharp.   So if a witness testified

20  that somebody raised their foot up off the ground and

21  stomped on Mr. Robinson's face, do you see any injury

22  consistent with that on these photographs?

23       A.    Well, again, I can't differentiate a shoe

24  injury from a baseball bat injury, but there was injury.

25  All I'm describing is injuries to his face.   I cannot

1    tell you how they occurred.  It was an impact injury to

2    his right side of his head.

3        Q.    But you testify a lot.  You've testified a

4    lot in your career as an officer of the court.

5        A.    I have, yes.

6        Q.    And you're telling the ladies and gentlemen

7    of this jury and this Court that you can't differentiate

8    between the injury that you would expect to see in your

9    experience if somebody picked up their foot and stomped

10   it on somebody's face?

11       A.    That would be a blunt injury and that

12   could -- it could cause no injury.  It could cause an

13   abrasion and beyond.  I can't tell you what kind of

14   object caused these abrasions.

15            BY MR. CORY:  I have no further

16            questions for this witness.

17            BY THE COURT:  Cross-examination on

18            behalf of Lampley.

19            BY MR. SPRINGER:  Thank you, Your Honor.

20   CROSS-EXAMINATION BY MR. SPRINGER:

21       Q.    Dr. LeVaughn, I'm Francis Springer.  I

22   represent Lincoln Lampley.  I hope not to take a lot of

23   time because you've been up there for a while.

24        Let me just ask one question that caught my

25   attention a minute ago.  You said that you can't

Mark LeVaughn, M.D. -- Cross                              376

1    differentiate between an injury caused by a baseball bat

2    and one caused by a shoe or a foot?

3        A.    I would --

4        Q.    I'm just asking is that what you said?

5        A.    -- say is they're both blunt injuries.

6    They're different objects and they're nonsharp objects.

7    They can cause abrasions and bruising.

8        Q.    But you can't tell the difference between

9    which caused an injury?

10       A.    Well, I mean, it depends on, I guess, the

11   amount of force that's used.  You can sometimes see shoe

12   prints.  I've seen that on people.  You can see

13   depressed skull fractures in baseball bat -- but just

14   unless there's something very significant that leaves a

15   specific pattern, no, they're both nonsharp objects.

16       Q.    So a moment ago when you said you couldn't,

17   you actually can in some instances?  I'll --

18       A.    I'm not sure that's a question or --

19       Q.    -- withdraw that question.  That's fine.  No.

20   No.

21       A.    -- just a comment.

22       Q.    It was a question, but I'll withdraw it and

23   move on.

24           How many pages of medical reports did you have

25   when you did your first autopsy -- when you completed

1  the autopsy report the first time?

2       A.    Seven.

3       Q.    How many have you reviewed since then?

4       A.    Hundreds.

5       Q.    And nothing changes?

6       A.    As far as what?

7       Q.    As far as any of your findings, rulings,

8  anything?

9       A.    No.  I mean, the records that I have reviewed

10  after the report described things that I -- I believe I

11  described in the report.

12       Q.    Okay.  Did you review any of the ambulance

13  reports?

14       A.    Any what reports?  I'm sorry.

15       Q.    Reports of AMR, the ambulance that responded

16  to attend to Mr. Robinson.

17       A.    I don't believe I have the -- those actual

18  run sheets, no.

19       Q.    So you've not seen those?  Is that what

20  you're saying?

21       A.    Correct.

22       Q.    Okay.  How did you learn of the possibility

23  of an assault involving law enforcement?

24       A.    It was -- that's the way the investigative

25  form described --

Mark LeVaughn, M.D. -- Cross                                378

1        Q.     Okay.  Specific- --

2        A.     -- the sequence of his injury.

3        Q.     Okay.  Specifically, what type of assault or

4    injuries?

5        A.     I don't understand the question.  I mean, it

6    was presented to us at the medical examiner's office

7    that he suffered an assault.

8        Q.     Okay.  But it wasn't specific?

9        A.     No.  Didn't have any more detail than that,

10   no.

11       Q.     Didn't say a head injury, a torso injury, leg

12   injury or anything like that?

13       A.     Well, I think it described the subdural

14   hemorrhage and described rib fractures --

15       Q.     All right.  What --

16       A.     -- in the initial report.

17       Q.     Okay.  What report initially described that?

18       A.     I'm referring to what we call the ME-1 Form,

19   which is the form that the coroner presents to us which

20   is our -- basically it serves several purpose:

21   identification of the patient, a request for a

22   postmortem exam and history of the event.

23       Q.     Okay.  You get that from the coroner, the

24   county coroner?

25       A.     Yes, sir.

1       Q.    Okay.  And you said it had mentions of rib

2   fractures?

3       A.    On that report I believe it had a comment

4   about rib fractures.

5       Q.    Okay.  Would Dr. Davis have gotten that

6   report?

7       A.    Yes.

8       Q.    Did he make any notes -- and I'll ask you not

9   to refer to anything unless we're looking and talking

10  specifically about it and everyone knows what we're

11  talking about.

12      Did anything in his reports that you reviewed have

13  anything about rib fractures?

14              BY MR. GUTHRIE:  Objection, Your Honor.

15              If the expert witness needs to refresh his

16              memory or recollection from the notes that he

17              brought, we would ask that he be allowed to

18              do so.

19              BY MR. SPRINGER:  Well, that'd be fine.

20              I'd just like to know what he's referring to,

21              Judge.

22              BY THE COURT:  Okay.  Do you need to

23              ref- --- I'm going to sustain the objection.

24              I think he probably does need to refresh --

25              BY MR. SPRINGER:  That's fine.

Mark LeVaughn, M.D. -- Cross                                          380

1              BY THE COURT:  So I'll let you rephrase

2         and proceed.

3              BY MR. SPRINGER:  Sure.

4   BY MR. SPRINGER:  (Continuing)

5         Q.    Do you know of anything that Dr. Davis had

6   that you used to draw your conclusions and complete this

7   autopsy report that showed the fractured ribs as you

8   reported from the coroner?  Would he have had that,

9   that's the first part of the question, and I think you

10  answered that.  The second part of -- or what I'm asking

11  now is, did you have that, that he had?

12        A.    What I used to generate the report was what

13  he had in the case file.

14        Q.    Okay.  And your final report had nothing

15  about fractured ribs?

16        A.    That's correct.

17        Q.    Okay.  Did you talk to Dr. Davis about any of

18  this?

19        A.    I did not.

20        Q.    Did anything prevent you from talking to him

21  about any of this?

22        A.    Would anything prevent me from talking --

23        Q.    Did anything prevent you from calling him,

24  e-mailing him, anything like that with any questions or

25  anything about this?

1       A.      No, sir.

2       Q.      Okay.  Did you get any witness statements

3   that had been -- and gathered about what people said

4   they had seen regarding Mr. Robinson?

5       A.      At the time of the report or now?

6       Q.      At the time of the report.

7       A.      No.

8       Q.      Have you seen them since then?

9       A.      Yes, I have.

10              BY MR. SPRINGER:  Court's indulgence.

11  (PAUSE IN PROCEEDINGS)

12              BY MR. SPRINGER:  Just a couple of final

13          questions.

14  BY MR. SPRINGER:  (Continuing)

15      Q.      How many autopsies did you perform in 2019?

16  Do you have any idea?

17              BY MR. GUTHRIE:  Objection, Your Honor,

18          to relevance.

19              BY MR. SPRINGER:  Your Honor, it was 18

20          months between the time this was started and

21          finished.  I'm just trying to find out how

22          many they have.

23              BY THE COURT:  The objection will be

24          overruled.  You may proceed.  It goes to

25          credibility.

Mark LeVaughn, M.D. -- Redirect                                    382

1              BY THE WITNESS:  Let me back up.  I know

2         in 2018 I did over 700 autopsies.

3  BY MR. SPRINGER:  (Continuing)

4    Q.    Okay.  That's all right.

5    A.    In 2019, it was maybe a little less but --

6    Q.    Okay.  That's fine.  That's fine.

7    A.    -- several hundred.

8    Q.    That's fine.

9              BY MR. SPRINGER:  That's all the

10         questions I have, Your Honor.  Thank you,

11         Dr. LeVaughn.

12             BY THE COURT:  All right.  Any redirect?

13             BY MR. GUTHRIE:  Yes, Your Honor.

14  REDIRECT EXAMINATION BY MR. GUTHRIE:

15    Q.    Dr. LeVaughn, there's been several questions

16  about rib fractures.  Were there any notes in Dr. Davis'

17  reports about a rib fracture?

18    A.    No.

19    Q.    Were there -- and there were many more

20  pictures of the autopsy than what we actually went

21  through today.  But did you take those pictures?

22    A.    No.

23    Q.    Did those pictures show a rib fracture?

24    A.    In my opinion, no.

25    Q.    Okay.  Is that why you did -- chose not to

Mark LeVaughn, M.D. -- Redirect                               383

1    put it in your report?

2        A.    Correct.

3        Q.    Because you could not verify that; is that

4    correct?

5        A.    That's correct.

6        Q.    Okay.  Now, they were talking about a

7    subdural hematoma, and they went into that injury quite

8    a bit.  Do you expect a subdural hematoma to evolve

9    immediately?

10                  BY MR. CORY:  I'm going to object.  The

11               question was not asked to a reasonable degree

12               of medical probability.

13                  BY THE COURT:  I'm sorry.  Your mouth is

14               covered.

15                  BY MR. CORY:  I'm sorry.  I object.

16               This question is not asked to a reasonable

17               degree of medical probability.

18                  BY THE COURT:  I'm going to overrule the

19               objection.  You may proceed.

20                  BY MR. GUTHRIE:  Yes, Your Honor.

21   BY MR. GUTHRIE:  (Continuing)

22       Q.    Do subdural hematomas evolve immediately?

23   And I know it's a loaded question, so let me back up and

24   bring it in parts.

25          Does the subdural hematoma start immediately,

Mark LeVaughn, M.D. -- Redirect                                    384

1    which means do the veins begin to leak blood

2    immediately?

3         A.    When you say "immediately," I'm assuming

4    immediately after a blunt injury?

5         Q.    Correct.

6         A.    The bleeding -- there's no way to measure it,

7    but it initially is thought to begin immediately.

8         Q.    Correct.  Does it take some time for the

9    volume to increase enough to cause symptoms and swelling

10   on the brain?

11        A.    It does.

12        Q.    Does three hours -- is three hours reasonable

13   to expect between injury and symptoms?

14        A.    Yes.

15        Q.    Are the injuries to George Robinson

16   consistent with blunt force trauma?

17        A.    Yes.

18        Q.    Are the injuries consistent with an assault?

19   That's a generic term.  Just assault.

20        A.    There -- there are impact injuries to his

21   head.

22        Q.    Okay.  Are the injuries to Mr. Robinson

23   consistent with an impact to the pavement?

24        A.    That could be one of the reasons they

25   occurred, yes.

Mark LeVaughn, M.D. -- Redirect                           385

1       Q.     Okay.   There were many questions to you about

2   being driven head first or body slammed onto the

3   pavement, thrown down.   Everybody has a different

4   terminology.   Do any of these terminologies tell you the

5   force in which the head hit the pavement?

6       A.     I'm not sure I understand the question.   I

7   think you're asking me something I don't think I can

8   answer.

9       Q.     Okay.   And let me try to rephrase it.

10      If someone's head hit the pavement -- can

11  someone's head hit the pavement in different forces?

12      A.     Yes.

13      Q.     Okay.

14      A.     Yes.

15      Q.     So a generic term of someone's head hitting

16  the pavement, doesn't tell you with any reasonable

17  degree of certainty what kind of impact it was as far as

18  the force of the impact?

19      A.     No.

20      Q.     Okay.   So when they are thrown down -- when

21  an individual -- the -- the -- when witnesses describe

22  being thrown down to the pavement, whether they used the

23  term body slam, thrown down, driven head first, all of

24  these different terminologies that come about, they can

25  spur different things to us, but you as the medical

1   examiner -- are you able to determine the force of

2   impact of Mr. Robinson's head to the pavement from any

3   of these terms?

4        A.    No.

5        Q.    Okay.  These terms would be subjective to the

6   person using them, wouldn't they?

7        A.    The description?

8        Q.    Yes.  They mean different things to the

9   person that actually says the term.  It's not a medical

10  term for you to determine the force in which they hit

11  the pavement?

12       A.    Let me back up just a second.

13       Q.    Okay.

14       A.    I reviewed many medical records and witness

15  statements and I made a list -- I've got it in here

16  somewhere in the folder -- of about 12 -- 12 or 13

17  different descriptions in there of what happened to

18  Mr. Robinson.  Body slam, struggle, beat up -- there

19  were multiple descriptions of some type of injury that

20  occurred to him.

21        And in the same descriptions, there was a common

22  denominator that they resulted in a head injury which

23  had half a dozen different descriptions: abrasions,

24  strawberries, bumps, lumps.  So I can't tell you the

25  amount of force that was applied to his head either just

1    from the examination of the documents or the description

2    of some individual.  He had -- he sustained a blunt

3    injury to his head that resulted in these complications.

4         Q.    Okay.  To a reasonable degree of medical

5    certainty, did George Robinson being on Plavix kill him?

6    Was that the cause of his death?

7         A.    No.

8         Q.    To a reasonable degree of medical certainty,

9    what was the cause of death of George Robinson?

10        A.    As I stated in my opinion, the cause of death

11   was multiple blunt head trauma.

12        Q.    And what was the manner of death to a

13   reasonable degree of medical certainty?

14        A.    In my opinion, it was a homicide.

15             BY MR. GUTHRIE:  No further questions,

16        Your Honor.

17             BY THE COURT:  All right.  To the State,

18        may this witness be excused?

19             BY MR. GUTHRIE:  Yes, Your Honor.

20             BY THE COURT:  To the Defense Barney,

21        may he be excused?

22             BY MR. CORY:  Yes, Your Honor.

23             BY THE COURT:  To Defense Lampley, may

24        he be excused?

25             BY MR. SPRINGER:  Yes, Your Honor.

Mark LeVaughn, M.D. -- Redirect                                388

1              BY THE COURT:  Dr. LeVaughn, you may be

2        excused.

3              BY THE WITNESS:  Thank you, Your Honor.

4    (WITNESS EXCUSED)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25