Diplomate, American Board of Emergency Medicine
EMT-P, (Paramedic) Certified in New York State

**KEVIN BROWN, MD, MPH, FACEP, FAAEM**
28 BYRAM HILL ROAD
ARMONK, NEW YORK 10504-1504
Mobile: (914) 760 -8632
Email: krbrownmd@verizon.net

September 29, 2020

Dennis C. Sweet III, Esq.
Sweet & Associates
158 East Pascagoula Street
Jackson, MS 39201

Re: <u>Bettersten R Wade and Vernice Robinson v. City of Jackson, Mississippi, et al.</u>

### Physician Affirmation

**Credentials**

I am a full-time attending physician in the emergency department of New York-Presbyterian-Lawrence Hospital in Bronxville, New York, and a part-time attending physician at Bassett Medical Center in Cooperstown, New York. I have practiced Emergency Medicine for 28 years. Emergency medicine is a specialty that cares for unplanned emergencies and involves aspects of all medical branches, including traumatic injuries and subdural hematomas. The conditions involved in this case sustained by Mr. Robinson are those that I frequently care for in my capacity as an Emergency Medicine physician.


EXHIBIT "4"

1

I graduated from New York Medical College in 1986 with a master's degree in Public Health (MPH). I graduated from the Albert Einstein College of Medicine in 1988. I completed one year of internal medicine training at St. Luke's-Roosevelt Hospital Center in New York City and a three-year residency in emergency medicine at Jacobi Medical Center/Albert Einstein College of Medicine in 1992.

I am Board Certified by the American Board of Emergency Medicine. I have a faculty appointment at two medical schools: assistant professor of medicine at Columbia University Physicians & Surgeons in New York City and assistant clinical professor of family medicine at New York Medical College in Valhalla, New York.

I worked as an EMT-Paramedic and was initially certified in New York State in 1974 and have retained my paramedic certification up to the present. I am the medical director of an EMT training program in Westchester County, New York. I also serve as the assistant director of a Paramedic training program in Westchester County, New York. I conduct EMS continuing medical education lectures and call audits for several EMS organizations in Westchester, New York. I also provide on-line (direct) medical control to EMS ambulance staff in several counties in New York State. I have a particular interest in cardiac emergencies and specifically in cardiac arrhythmias (abnormal heart rhythms).

I have been the director of three emergency departments over a ten-year period. I have worked in small community hospitals as well as large, tertiary care medical centers. I currently teach medicine, family practice, and emergency medicine residents. I supervise residents in the provision of clinical care in the emergency department.

My CV contains additional information about my professional training, education, and experience.

**Material Reviewed**

I have reviewed the following material regarding George Robinson in the matter named above:

1. First Amended Complaint Civil Action No. 19-725.
2. Answer and Defenses of AMR to First Amended Complaint.
3. Summary of Witness Statements: Ronnie (Randle) (Twain) Arnold, Ray Rowland, Connie D. Bolten, Samuel Rawls, Constance Johnson.
4. The City of Jackson, Mississippi's Objections and Responses to Plaintiff's Request for Production of Documents.
5. Postmortem autopsy report.
6. Postmortem toxicology report. Mississippi Forensics Laboratory.
7. Jackson Police Department records.
8. JPD's timeline of George Robinson's Death Shows he Drove Away after Arrest, was Filmed at Motel. Alissa Zhu, Mississippi Clarion-Ledger. January 28, 2019.
9. The University of Mississippi Medical Center medical records dealing with the admission on 12/25/2018.
10. The University of Mississippi Medical Center medical records dealing with Mr. Robinson's admission dated 1/14/2019.
11. American Medical Response (AMR) Central MS Patient Care Report (PCR) #1 dated 1/13/2019 timed at 19:43:03 hours (7:43 p.m.).
12. American Medical Response (AMR) Central MS Patient Care Report (PCR) #2 dated 1/13/2019 timed at 23:12:59 hours (11:12 p.m.).
13. Deposition transcript of Shawn McEwen, AMR Paramedic, dated September 18, 2020.
14. Deposition transcript of Andrew Aycox, AMR Paramedic, dated September 17, 2020.
15. Deposition transcript of Jeremy Schilling, AMR EMT, dated September 17, 2020.
16. AMR Ambulance paramedic protocols.
17. Relevant medical literature (attached)

**Relevant Case Details**

1. On December 25, 2018, Mr. Robinson was diagnosed with and treated for a stroke. He had a history of diabetes and hypertension. Two antiplatelet medications (aspirin and Plavix) was prescribed to Mr. Robinson upon his discharge from his stroke.
2. On January 13, 2019, Mr. Robinson drove up and sat in his vehicle in front of 1729 Jones Avenue.
3. At 7:21 p.m., after Mr. Robinson parked his vehicle, Mr. he was approached by the Jackson Police Department Canine Unit officers. The police officers, including one identified as Officer Fox, searched for the men who killed a pastor, Anthony Longino, earlier in the day one block away from the Jones Avenue address.
4. Three officers: Anthony Fox, Desmond Barney, and Lincoln Lampley, approached Mr. Robinson was sitting in his car. One of the officers yelled that Mr. Robinson had "something in his mouth and was trying to swallow it." A witness stated that Mr. Robinson wasn't moving fast enough for the officers, so the three officers forcefully removed Mr. Robinson from his car, and "body-slammed" him to the ground in a prone, face down position.
5. The officers restrained Mr. Robinson with their knees into his back. A witness described the officers as "stumping him," and another said they "kicked him." Mr. Robinson was "bleeding profusely" from his head. Mr. Robinson was trying to explain to the officers that he was recovering from a recent stroke, and that was why he wasn't moving fast when he was exiting his vehicle.
6. At 7:35 p.m., the officers called for an ambulance, and AMR (American Medical Response) unit #314, staffed by Andrew Aycox, RMT-P (Paramedic) and Jeremy Schilling, EMT-B, responded to the site.
7. At 7:55 p.m., the staff of AMR ambulance unit #314 arrived and "shined a light on Mr. Robinson's head," bandaged his head injury and observed Mr. Robinson and released him without further medical attention.
8. A description of their ambulance PCR (patient care report) in a letter to the police officer investigating the case stated that "The male was alert and oriented times 4 with a Glasgow Coma Score of 15."

9. At 8:30 p.m., Mr. Robinson was cited by the police officer for "failing to obey an officer and resisting arrest." He was given a court date and given a field release. Officer Fox made Mr. Robinson ger back into his vehicle, and he drove away.
10. At 8:41 p.m., Mr. Robinson is seen on video at the Mustang Motel in West Jackson, MS, where he stays with his girlfriend, Constance Johnson, with "many visitors in his hotel room."
11. Constance Johnson said that Mr. Robinson told her that he "had been beaten by the police." She said that Mr. Robinson "wasn't acting right." He was "doing crazy stuff with his hands" and "foaming at the mouth."
12. At 11:00 p.m., She called for an ambulance after seeing Mr. Robinson having "seizures."
13. At 11:18 p.m., the AMR ambulance #323, staffed by Shaun McEwen, EMT-P (paramedic) and Krystopher Holman, EMT-B, arrived at the Mustang Hotel.
14. At 11:37 p.m., AMR ambulance transported Mr. Robinson to the University of Mississippi Medical Center.
15. The Medical Center medical staff found Mr. Robinson to be in critical condition with a subdural hematoma and a significant brain midline shift [indicating severe intracranial pressure] with signs of brain herniation [his brain was squeezed into the spinal canal opening]. An endotracheal intubation [breathing] tube was placed, and Mr. Robinson was attached to a ventilator. A decompressive craniotomy/ craniectomy was performed in the operating room, and he was administered mannitol to decrease brain swelling. His Glasgow Coma Score was 5 (normal is 15 on a scale of 3 to 15).
16. Mr. Robinson's CT scan also showed acute (recent) nondisplaced ribs fractures (right 10th and 11th ribs).
17. On January 14, 2019, Mr. Robinson was admitted to the intensive care unit in a life-threatening condition.
18. On January 15, 2019, at 6:33 p.m., Mr. Robinson died.
19. On January 23, 2019, the Hinds Coroner Sharon Grisham-Stewart listed Mr. Robinson's death as a homicide.
20. The Office of the State Medical Examiner Case #ME19-0058 showed that Mr. Robinson's cause of death was: multiple blunt head trauma; abrasions of the

right side of head; right periorbital soft tissue swelling (hematoma); right scalp contusions, right subdural hematoma; right frontal lobe contusions; status post decompressive right craniotomy and hypertensive and atherosclerotic cardiovascular disease. Toxicology was non-contributory.

**Relevant EMS/ Medical Literature (all are attached)**

1. Givot D.: <u>Duty to act, assess, treat and transport: A legal refresher for EMS providers</u>. EMS1. (On-line journal). August 25, 2020; originally published on July 6, 2015. This review for EMTs and paramedics concerns their responsibilities as emergency responders. There is a legal duty from EMTs and paramedics to respond to emergency calls and prevent harm to the general public. "Responding refers to what a provider does on the scene itself." "Make no mistake; the law is crystal clear on duty when it comes to assessments. As illustrated by Wright v. City of Los Angeles and Hackman v. AMR, a provider, once patient contact is made, has an absolute duty to perform a thorough assessment and to act upon the findings thereof." "Once again, the law is unambiguous about a provider's duty to treat; if a treatment is indicated based on the thorough assessments, and providing the indicated treatments is reasonable under the circumstances, the provider has an absolute duty to provide—or attempt to provide—such treatment." Lastly, "Where there is an assessment with findings that require treatment, transport to an appropriate receiving facility is the logical completion of the sequence—and legal requirement." The author concludes: "The law only codifies what we all learned in school: EMS providers must respond, they have a duty to act, a duty to perform a thorough assessment, a duty to appropriately that the findings of that assessment, and to transport where necessary. It's not brain surgery, its EMS."

2. Page, Wolfberg, & Wirth: <u>Why Documentation is Part of Good Patient Care.</u> EMS1. (On-line journal) March 10, 2015. The author reminds EMS providers that documentation via the patient care report (PCR) is an integral part of patient care. "...the provision of good patient care requires excellent, thorough, and complete documentation of that patient encounter, with great attention to the details, for every patient, on every trip, every time." "The importance of a

6

well-written narrative on the PCR cannot be overemphasized...A well-written narrative will not simply duplicate information documented elsewhere. Instead, it will paint in the details, and clearly describe why treatments provided were necessary."

3. Givot D: <u>Non-transport PCR: Choose Either Thorough Documentation or Saving for a Lawyer.</u> EMS1. (On-line journal). April 6, 2015. "As it is for all PCRs [patient care reports] when documenting a non-transport, tell the whole story; what you did, what others did, what you said, what others said, what others claim to have seen, and most of all, what you did to convince the patient to accept transport to the hospital and what the patient said in response." "Every agency has an Against Medical Advice page or paragraph for the patient to sign."

4. Page, Wolfberg & Worth: Brody, Ken: <u>Why Patient Refusal Documentation is in Your Best Interest.</u> EMS1. (On-line journal). The article advises EMS providers to protect themselves by documenting decision-making capacity. "Only a person with the capacity to make a decision and who fully understands the risks of the refusal can properly refuse care and transport. It is your responsibility to ensure that the person who refuses care has such capacity and understands the risks."

5. Selde W: <u>Know When and How and When Your Patient Can Legally Refuse Care.</u> JEMS, Journal of EMS. 2015; Issue 3, Volume 40. The concept of informed refusal of care is covered. The idea of decision-making ability is included. "1. The patient must have sufficient information about his or her medical condition. 2. The patient must understand the risks and benefits of available options, including the option not to act. 3. The patient must have the ability to use the above information to decide in keeping with his or her values. 4. The patient must be able to communicate his or her choices. 5. The patient must have the freedom of will to act without undue influence from other parties, including family and friends."

6. Duckworth R: <u>EPIC: An EMS-centered Approach to Head Injuries.</u> EMS1. (On-line journal). March 26, 2018. This article reviews the various forms of head injuries that EMS providers might encounter and the treatments. The

guidelines specifically consider elderly patients and those taking anticoagulants—as Mr. George Robinson was. "Many geriatric patients take some form of blood thinner. These should be identified, as they significantly contribute to morbidity and mortality."

7. Burstein JL, et al. <u>Refusal of Out-of-hospital [EMS] Medical Care: Effect of Medical-control Physician Assertiveness on Transport Rates.</u> Academic Emergency medicine. Jan 1998. Vol. 5. No 1. The main thrust of the study reached the following conclusion: "Contact with a medical-control physician appears to markedly improve the transport rate for patients who initially refuse out-of-hospital medical care. This is especially so when physicians are more assertive in recommending transport [to EMS patients via phone or radio]." In Mr. Robinson's case, the AMR patient care protocols call for the paramedics to contact medical control to have a physician speak with him. The paramedics deviated from this protocol.

8. Hoyt BT, Norton RL: <u>Online Medical Control and Initial Refusal of Care: Does it Help to Talk With the Patient?</u> Academic Emergency Medicine. July 2001. Volume 8. No.7. The conclusion of this study showed that: "Although time-consuming, the use of PPC [physician medical control speaking with the patient] is associated with more patients' agreeing to be transported [to the emergency department]." Had the AMR paramedic had Mr. Robinson speak with the medical control physician as required, the transport outcome would have been different.

**Opinions of George Robinson's Cause of Death, His Refusal of EMS Care, and Contributing Factors**

I make the following statement and opinion within a reasonable degree of medical certainty based upon my education, training, and experience.

1. The cause of Mr. Robison's head injury occurred when he was forced from his car, forcefully brought to the ground by the police officers. The officers subdued Mr. Robinson and put their knees into his back, causing him to sustain facial, head, and rib injuries.

8

2. Mr. Robinson was taking two antiplatelet medications for approximately 2 ½ weeks since his stroke (on Christmas Day, 12/25/2018) to prevent another stroke. These medications made Mr. Robinson prone to intracranial bleeding, even as a result of minor head trauma. The paramedic and EMT were taught this. Had they taken a past medical history and found out this fact, Mr. Robinson would have been at a very high risk of intracranial intracerebral bleeding due to his head injury. The paramedic, however, failed to record a past medical history.
3. AMR EMS Unit #312 was called to the scene, and the EMTs (emergency medical technicians) performed a brief examination and bandaged Mr. Robinson's head wound. Although a description of their findings as finding Mr. Robinson as alert and oriented with a normal Glasgow Coma Score, they permitted Mr. Robinson to "refuse" treatment without obtaining informed consent to refuse care.
4. Andrew Aycox, EMT-P (Paramedic) was required to provide Mr. Robinson with the "risks, benefits, and alternatives" of not going to the hospital and determine his ability to understand those risks before leaving him at the scene. Had he been informed of the likelihood of further internal bleeding due to his medication, Mr. Robinson would likely have sought medical care with the AMR crew.
5. Had the paramedic followed AMR patient care protocol and had a medical control physician speak with Mr. Robinson about his head injury's seriousness, he would likely have consented to transportation to the emergency department.
6. The narrative section of the patient care report (PCR) is wholly suspect since it was written hours later by Andrew Aycox, EMT-P (Paramedic) was informed by his colleague on AMR Unit #323 Shaun McEwen, who later treated Mr. Robinson at the Mustang Hotel that Mr. Robinson was in critical condition. It was after receiving this information that Paramedic Aycox wrote the narrative of his PCR *after the fact*. It is more of an effort to "cover one's butt" rather than an objection contemporaneous report of his encounter with Mr. Robinson. Paramedic Aycox had not even recorded Mr. Robinson's demographic information and didn't even know his age. The information written in the narrative section has to be considered by the court with a skeptical eye as it

was not recorded as a timed addendum but rather appeared to be written to support their deviations from standard medical care.

7. Paramedic Aycox further claims that the police officer canceled the ambulance because Mr. Robinson refused medical attention. The police are in no position to accept an informed refusal of care beyond their training. The police officers have no authority; it is a medical function that the officers are not trained to obtain. The officers are simply observers after EMS arrives and must defer care to EMS. Further, Mr. Aycox has the legal responsibility and duty to care for Mr. Robinson as the highest level of medical provider at the scene. He abdicated this responsibility and abandoned Mr. Robinson at the time that he most needed help.

8. According to the AMR's patient care protocols, a prudent action by the paramedic crew would have been to put Mr. Robinson in radio contact with an Emergency Department physician to emphasize the need for transportation and other medical care.

9. Head trauma is taught in both EMT courses and paramedic courses. The potential complications are taught to paramedics including, subarachnoid hemorrhage, epidural and subdural hematomas and cerebral contusions, and brain herniation. These topics were part of paramedic Aycox's professional education.

10. Had the AMR EMTs/ paramedics taken Mr. Robinson to the hospital directly from the scene of his injuries, a brain CT scan would have no doubt been done. The CT scan would have shown the subdural hematoma, which would have been successfully treated in its early development stage.

11. Subdural hematomas occur more frequently in older patients and in those taking anticoagulants and antiplatelet medications as Mr. Robinson was.

12. The bleeding that occurs with a subdural hematoma involves the tearing of thin-walled veins termed dural sinuses. Typical subdural presentations occur hours-to-days after the original trauma because it takes time for the venous bleeding to accumulate and cause symptoms, like Mr. Robinson's intense headache at the motel and "doing crazy things with his hands."

13. The fact that Mr. Robinson was able to drive away from the scene of his encounter with the police and be observed with his friends later at the motel is in no way incompatible with Mr. Robison having sustained a critical head injury hours before during his encounter with the police officers. The subdural bleeding was slowly accumulating before it reached a crucial amount that affected Mr. Robinson's behavior.
14. The EMTs on AMR Ambulance #312 had an obligation to properly assess, treat and transport Mr. Robinson when they were called to the scene by the police officer at Jones Street.
15. In summary, the AMR EMT's assigned to ambulance #312, failed to perform a thorough assessment of Mr. Robinson; failed to have Mr. Robinson discuss his care with a medical control physician to discuss him "refusing" medical care and failed to transport him to an emergency department; along with failing to obtain an informed refusal (with the risks, benefits, and alternatives discussed). These omissions and actions were below the standard of care for paramedics and EMS providers.
16. The failures of the AMR EMT's caused the subsequent accumulation of intracranial bleeding and his death. Had Mr. Robinson's injuries been detected and treated hours earlier at the medical center, he would have, more likely than not, survived.
17. Paramedic Aycox falsified Mr. Robinson's EMS medical record.

I reserve the right to alter these opinions as additional information becomes available for my review.

Sincerely,

*Ken Brown MD*  9/29/2020

Kevin R. Brown, MD.        Date