IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**BETTERSTEN R. WADE, et al.**                                    **PLAINTIFFS**

**V.**                                              **CAUSE NO 3:19-CV-897-CWR-FKB**

**CITY OF JACKSON, MISSISSIPPI,**                          **DEFENDANTS**
**et al.**

<u>**ORDER**</u>

This case arose from the death of George Robinson, Jr. (Robinson), after a lamentable altercation with officers of the Jackson Police Department (JPD). Robinson's surviving family members filed suit against the City of Jackson, JPD officers Anthony Fox, Desmond Barney, and Lincoln Lampley, as well as American Medical Response Inc. (AMR).[1] Before the Court are three motions: (1) the JPD officers' Motion for Summary Judgment [Docket No. 174]; (2) the City of Jackson's Motion for Summary Judgment [Docket No. 179]; and (3) the JPD officers' Motion to Strike Plaintiffs' Exhibit A [Docket No. 194]. For the reasons stated below, the Court rules as follows.

**I.    Factual Background**

**A.    Defendants' Account[2]**

On January 13, 2019, Fox, Barney, and Lampley were on duty with JPD as SWAT operators investigating the early morning carjacking and murder of Jackson pastor Anthony

---

[1] American Medical Response Inc. contends that it is incorrectly named in this action. It states that the proper name of the entity is Mobile Medic Ambulance Service, Inc. However, for the purpose of clarity the Court will refer to Mobile Medic as AMR.

[2] The defendants' version of the events is taken primarily from the deposition testimony of the officers who had direct contact with Robinson: Fox, Barney and Lampley. We also have the testimony of Andrew Aycox, the AMR emergency medical technician who arrived on the scene to provide aid to Robinson. Unfortunately, the officers were not equipped with body cameras so there are no video recordings of the events. Docket No. 174-7 at 121. Of course, Robinson is not here to tell his side of the story.

Longino. Docket No. 174-7 at 48. In search of the suspect, JPD probed nearby neighborhoods. In doing so, the officers received a tip that the suspect was on Jones Avenue. *Id.* at 137.

While patrolling Jones Avenue that night, Fox observed what he assumed was a hand-to-hand drug transaction between Robinson, who was sitting in the driver's seat of his white Chevy Impala, and an unknown woman. Docket No. 174-1 at 68, 87-88, 99; Docket No. 174-7 at 114. According to Fox, the woman was standing at the driver's side window, clutching cash in her right hand, and handed the money to Robinson. Docket No. 174-1 at 60-62, 97. Fox then approached Robinson's vehicle. The woman walked away quickly, and Robinson turned to his right and began reaching with his right hand between his seat and the center console. *Id.* at 64, 66, 68, 94, 100. Fox perceived this movement to be an immediate threat.

What happened next is at the center of this case. The officers' version of events consumes more than 400 pages of deposition testimony. In describing the events of that day, their testimony was consistent on several key points: (1) Fox gave loud and clear commands for Robinson "to show his hands," but Robinson did not comply;[3] (2) it appeared that Robinson was reaching for something;[4] (3) Lampley had to assist Fox in removing Robinson from the vehicle because Robinson was resisting, and when they finally removed him, they placed him face down on the concrete;[5] (4) while he was being subdued, Robinson was successful in placing an unknown substance in his mouth;[6] (5) Fox and Barney unholstered their weapons;[7] (6) after finally gaining control over Robinson, the officers handcuffed him, stood him up, and placed him under arrest;[8]

---

[3] *See* Docket Nos. 174-1 at 64, 66, 68, 94, 100, 101; 174-7, 149-50 and 152.
[4] *See* Docket Nos.174-1 at 64, 66, 68, 94, 100; 174-8 at 88, 103-04.
[5] Docket Nos. 174-1 at 95; 174-8 at 84, 87 and 174-7 at 134.
[6] Docket Nos. 174-1 at 70, 102, 117, 132; 174-7 at 153; 174-8 at 84, 91, 105.
[7] *See* Docket Nos. 174-1 at 95, 102, 132; 174-8, at 84.
[8] Docket Nos. 174-1 at 114, 117-19 and 174-7 at 122. According to Fox, he and Robinson then recognized each other. Robinson stated, "Fox, man you know I respect you, bro . . . man, that's my bad . . . I didn't mean to do all of that . . . so, I just swallowed the tab." Docket Nos. 174-1 at 130. Lampley also claims to have heard this apology, *see*

and (7) to the extent Robinson suffered an injury, he sustained only an abrasion on his forehead, which according to Lampley did not need medical treatment.[9]

After observing Robinson's injury, Fox wanted to call AMR, but Robinson objected, stating he was fine and simply wanted to go home. Docket No. 174-1 at 130, 139, 143-44. Ignoring Robinson's protest, Fox called dispatch to request that AMR evaluate Robinson. Docket No. 174-1 at 127-28, 146.

AMR received a call from JPD at 7:43 P.M., requesting an ambulance to check out Robinson. Docket Nos. 174-3; 174-6. Paramedic Andrew Aycox and emergency technician Jeremy Schilling were dispatched to the scene. Docket No. 176-5. When they arrived, they saw Robinson handcuffed, standing beside an unmarked SUV. *Id.* Aycox attempted to evaluate Robinson, but Robinson was uncooperative. Docket No. 179-11 at 24. He would not provide his medical history, his age, or answer other substantive questions. Docket No. 176-6 at 23-24. Robinson declined all other medical care other than permitting the AMR employees to put a bandage on his forehead. *Id.* at 33-35, 42, 43. Robinson rejected AMR's offer to take him to the hospital. Docket No. 179-11 at 24. AMR then left the scene. Docket No. 176-6 at 43, 46, 48. Robinson was alert and oriented with a standard Glasgow Coma Scale (GCS) score of 15 out of 15 when Aycox and Shilling left.[10] Docket No. 174-6.

Robinson was then charged with disobeying a police officer and resisting arrest at which point he was field released. Docket No. 174-1 at 80-81. He left the scene on his own volition and drove himself to the Mustang Inn, a nearby hotel. *Id.* at 144. According to Lampley, a video from

---

174-7 at 162, but as counsel for Wade pointed out, Lampley did not include that information in his police report. *Id.* at 163.

[9] *See* Docket Nos. 174-1 at 73, 111, 129, 149; 174-8 at 91, 141; 174-2; and 174-7 at 157.

[10] The Glasgow Coma Score (GCS) is a clinical scale used to assess a patient's consciousness and level of functioning, with 15 being the highest possible score.

the Mustang Inn shows Robinson wearing the same clothes from earlier that evening, driving the same white Chevy Impala, pull into a parking spot on the hotel's parking lot. Docket No. 174-5, at 1-2. The video also shows Robinson walking inside the hotel, returning to his car, and then walking back into his hotel room. *Id.* at 2. Over the next hour or so, multiple people can be seen going in and out of Robinson's hotel room. *Id.*

Later that night, AMR received a 9-1-1 call from the Mustang Inn seeking medical assistance for Robinson who had suffered a seizure. Docket No. 176-8. AMR arrived on the scene at 11:18 P.M., where the paramedics found Robinson unresponsive. *Id.* Shortly before midnight, AMR transported Robinson to the University of Mississippi Medical Center. *Id.* A CT scan revealed that Robinson suffered from a subdural hematoma.[11] Docket No. 176-9. UMMC medical reports state physicians performed an emergency craniotomy.[12] *Id.* However, Robinson never recovered and was pronounced dead at 6:33 P.M. on January 15, 2019. *Id.*

In response to plaintiffs' claims, the officers assert that the only injury Robinson suffered at their hands was a superficial abrasion, and his death did not result from their use of excessive force. Docket No. 175, at 14-15. The City of Jackson argues that Robinson's seizure and subsequent death did not result from the officer's use of excessive force and that all force used was reasonable. Docket No. 180, at 10-11. And, AMR says that nothing it did was the proximate cause of Robinson's death. Docket No. 177, at 19.

---

[11] A subdural hematoma is a collection of blood between the covering of the brain (dura) and the surface of the brain. *Subdural Hematoma*, MEDLINE PLUS, http:// www.nlm.nih.gov/medlineplus/ency/article/000713 htm (last visited July. 28, 2021).

[12] A craniotomy is "the surgical removal of part of the bone from the skull to expose the brain." *Craniotomy*, JOHNS HOPKINS MEDICINE, https://www hopkinsmedicine.org/health/treatment-tests-and-therapies/craniotomy (last visited July 28, 2021).

### B.      Plaintiffs' Account

Plaintiffs provide a different narrative of the events through the testimony of Ronald Arnold, Robinson's landlord. Plaintiffs' citation to the record is sparse, but it is apparent after reading Arnold's entire deposition that many of the purported facts that plaintiffs provide in their memorandum of authorities in support of their response come from that deposition. *Compare* Docket No. 182 at 1-2 *with* Docket No. 182-8. Plaintiffs also seek to buttress Arnold's testimony with the statements of others, but as will be explained below, those statements will not be considered.

Arnold informs us that several people were attending a barbecue that he was hosting on Jones Avenue. Docket No. 182-8, at 20-21. Robinson initially pulled up in his vehicle, but he left to go to the store and returned. *Id.* at 21. When he returned, two individuals attending the festivities went to help Robinson get out of his car because he had recently suffered a stroke. *Id.* at 22.

As Robinson parked, the police pulled up, jumped out, started tussling with him, and told him to get out of the vehicle. *Id.* at 22. Robinson said he was trying to get out and told the officers that he had suffered a stroke. *Id.* at 22. Fox then snatched him from the vehicle, picked him up, and slammed him to the ground. *Id.* at 23-24. Fox had his knee in Robinson's back and hit him multiple times. *Id.* at 25 and 34. In addition, the officers pulled their guns on him. *Id.* at 32. As all this was happening, Arnold asked why Robinson was being treated in this manner and asked how Robinson was resisting arrest. *Id.* at 25. "I ain't did nothing," Robinson shouted. *Id.* at 70. Arnold says he never saw Robinson do anything improper. *Id.* at 35.

Arnold describes Robinson's injuries somewhat differently from the officers' version. There was a "lot of blood." *Id.* at 71. There are other disagreements with the officers' testimony. Arnold says that Robinson did not engage in a hand-to-hand transaction with the unidentified

woman, and he also testifies that Robinson did not put anything in his mouth. *Id*. at 35-36. Although AMR came to check on Robinson, the EMTs did nothing for him. They did not even ask him questions, says Arnold. *Id*. at 29. But, Arnold acknowledged that Robinson drove from the scene under his own power. *Id*. at 54-55.

We learn more about plaintiffs' allegations and their claims by reviewing the pleadings and other submissions, including their briefs. Plaintiffs contend that Fox, Barney, and Lampley were engaged in "jump out" activities—a JPD policy in which squads of officers go to "hot spot areas" of the city, "jump out" of their cars, and detain ordinary citizens for field interviews—when they approached Robinson's car, and things unfolded as Arnold testified.

More information reveals why the plaintiffs have sued AMR. They claim that at approximately 7:43 P.M., JPD contacted AMR to provide care for Robinson. Docket No. 186 at 2. An AMR ambulance arrived on the scene at 7:55 P.M., but the police cancelled the request five minutes after arrival. *See* Docket No. 186-1 (AMR's Patient Care Report ("PCR") states, "NO PT CONTACT – CANC BY LAW ENFORCEMENT."). "AMR failed to treat Robinson due to the purported statement from a police officer who claimed that Robinson did not want treatment," plaintiffs contend. Docket No. 186 at 5.

Later that evening, AMR received a second call requesting medical assistance for Robinson who had collapsed at the Mustang Inn. Docket No. 186-3. According to a second PCR, Robinson had complained of a head injury. *Id*. Without citing to the record, plaintiffs say that Robinson suffered multiple contusions and fractured ribs. *See* Docket No. 182 at 4. Robinson died the next day. Mark LeVaughn, Chief Medical Examiner of the Mississippi State Medical Examiner's Office, produced a Report of Postmortem Examination which stated Robinson's cause of death as "Multiple Blunt Head Injury" and the manner of death as "Homicide." Docket No. 186-4.

6

This action followed. Plaintiffs Bettersten R. Wade and Vernice Robinson filed their Complaint in Hinds County Circuit Court alleging that officers Fox, Barney, and Lampley, in their individual and official capacities, violated Robinson's civil rights under the Fourth Amendment. Additionally, plaintiffs allege that the City of Jackson is liable based on its unconstitutional jump-out policy and failure to train and supervise its officers. Plaintiffs also bring state-law claims against the officers and the City of Jackson. Lastly, plaintiffs allege negligence and gross negligence claims also grounded in state law, against AMR, asserting it failed to respond appropriately to the initial emergency medical call.

Discovery is complete, and defendants now move to dismiss all claims. But first, defendants have filed an evidentiary motion concerning the admissibility of plaintiffs' summary-judgment evidence.

## II.    Discussion

### A.    Motion to Strike Plaintiffs' Exhibit A

Recall that plaintiffs submitted certain statements in opposition to the motions for summary judgment, but the JPD officers filed a motion to strike plaintiffs' Exhibit A. Because that motion impacts the evidence to be considered in ruling on the defendants' motions for summary judgment, the Court considers it first.

The officers argue that plaintiffs' Exhibit A, which consists of a summary of witness statements taken or recorded by Tyrone Lewis, an investigator for the plaintiffs, should be stricken for three reasons: (1) Lewis lacks personal knowledge of any of the facts that took place; (2) the Exhibit is inadmissible hearsay evidence; and (3) the Exhibit does not comport with 28 U.S.C. § 1746. Docket No. 194.

Plaintiffs respond that the exhibit is permissible under *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). They argue that *Celotex* stands for the proposition that this Court may consider materials in response to a motion for summary judgment even though they are not "in a form that would be admissible at trial." Docket No. 198 at 3 (quoting *Celotex Corp.*, 477 U.S. at 324).

Plaintiffs' argument is unavailing. In *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187 (5th Cir. 1991), the Fifth Circuit stated that "*Celotex* did not alter the settled law" for the proper standard for submitting evidence in opposition to a motion for summary judgment:

> Rule 56(e) requires the adversary to set forth facts that would be admissible in evidence at trial. Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless.

*Id.* at 192. In that case, the court concluded that a nonmoving party could not oppose a motion for summary judgment using unauthenticated documents. *Id.* If the party opposing summary judgment has evidence that is relevant, but that evidence has not been reduced to admissible form, the proper procedure is to request a continuance to permit affidavits or depositions to be obtained. *Id.* at 191. Absent a motion to continue, it is not "the district court's duty to examine whether and how [the admissible documents] might be reduced to acceptable form by the time of trial." *Id.*

With these principles in mind, the Court now turns to the merits of defendants' objections.

### 1.     Lewis Lacks Personal Knowledge

Federal Rule of Evidence 901(a) is a straightforward rule. It provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "To authenticate documents used to support a motion, a party must attach the documents as exhibits to an affidavit made by a person through whom the exhibits could be admitted into evidence at trial." *BP Expl. & Prod. Inc. v. Cashman Equip. Corp.*, No. H-13-3046,

2016 WL 1387907, at *2 (S.D. Tex. Apr. 8, 2016) (quoting *Orr v. Bank of America NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)). To authenticate by affidavit, an affiant must show that he has personal knowledge and "is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

After reviewing the exhibit, the Court agrees with the defendants. There is no indication that Lewis observed or was otherwise personally aware of the events that took place on January 13, 2019. Lewis's information consists of his summary of what purported eyewitnesses told him. This is not competent evidence. He would not be allowed to take the witness stand at trial and tell the jury what these witnesses told him. Nor could it be presented to a jury for their consideration. If plaintiffs wanted the Court to consider the testimony of these witnesses, they could have taken their depositions just as they did for the officers and Arnold. The witnesses would have been subjected to cross-examination. If the witnesses were unavailable for trial, that deposition testimony would then be competent evidence. *See* Fed. R Evid. 804(b)(1). In its current form, it is not.

For this reason, the Court will disregard the statements in Exhibit A.

### 2.    Lewis's Summary is Inadmissible Hearsay

As to defendants' hearsay objection, it is also well-taken. It is well-settled that hearsay evidence may not be considered at the summary judgment stage. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."). Hearsay evidence is evidence used to prove the truth of the matter asserted. Fed. R. Evid. 801. Thus, how the statement is used is determinative of whether it is hearsay.

The statements Lewis recorded are hearsay: they are out-of-court statements being offered for their truth—*i.e.*, not simply to prove that the Lewis did in fact prepare a summary of witness statements but rather that Lewis's summary of those witness statements is accurate and true.

Because these statements are hearsay, they are not admissible. "[T]he proponent of hearsay bears the burden of demonstrating that an exception to the hearsay rule applies." *Gomez v. Mi Cocina Ltd.*, No. 3:14-CV-2934-L, 2016 WL 11665867, at *3 (N.D. Tex. Aug. 22, 2016); *see also Broad. Music, Inc. v. Tex Border Mgmt., Inc.*, No. 3RU:10-CV-2524-BH, 2012 WL 4119111, at *4 (N.D. Tex. Sept. 18, 2012) (same). Here, plaintiffs have not argued that any hearsay exception applies to these statements.

Therefore, the Court finds that the statements in Exhibit A will not be considered.

### 3.      Lewis's Summary Violates 28 U.S.C. § 1746

Lastly, defendants object to Exhibit A because it does not comply with 28 U.S.C. § 1746, which requires that statements be subscribed "under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. An unsworn declaration may substitute for an affiant's oath when it complies with § 1746. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306–07 (5th Cir. 1988) (citations omitted). Statements that fail to comply with this requirement are inadmissible. *Rodrigues v. U.S. Bank Nat'l Ass'n*, No. 3:20-CV-291-D, 2021 WL 2717538, at *2 (N.D. Tex. July 1, 2021) (holding "[g]iven the explicit language of the statute" the declaration "must therefore be excluded from consideration" due to plaintiff's failure to comply with § 1746); *see also Nissho–Iwai American Corp*, 845 F.2d at 1305–06 & n.9 (5th Cir. 1988) (noting that an unsigned affidavit which failed to state that it was made under penalty of perjury was properly stricken from consideration of summary judgment).

Here, none of the statements in Lewis's summary are sworn, certified, or notarized, and none contain language similar to the form language of 28 U.S.C. § 1746. For this additional reason, these statements will not be considered.

The Court now turns to the defendants' motions for summary judgment.

### B.      Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Pointing to and setting forth these specific facts is the responsibility of the non-movant, and these facts must consist of more than "[c]onclusional allegations and denials, speculation, improbable inferences, [and] unsubstantiated assertions." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

1. **Federal Claims**

a. **Excessive Force Claims as to Fox, Barney, and Lampley**

Plaintiffs bring excessive force claims against Officers Fox, Barney, and Lampley in their individual capacities. The officers have invoked the defense of qualified immunity. The doctrine of qualified immunity shields police officers from civil liability when their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted).

At the summary judgment stage, courts engage in a two-prong inquiry to resolve questions of qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The first prong asks whether the facts, when viewed in the light most favorable to the party opposing summary judgment, show that the officer's conduct violated an individual's right either under a federal statute or the Constitution. *Id.*

The second prong then asks whether that federally-guaranteed right was clearly established. *Id.* at 656. In explaining this standard, the Fifth Circuit recently emphasized:

> To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The key purpose is to create fair warning, thus the clearly established prong can be satisfied despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.

*Terwilliger v. Reyna*, No. 19-50888, 2021 WL 2850052, at *7 (5th Cir. July 8, 2021) (citations and quotations omitted). But an official's conduct may also be so "obvious[ly]" illegal that no "body of relevant case law" is necessary. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

"The Fourth Amendment creates a right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 339–40 (5th Cir. 2017) (quotation marks omitted). This right is violated when a plaintiff suffers an "(1) injury, (2) which resulted directly and only from a use of force that was *clearly* excessive, and (3) the excessiveness of which was *clearly* unreasonable." *Id.* at 340 (emphasis added). "To gauge the objective reasonableness of the force, we must balance the amount of force used against the need of force." *Carnaby v. City of Houston*, 636 F.3d 183, 187-88 (5th Cir. 2011) (quotation marks and citation omitted). Excessiveness turns upon whether the degree of force used was reasonable in light of the totality of the circumstances of the incident. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citation omitted). Factors that the court should consider include: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Trammell*, 868 F.3d at 340 (quotation marks omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quotation marks and citation omitted). Whether the force used was objectively reasonable is a question of law for the Court to resolve. *Carnaby*, 636 F.3d at 188; *see Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

### i.    Constitutional Violation

Plaintiffs argue that Officers Fox, Barney, and Lampley used excessive force when they pulled Robinson from his vehicle and "thereafter brutally, viciously, and mercilessly beat Mr. Robinson by striking and kicking him." Docket No. 182 at 2. They claim that Robinson suffered severe brain injuries, which led to his death.

Viewing the facts in the light most favorable to the plaintiffs, the allegations regarding the amount of force used by the officers during their altercation with Robinson are sufficient to create genuine issues of material fact as to the objective reasonableness of the force used. According to Arnold's account, the officers aggressively pulled up, jumped out of their vehicles, and approached Robinson while he was sitting in the front seat of his car. Docket No. 182-8 at 14-24. Standing only about two yards away, Arnold states that Robinson did not engage in a drug transaction with an unknown woman. *Id*. at 32-33.

Fox told Robinson repeatedly to get out of his car, but Robinson was having difficulty getting out because he had recently suffered from a stroke. *Id*. at 32-33. As Robinson attempted to exit his vehicle, there was a tussle between the officers and Robinson. *Id.* at 22. The officers pulled Robinson out of his car and slammed him to the ground. *Id.* at 23-25. Fox placed his knee in Robinson's back and struck him repeatedly, says Arnold. *Id.* at 25. Also, Arnold testified that Robinson was bleeding badly and could barely stand when the ambulance arrived. *Id.* at 24, 25, 26-28, 71.

Under these facts, plaintiffs have established the presence of material factual disputes regarding the defendants' alleged use of excessive force in attempting to subdue Robinson. *See, e.g.*, *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 336 (5th Cir. 2020) (stating summary judgment not warranted where plaintiff's evidence, accepted as true and drawing all reasonable inferences in plaintiff's favor created an issue of fact whether the officer used excessive force); *Marcantel*, 567 F.3d at 169 (finding summary judgment inappropriate where parties' factual recitations differed regarding the amount of force used); *see also Adams v. May*, 903 F. Supp. 2d 433, 444 (S.D. Miss. Oct. 19, 2012) (same).

In sum, there is a genuine dispute in the record over whether the force deployed by defendants was provoked by Robinson's resistance, or, rather, was unprovoked altogether. Upon review of the exhibits and filings in the light most favorable to Robinson, this Court concludes that Robinson has demonstrated a genuine factual dispute about whether he was subject to a lawful stop and seizure or a malicious attack.

### ii.    Clearly Established Law

 The Court now turns to the second prong of the qualified-immunity analysis. As the Fifth Circuit has stressed, "the dispositive question in this step of the qualified-immunity analysis is 'whether the violative nature of *particular* conduct is clearly established.' Cases that are 'too factually distinct to speak clearly to the specific circumstances here' are not enough to deny qualified immunity." *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019).

Applying this rule, the Court concludes that plaintiffs have not carried their burden. Although this case involves troubling facts, plaintiffs have not identified any prior case suggesting (let alone holding) a constitutional violation under our present facts.[13] Indeed, plaintiffs' brief only addresses whether a constitutional violation occurred; it fails to address whether the defendants' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

As the Supreme Court has stated repeatedly, liability under § 1983 is not available unless an officer's "conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every 'reasonable official would have

---

[13] Plaintiffs' brief only vaguely cites to *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008) to support their excessive force claims. In that case, plaintiff allege that after "she ceased her resistance and both hands were cuffed, [the officer] placed his hand behind her neck and head and forced her face into the rear window of a nearby vehicle, injuring her jaw and breaking two of her teeth." *Bush*, 513 F.3d at 496. However, that factual scenario is not present here as both parties agree that Robinson had not been restrained when the JPD officers attempted to subdue him. Thus, the plaintiffs have failed to meet their burden that existing precedent at the time of Robinson's injury has placed the constitutional question beyond debate. *See Mullenix*, 136 S. Ct. at 308.

understood that what he is doing violates that right." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (citation omitted and quotation marks omitted). This standard is not satisfied here so the plaintiffs' claim must be dismissed.

The discussion around qualified immunity has been robust and illuminating. This Court has expressed its doubts about the constitutionality of the doctrine. *See generally Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020). Federal judges and legal academics from all corners have also levied strong criticism about its application, its usefulness, as well as its fundamental fairness.[14] Recently, Judge Willett of the Fifth Circuit asserted that the Supreme Court "has signaled a subtle, perhaps significant, shift regarding qualified immunity, pruning the doctrine's worst excesses." *Ramirez v. Guadarrama*, 2 F.4th 506, 516 (5th Cir. 2021) (Willett, J., dissenting from the denial of rehearing en banc).

These developments are important and may bring § 1983 back in line with its purpose and text. Nevertheless, these criticisms do not change this Court's current task. "The clearly-established prong remains an integral part of this doctrine." *Neal v. Hinds Cty., Miss.*, No. 3:18-CV-590-CWR-FKB, 2021 WL 1268382, at *5 (S.D. Miss. Apr. 6, 2021). Accordingly, the officers are entitled to qualified immunity.

### b. Bystander Liability

Next, plaintiffs bring claims for bystander liability against the JPD officers. However, the Court finds that these claims should be dismissed because plaintiffs have failed to make their *prima facie* case.

---

[14] *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring); *Mullenix v. Luna*, 577 U.S. 7 (2015) (Sotomayor, J., dissenting); Fred O. Smith, Jr., *Abstention in the Time of Ferguson*, 131 HARV. L. REV. 2283, 2305 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797, 1798-99 (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALI. L. REV. 45 (2018); Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 MICH. L. REV. 1405 (2019).

The Fifth Circuit recognizes bystander liability under § 1983 where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Randall v. Prince George's Cty.*, *Md.*, 302 F.3d 188, 204 n.24 (4th Cir. 2002).

Here, as noted above, plaintiffs have failed to show that any of the defendants violated Robinson's clearly established constitutional rights. Bystander liability requires that the defendants "*know* that a fellow officer is violating an individual's constitutional rights." *Hanna*, 726 F.3d 631, 646 (emphasis added). As plaintiffs failed to show that any of the defendants violated Robinson's constitutional rights, it follows that any other officer could not be aware of a violation. As such, plaintiffs' bystander liability claims fail.

### c. Official Capacity Claims Against JPD Officers

To the extent that plaintiffs sue the JPD officers for damages in their official capacity, a suit against a governmental agent or officer in his official capacity is a suit against the office the employee holds and not against the employee. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Court, therefore, turn to the claims against the City of Jackson.

### d. Municipal Liability

Plaintiffs assert *Monell* claims against the City of Jackson. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To prevail against a municipality, a plaintiff must show: (1) the city had a policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is the policy or custom. *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009); *see*

*also Monell*, 436 U.S. at 694. To state a cognizable failure-to-train claim, a plaintiff must plead facts plausibly demonstrating that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violations in question. *World Wide*, 591 F.3d at 756.

Plaintiffs articulate two theories of municipal liability: (1) a policy of using "jump out" squads to unlawfully detain, arrest, and harass the citizens of Jackson and (2) the failure to train and supervise its officers regarding the use of force. The Court will now address each theory in turn.

### i.    Jackson's Jump Out Policy

First, plaintiffs argue that the JPD jump-out policy is an unconstitutional violation of the Fourth Amendment. Specifically, plaintiffs argue that the "City of Jackson knew of, approved, and otherwise directed the use of 'jump out' squads to detain, harass, and question individuals located within a target area." Docket No. 182 at 10. Plaintiffs support this argument with a prior Order of this Court (although in an unrelated case) and a series of depositions of JPD officers and supervisors: Tarik Williams, Joseph Wade, and Timothy Bailey.

Viewing all inferences in the light most favorable to the nonmoving party, this Court accepts plaintiffs' evidence as true for purposes of ruling on the City's motion. Assuming *arguendo* that JPD's jump-out policy is unconstitutional, plaintiffs have provided no evidence that this policy was the "moving force" behind Robinson's constitutional injury. In other words, plaintiffs have not shown that Robinson's injuries were sustained *because of* the execution of the jump-out policy. *Bennet v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (en banc).

There is no dispute that the officers were in the neighborhood to gather information about the murder of Pastor Longino, which occurred that morning. Citizens in the neighborhood were aware of this fact. Indeed, Arnold, plaintiffs' eyewitness, spoke with JPD regarding the murder suspect's location on that day. *See* Docket No. 182-8.

Plaintiffs have failed to produce any evidence to the contrary. Even assuming Jones Avenue was a target neighborhood, the "municipal policy must be *affirmatively* linked to the constitutional violation." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (emphasis added). They have pointed to no evidence which shows that any of the citizens in the neighborhood were harassed or detained pursuant to this policy on the date in question. Plaintiffs merely speculate that the jump-out policy was the moving force behind Robinson's injuries. Speculation, however, is not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence."); *see also Oliver*, 276 F.3d at 744. For these reasons, plaintiffs' § 1983 claim against the City under this theory warrants dismissal.

### ii.    Failure to Train and Failure to Supervise

Next, plaintiffs argue that the City of Jackson is liable under § 1983 for failing to train and supervise its officers, thereby violating Robinson's constitutional rights. The City contends summary judgment is appropriate because plaintiffs have failed to produce evidence of widespread improper training or supervision.

Where a plaintiff alleges a failure to train or supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure

to train or supervise amounts to deliberate indifference." *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir.2005).

"To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *see also Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011) ("To establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program.") (cleaned up).

After reviewing the record, the Court finds that the plaintiffs have not met their burden. They have not provided any *evidence* that the City failed to train or adequately supervise its officers regarding the use of force. Likewise, plaintiffs have not demonstrated that the alleged failure to train or inadequate supervision was causally connected to Robinson's constitutional injury. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). And lastly, plaintiffs have failed to show that the City and its supervisors' alleged failure to train and lack of supervision amounted to deliberate indifference to Robinson's constitutional rights. Therefore, summary judgment should be granted in favor of the City.

### 2.    State Law Claims

Plaintiffs also bring several state-law claims against the JPD officers, the City of Jackson, and AMR. The Court's jurisdiction arises from plaintiffs' federal-law claims, with supplemental jurisdiction over the state-law claims authorized by 28 U.S.C. § 1367.[15] Because the plaintiffs'

---

[15] *See* Docket No. 1. The only claims brought against AMR are grounded in state law. AMR has also filed a motion for summary judgment [Docket No. 176], but those claims are remanded to the state court.

federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over their state-law claims. *See Senu-Oke v. Jackson State Univ.,* 521 F. Supp. 2d 551, 561 (S.D. Miss. 2007); *see also Pitts v. City of Madison,* No. 3:15-CV-892-CWR-LRA, 2018 WL 1075729, at *2 (S.D. Miss. Feb. 27, 2018). Plaintiffs' remaining state law claims are remanded to the Circuit Court of Hinds County from which this case was removed.

### III.    Conclusion

For the reasons stated above, the Court grants the defendants' motion to strike. As to their motions for summary judgment regarding the federal claims, the motions are granted, and plaintiffs' federal claims are dismissed with prejudice. The Court, however, declines to exercise supplemental jurisdiction over the plaintiffs' state law claims. The state law claims are remanded to the Circuit Court of Hinds County, First Judicial District. The Clerk is directed to remand this matter to the Hinds County Circuit Court. A separate Final Judgment shall issue this day.

**SO ORDERED**, this the 2nd day of August, 2021.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE